# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Brandon Leon Basham, | ) | CR No.:  4:02-992-JFA |
| | ) | C/A No.  4:11-70079-JFA |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ORDER DENYING PETITION FOR |
| | ) | RELIEF UNDER 28 U.S.C. § 2255 |
| United States of America, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

INTRODUCTION

A South Carolina federal jury sentenced Brandon Basham to death for the 2002 carjacking and kidnapping resulting in the death of Alice Donovan.  After an unsuccessful appeal to the United States Court of Appeals for the Fourth Circuit, *United States v. Basham*, 561 F.3d 302 (4th Cir. 2009), and the United States Supreme Court,  *Basham v. United States*, 130 S. Ct. 3353 (2010), Basham returns to this court with a petition pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his federal death sentence.

Contending that his trial counsel were constitutionally ineffective in a variety of ways and that other violations of his constitutional rights render his death sentence infirm, Basham asserts thirty-two claims in his § 2255 petition, as amended.[1]  Because the court finds no merit to any of the grounds of error asserted, the petition is denied.

_____

[1] The petition originally listed thirty-four claims.  Prior to the evidentiary hearing, Basham's counsel wrote to the court and formally withdrew two of the claims (Claim 8 and Claim 31).  Due to the fact that the original petition filed on May 31, 2011 (ECF No. 1393) contained an error in the signature block, an amended petition was filed the next day on June 1, 2011 (ECF No. 1394).  For simplicity, any reference to "the Petition" in this order shall be deemed to refer to the amended petition, ECF No. 1394.  Likewise, any reference to "the Reply" shall be deemed to refer to the petitioner's reply to the government's response in opposition, ECF No. 1465.  Citations to the petition and to the reply shall be designated as "Pet. at [page(s)]" and "Reply at [page(s)]," respectively.

1

PROCEDURAL HISTORY OF THE UNDERLYING CRIMINAL CASE

*Facts Relating to the Criminal Acts*

The Fourth Circuit Court of Appeals set out at length the facts surrounding the abduction, rape, and murder of Alice Donovan in Basham's direct appeal of this case. The court hereby incorporates the following facts in this order:

In 2002, Basham, a lifelong Kentucky resident, was serving the final years of a felony forgery conviction sentence at the Hopkins County Detention Center in Kentucky. In October of that year, Chadrick Evan Fulks became Basham's new cell-mate. In early November, Fulks was charged with an additional (and serious) state offense, first degree abuse of a child aged twelve years or younger. On November 4, 2002, Basham and Fulks escaped the detention center together by scaling a wall in the recreation area and leaving the area on foot.

By the evening of November 5, Basham and Fulks reached the home of James Hawkins in nearby Hanson, Kentucky. Basham approached the dwelling, knocked on the door, and asked to use the telephone. Basham told Hawkins that his car had broken down and, after Basham made two calls, Hawkins agreed to drive him to a nearby convenience store. When Basham and Hawkins left the residence, Fulks joined them and the three men left in Hawkins's truck. The two men then told Hawkins that their vehicle was disabled in Robards, Kentucky, and they asked for a ride. During the drive, Fulks told Hawkins that the disabled vehicle was actually in Indiana and directed Hawkins to drive there. Fulks later changed the directions again; by this point, Basham was pointing a knife at Hawkins to keep him driving to their preferred destination. At some point, Fulks took the wheel, drove the truck into a field, and ordered Basham to tie Hawkins to a tree. Fulks became dissatisfied with Basham's speed in tying and eventually completed the job himself. They left Hawkins clothed in shorts, flip-flops, and a short-sleeved vest. Fifteen hours later, Hawkins freed himself and flagged a passing motorist. When interviewed by police officers later that day, Hawkins identified Basham and Fulks as the individuals who kidnapped him.

After abandoning Hawkins, Fulks and Basham drove to Portage, Indiana, to visit one of Fulks's former girlfriends, Tina Severance.[2] They

---

[2]  Tina Severance and Fulks met while Fulks was imprisoned in Indiana.  Severance worked as a correctional officer at the facility where he served his sentence.

2

abandoned Hawkins's vehicle at a hotel and walked to a trailer shared by Severance and her friend Andrea Roddy. The four then drove to a hotel in northern Indiana and stayed there for the next few days. At some point, Basham and Roddy began a consensual sexual relationship.

During their time in Indiana, Fulks asked Severance if she knew anyone from whom he could obtain firearms. Severance informed Fulks that a friend of hers, Robert Talsma, kept several firearms at his home; Severance and Roddy thereafter agreed to lure Talsma out of his house by offering to buy him breakfast. While Talsma was at breakfast with the women, Basham and Fulks entered Talsma's home and stole four firearms, a ring, and several blank checks. They then reunited with Severance and Roddy, and the four traveled in Severance's van to Sturgis, Michigan. That night, November 8, Basham and Roddy stayed at a hotel in Sturgis while Fulks and Severance drove to Goshen, Indiana, to smoke marijuana and methamphetamines with Fulks's brother, Ronnie Fulks.

That evening, two police officers began knocking on doors at the hotel where Basham and Roddy were staying in Sturgis. Basham opened his room door, saw the officers, closed the door, and cocked a .22 caliber revolver that he had stolen from Talsma. The officers ended up leaving before reaching Basham's door. Basham told Roddy, however, "I was about to shoot me a mother-f* * *er cop right. I was going to blow the f* * *ing cop away." The next morning, November 9, Basham and Roddy drove to a local Kmart to purchase sundries. Basham met a group of teenagers in the parking lot, and he reported to Roddy that they had some money and he wanted to kill them for it. After purchasing sundries with some of Talsma's stolen checks, Basham invited the teenagers back to the hotel room. Severance and Fulks arrived back at the hotel shortly thereafter, and the teenagers left. Fulks, Basham, Severance, and Roddy then drove Severance's van to the home of Fulks's brother, Ronnie Fulks, in Goshen, Indiana.

On November 10, 2002, the group of four drove to Piketon, Ohio, in Severance's van. Basham again used Talsma's checks to buy sundries, which Roddy later returned for cash. Basham and Fulks also bought two sets of camouflage clothing and Fulks stole a purse and cell phone from a Wal–Mart parking lot. On November 11, they drove to Kenova, West Virginia, near Huntington, and rented a hotel room. Fulks and Basham, wearing their sets of camouflage clothing, left the hotel room by themselves and did not return until the morning hours of November 12.

3

Samantha Burns, a nineteen-year-old Marshall University student, worked at the J.C. Penney's store in the Huntington Mall. In addition, Burns also participated in a school fundraiser by selling candy boxes, which she kept in her car. On November 11, Burns met her aunt at Penney's to purchase clothing for one of Burns's nieces; they parked in separate locations at the mall. At 9:46 p.m. that evening, Burns called her mother to say she was staying at a friend's house that night. Burns has never been seen since.

During the early morning hours of November 12, 2002, a local fire department responded to a reported explosion and fire at a rural area three miles outside of Huntington. The responding firemen found a car later identified as belonging to Burns burned out at a cemetery.

Meanwhile, Fulks and Basham returned to the hotel carrying muddy clothing, and Fulks indicated that they had stolen some money. Later that morning, the group of four checked out of the motel and drove to South Carolina, where Fulks had lived for several years in the 1990s. Several facts emerged linking Basham and Fulks to Burns's disappearance. Roddy and Severance reported seeing mud, as well as one of Burns's candy boxes, in the van. In addition, Basham began wearing a heart-shaped ring around his neck that belonged to Samantha Burns. Basham told the women that he had stolen the candy from a girl selling it and that he had stolen the ring from a car. Roddy also found Burns's photo ID discarded with other items linking Burns to Fulks and Basham. Moreover, it was later revealed that Fulks used Burns's ATM card twice on the evening of November 11 at local banks.

The evening of November 12, Fulks, Basham, Severance and Roddy arrived at a motel in Little River, South Carolina. The next day was a day of relative rest; Fulks and Basham stole several purses and wallets from unattended vehicles, went shopping, and then returned to the motel room to smoke marijuana, drink, and play cards. On November 14, the four moved to a motel in Myrtle Beach, South Carolina. Fulks and Basham left the women and drove to nearby Conway, South Carolina. Hoping to steal firearms, Fulks and Basham burglarized the Conway home of Sam Jordan. Carl Jordan, Sam's father, drove up to the home as Fulks and Basham were leaving. Fulks attempted to ram Jordan's car with Severance's van but stopped short; Basham exited the house and fired a shot at a nearby greenhouse. Fulks then fired a shot that shattered the back-window of Jordan's car. Jordan fled the area, with Fulks and Basham in pursuit, still firing. At some point, Fulks and Basham ceased their chase, abandoned Severance's van, and stole a truck, which they drove to the Wal–Mart in Conway.

4

Upon arriving at the Wal–Mart, Basham approached a blue BMW sedan driven by forty-four year old Alice Donovan. Basham entered the car and forced Donovan to drive to the back of the parking lot, where Fulks waited. There, Fulks entered the driver's side of the car and drove away; at 4:03 p.m., Fulks used Donovan's ATM card to purchase gas from a service station in Shallote, North Carolina. At 4:30 p.m., Donovan called her daughter to say she was shopping and would be home late. Later that day, several men at the Bee Tree Farms Hunt Club in Winnabow, North Carolina, saw two men and a woman in a blue BMW drive to the end of a road by the lodge, turn around, and leave the area. Donovan, like Burns, was never seen again.

Basham and Fulks returned to their Myrtle Beach motel later that day and told Severance and Roddy they had to leave town because Basham shot at some police officers and Severance's van had been seized. Basham and Fulks took Donovan's BMW and began driving to West Virginia, leaving Severance and Roddy behind in Myrtle Beach. Donovan's ATM card was used in Little River, Myrtle Beach, and Raleigh, North Carolina. Meanwhile, Severance filed a (false) police report alleging that her van had been stolen.

On November 15, 2002, Fulks and Basham arrived at the home of Beth McGuffin near Huntington, West Virginia. McGuffin, a childhood friend of Fulks, agreed to let Fulks and Basham stay at her home. Fulks introduced Basham to her as "Tommy Blake." Later on November 15, Fulks and Basham purchased crack cocaine to share. Basham and McGuffin also began a sexual relationship and had sexual intercourse three times over the next several days. Basham also gave McGuffin Burns's heart-shaped ring. On November 16, the three watched a news story about the disappearance of Samantha Burns. When McGuffin remarked that Burns was likely dead, Fulks stated, "[s]he is dead."

At the same time, the Federal Bureau of Investigation ("FBI") was investigating the kidnapping of James Hawkins, which it believed Basham and Fulks had committed after escaping from prison. The FBI learned that the two men might be in Myrtle Beach, South Carolina, and that Severance had reported her van stolen. On November 16, the FBI and local authorities interviewed Severance and learned that Basham and Fulks had left the area. The FBI also became aware of the disappearance of Alice Donovan and suspected that Fulks and Basham might be involved.

On Sunday, November 17, Fulks, Basham, and McGuffin smoked marijuana before Fulks and Basham left McGuffin's house, telling her they were headed to Arizona. Instead, they stopped at the Ashland Mall in Ashland, Kentucky, about 20 minutes from Huntington. Sometime that evening, in a Wal–Mart parking lot, Basham approached Deanna Francis's fifteen-year-old

daughter as she entered the passenger side of their vehicle. Basham pointed a gun into the teenager's side, attempted to enter the car, and asked for directions to Greenville, Kentucky. When Basham realized Deanna's daughter was talking on her cell phone, he said "[M]y bad, I didn't mean to scare you" and walked away.  Deanna immediately called the police.

Ashland Police Officer Matt Davis was approximately four blocks from the Ashland Mall when he heard the dispatch about the attempted carjacking. Davis drove to the mall, where he saw Basham, who met the description of the suspected carjacker. Davis exited his patrol vehicle and approached Basham; Basham immediately began to flee. As Davis chased Basham through the mall area, Basham drew his weapon and fired a shot in the air. As the chase continued, Basham drew his weapon a second time, turned, and fired at Davis, who fired three shots of his own in return. Basham eventually made his way to a rail yard on the banks of the Ohio River where he hid. Davis radioed reinforcements, which surrounded the area. More than an hour later, at approximately 9:00 p.m., Basham surrendered to police, identifying himself as "Josh Rittman." Police recovered a knife—later identified as belonging to Alice Donovan—and a crack cocaine pipe on Basham's person. Basham's pistol was recovered from a rail car several days later.

Fulks returned to McGuffin's home that evening and watched a news report on Basham's arrest. The morning of November 18, Fulks left McGuffin's residence to drive Donovan's BMW to his brother's house in Goshen, Indiana. Fulks stopped at a rest area, where an Ohio state trooper, who had ascertained that the BMW was stolen, approached him; a high-speed chase then ensued at speeds in excess of 130 miles per hour. During this chase, Fulks nearly struck another trooper before managing to evade capture. Fulks eventually arrived at his brother's home in the early morning hours of November 20. Police officers were staking out Ronnie's home, however, and when Fulks, his brother Ronnie, and Ronnie's girlfriend drove to a barn to hide the BMW, Fulks was arrested. Fulks's semen and the bodily fluids from an unidentified female were later found in the back seat of the BMW.

Back in West Virginia, investigators determined that "Josh Rittman" was actually Basham, and that he was a recent prison escapee. At 2:00 a.m. on November 19, Basham was interviewed for the first time. Basham first told investigators that he and Fulks had escaped from prison and committed several crimes along the way. Later, he admitted that they had traveled to South Carolina and kidnapped a woman in Conway, South Carolina. Basham, however, insisted that the woman was alive and with Fulks.

6

At 9:45 a.m. on November 19, investigators re-interviewed Basham. Basham told investigators that he and Fulks kidnapped a man after escaping from prison, and carried firearms when kidnapping Donovan. He further told investigators that they used her credit cards to obtain cash, that they had driven Donovan to Ashland, Kentucky, and that Fulks was waiting for Basham when Basham was caught. This time, Basham said he thought Donovan was dead because she was not with Basham and Fulks at the Ashland Mall. During this interview, Basham also told investigators that Fulks "got a girl" in West Virginia as well.

On November 20, FBI agents interviewed Basham for seven hours. On this occasion, Basham told investigators that after they kidnapped Donovan, Fulks dropped Basham off at the hotel, drove Donovan to a resort area, raped her, tied her up, and left her. Basham also claimed that Fulks was the one who actually carjacked Donovan. Basham also clarified that when he said Fulks "got a girl" in West Virginia, that he meant they had stolen a girl's credit cards, not that they had kidnapped anyone else. At this point, investigators believed Donovan may have been still alive. Basham drew a map of the places Fulks and Basham had been with Donovan. This map roughly corresponded with the Savannah Bluff area of Horry County, South Carolina. A two-day search of the area, however, left investigators no closer to discovering Donovan's fate.

On November 25, Basham, now represented by counsel, agreed to further aid investigators in finding Donovan's body. He drew a map, mentioned passing through a cemetery, and informed investigators that Donovan's body was left covered but unburied in the woods. Basham was unable to identify any specific landmarks to aid investigators.

On November 26, through counsel, Basham informed investigators that Samantha Burns was dead and that he and Fulks had rolled her body down an embankment and into the Guyandotte River near Huntington.

Two days later, on November 28, FBI and state investigators organized a search team to search Brunswick County, North Carolina, for Donovan's body. Basham, now represented by Cameron B. Littlejohn, Jr. and William H. Monckton, VI, accompanied the agents. During the ride, Basham saw a deer and said, "I never could kill a deer and here I have," but was cut off before finishing his sentence. Later that day, Basham told the investigators that he and Fulks had driven past a park, taken Donovan's body out of the car, dragged it into the woods, and covered it. On two occasions, Basham became emotional as he identified landmarks where he and Fulks had taken Donovan. Later, Basham told the investigators he had thrown out a Liz Claiborne purse

7

strap at the Bee Tree Farms Cemetery. When they arrived, the local sheriff asked, "Is this where it happened?" Basham responded, "This is it. It is." The cemetery was searched to no avail. To date, Donovan's remains have not been identified.[3]

Starting in late November 2002, while in jail awaiting trial, Basham began writing letters to McGuffin, telling her his real name, claiming that he loved her, that he had not "hurt that girl from South Carolina," and that Fulks was responsible for their crime spree. On this last point, Basham wrote that Fulks "lied to me" and "told me he had all kinds of money, and a new car, and all of this stuff just waiting on him, and all he needed me to do was to show him the way away from the jail because I was raised in that area." Basham was not entirely forthright with McGuffin, however, as he also wrote that Burns's ring, which he had given to McGuffin, was "not stolen or anything like that." Basham also confided that he "did a lot of bad s* *t with [Fulks]."

On December 24, 2002, Basham called a former middle-school teacher in Madisonville, Kentucky, Clifford Jay. When Jay asked whether Basham had killed Alice Donovan, Basham replied, "Yes, Sir. We killed them." Jay was surprised by the use of the term "them," because he had only heard about the Donovan killing.

*Basham*, 561 F.3d at 309–14 (citations omitted).

*The Criminal Indictment and Notice to Seek the Death Penalty*

Fulks and Basham were indicted in the District of South Carolina on December 17, 2002. The Grand Jury returned a Superseding Indictment on April 23, 2003, charging Fulks and Basham with eight separate offenses and setting forth special findings supporting the imposition of the Death Penalty on the first two Counts: (1) carjacking resulting in Alice Donovan's death, 18 U.S.C. § 2119; and (2) kidnapping resulting in Alice Donovan's death, 18 U.S.C. § 3571.

---

[3] Subsequent to the direct appeal in this case, Donovan's remains were located in Horry County, South Carolina, at least twenty miles from the Brunswick County, North Carolina area where Basham had directed authorities to look.

The notice of intent to seek the death penalty was filed on September 13, 2003, pursuant to 18 U.S.C. § 3593(a) and the Federal Death Penalty Act (FDPA).[4]

*Appointment of Defense Counsel*

Pursuant to the FDPA, a Magistrate Judge of this court initially appointed two attorneys to represent Basham: Cameron B. Littlejohn and William H. Monckton.

Literally from the hour they were appointed to represent Basham, Littlejohn and Monckton were called upon to become deeply involved in the case, because Basham had already given statements, after being Mirandized and under the advice of counsel, to law enforcement officials after being apprehended in Kentucky, essentially admitting to his participation in the carjacking and kidnapping of Alice Donovan. Additionally, Basham had agreed to assist authorities in South Carolina in searching for Donovan, acting on the slim hope that she might still be alive or, at the very least, that her remains could be located. The location of Donovan's remains could conceivably have helped Basham avoid the death penalty.

To this end, arrangements were made to have Basham transported to Horry County, South Carolina, early in the morning of Thanksgiving Day, November 28, 2002. Basham, accompanied by Littlejohn and Monckton, and at least six law enforcement officers, including an investigator from the Federal Bureau of Investigation, traveled the back roads of Brunswick County, North Carolina, in a vain effort to locate the place where Basham and Fulks had left Alice Donovan. Approximately twenty local volunteers joined the effort.

---

[4] The Federal Death Penalty Act of 1994 was enacted as Title VI of the Violent Crime Control and Law Enforcement Act of 1994 and became effective on September 13, 1994. *See* Pub. L. No. 103–322, Title VI, §§ 60001-26, Sept. 13, 1994, 108 Stat. 1959 (codified at 18 U.S.C. § 3591– 98).

During the search and in the presence of his attorneys, Basham made several inculpatory statements. Specifically, at one juncture, Basham stated, "You know I have never even killed a deer and here I have . . . ." Basham never finished the sentence because Littlejohn, who was seated beside Basham in the police van, put his hand on Basham's knee and indicated that he should stop talking.

At another point, while still in the van and in the presence of his attorneys, Basham, with the express permission of his attorneys, made reference to a strap that was used to strangle Alice Donovan. Later during the search for the purse strap, Basham apparently walked off with Sheriff Ronald Hewett (who, at that time, was the Sheriff of Brunswick County, North Carolina) and two additional law enforcement officers. During that sojourn, Basham made a statement to Hewett about the purse strap that had been used to strangle Donovan. This statement, as well as other statements about the purse strap, is the subject of much debate in this case and forms the basis for several of the claims asserted in this § 2255 proceeding. The statement will be discussed in more detail as the claims are analyzed by the court, but at this point it should suffice to say that Basham demonstrated to Sheriff Hewett how Alice Donovan "was strangled" and then Basham demonstrated to Sheriff Hewett how he (Basham) threw the strap into the woods.

The search for Donovan, which began at sunrise and lasted until the early part of the afternoon, was eventually called off. Donovan's remains were not located until 2010—after the trial and direct appeals of both Basham and Fulks.

During the preliminary stages of the criminal case, the government filed a motion with the court suggesting that the court conduct an investigation as to whether Littlejohn and

10

Monckton should continue to represent Basham, because Littlejohn made certain statements during the search, albeit on a "hypothetical" basis, which might cause Littlejohn to become a witness in the case or otherwise have a conflict of interest that would prevent his effective representation of Basham.

This court also appointed two respected ethics experts as the court's expert witnesses on the disqualification issue:  University of South Carolina Law School Dean Robert M. Wilcox and criminal defense attorney John F. Hardaway.  Littlejohn and Monckton thereupon retained two more legal ethics experts (Professor John P. Freeman and attorney Morgan Martin) to represent them in the case, and then persuaded the court to appoint yet another attorney (Michael O'Connell) as an expert on death penalty litigation issues.

In an unprecedented move for this court, the court thus convened a hearing with seven lawyers (Littlejohn, Monckton, Hardaway, Wilcox, Freeman, Martin, and O'Connell) on the question of whether Littlejohn and Monckton should continue their representation in the case.  At the conclusion of the hearing, the court determined that it would disqualify Littlejohn and Monckton and appoint new counsel.  The reasons for the disqualification are set out in this court's order dated April 9, 2003.  *See* ECF No. 69.

The court then appointed Columbia, South Carolina attorneys Jack B. Swerling and Gregory P. Harris to represent Basham and directed that Littlejohn and Monckton cooperate in turning over their files and otherwise assisting in the transition to new counsel.

Jack Swerling is widely regarded as one of the preeminent criminal defense lawyers in South Carolina.  Admitted to the South Carolina Bar in 1973, he has participated in hundreds of criminal trials in the federal and state courts of South Carolina, including, by his

11

estimate, 150 to 200 homicide cases, four of which involved the death penalty.  He stated that, at any given time, he usually found himself working on three to four murder cases.  His peers have elected him to membership in the American College of Trial Lawyers, the American Academy of Appellate Lawyers, the American Board of Criminal Lawyers, and the International Academy of Trial Lawyers.  He has written several books on criminal practice, and the South Carolina Supreme Court has called upon him to provide leadership in a number of bar-related areas, including service as a member of the Chief Justice's Commission on the Profession of Law, the Bar Board of Commissioners on Grievance and Discipline, and the Board of Bar Examiners.  He has served as an adjunct professor at the University of South Carolina School of Law and also at the University of South Carolina School of Medicine, Department of Neuropsychiatry.  Since 1990, he has served as coordinator and moderator of the South Carolina Bar's Bridge the Gap program for young lawyers entering the profession.

Gregory Harris, an attorney who at the time shared office space with Swerling, also enjoys a reputation as an excellent criminal defense attorney.  After completing law school in 1986, he served as a law clerk for a state trial judge and then began his career in the courtroom as an assistant solicitor (prosecuting attorney) in the state court system. He moved from there to the U.S. Attorneys' Office where he served as a federal prosecutor for several years, rising to the position of deputy chief of the criminal division.  After nearly five years as a federal prosecutor, he left the United States Attorneys' Office to open his own practice, specializing in criminal defense.  Like Swerling, Harris has tried numerous cases in the federal and state courts of South Carolina.

During this court's twenty-six years on the trial court bench, the court has had numerous opportunities to observe both Swerling and Harris in a variety of criminal case settings. Suffice it to say that in selecting Swerling and Harris to assume responsibility of representing a capital murder defendant, the court endeavored to obtain the best possible legal representation in South Carolina for the defendant.

### The Jackson v. Denno Hearing

In late February 2004, the court held a three-day hearing on the motion by both Basham and Fulks to suppress certain statements made by them. Following the hearing, the court entered two orders: one denying the suppression motion with respect to most of Basham's statements (ECF No. 335), and another granting the motion to suppress the hypothetical statement made by Littlejohn (ECF No. 691 at 4–5).

### Severance of the Trial

Both defendants filed motions for separate trials, and following a hearing, the court ultimately determined that it was necessary to sever the trial of Basham and Fulks.[5] (ECF No. 292). Fulks's trial was scheduled first, with jury selection commencing on May 10, 2004. Fulks elected to plead guilty to all charges of the superseding indictment and proceed directly to the penalty phase of the death penalty component of the case. Following a trial that lasted five weeks, the jury imposed the death penalty on both Counts 1 and 2 against Fulks. The court entered a sentence of 744 months imprisonment on the remaining six

---

[5] The defendants urged that the court had a constitutional obligation to order separate trials for the two defendants, even though they were indicted together and allegedly worked together throughout their seventeen-day crime spree, because, among other things, the defendants had inconsistent defenses. Ultimately, neither Fulks nor Basham presented a guilt phase defense at their separate trials.

13

counts.

Basham's case was scheduled to be tried in the Fall of the same year as Fulks's case. Unlike Fulks, Basham did not plead guilty to any of the counts of the superseding indictment and so the court conducted both a guilt phase and a penalty phase trial. Jury selection began on August 30, 2004, and lasted nine days. Following a three-week trial, the jury convicted Basham on all counts. During the trial, Swerling conceded that Basham was guilty of Count 2, and, in regard to Count 1, indicated that the jury "probably" would be going to a penalty phase on that count as well. After the jury found Basham guilty on all counts, the court conducted the penalty phase, which consumed an additional four weeks. Following deliberations in the penalty phase, the jury imposed the death penalty on both Counts 1 and 2 against Basham. The court imposed a sentence of 744 months imprisonment on the remaining six counts.

### *Direct Appeal of Basham's Conviction*

Basham thereafter appealed to the United States Court of Appeals for the Fourth Circuit, raising six issues.[6] Although Jack Swerling was appointed appellate counsel, the Fourth Circuit granted his motion to withdraw and appointed Timothy J. Sullivan in his place. Attorney Melissa Meister of the firm of Jenner & Block was also added as appellate counsel. These attorneys were assisted by eight additional attorneys from the Jenner & Block firm, each of whom contributed to the preparation of the appellate brief. Basham thus had

---

[6] The six contentions of error Basham raised on direct appeal included claims of (1) juror misconduct; (2) disqualification of appointed counsel; (3) improper admission of evidence during the guilt phase of the trial; (4) improper admission of evidence during the penalty phase of the trial; (5) error in the jury instructions regarding mitigation factors; and (6) whether the death sentence was imposed under an improper influence.

14

ten appellate attorneys working on his behalf for the appeal.

On March 30, 2009, the Fourth Circuit issued its decision rejecting all grounds for appeal and affirming the sentence of death on both Counts 1 and 2. *Basham*, 561 F.3d 302. Basham then petitioned the United States Supreme Court for a writ of certiorari. The Supreme Court denied the petition on June 1, 2010. *Basham v. United States*, 130 S. Ct. 3353 (2010).

*Appointment of Counsel for the §2255 Petition*

On September 19, 2009, the court appointed Assistant Federal Public Defender Jon M. Sands of the Arizona Federal Public Defender's Capital Litigation Unit, and Charlotte, North Carolina attorney Julia Mimms to represent Basham on his yet-to-be-filed § 2255 petition. The court noted that the appointment would take effect if and when the petition for a writ of certiorari was denied in the Supreme Court. As noted above, the Supreme Court denied the petition for a writ on June 1, 2010. *Id.*

*28 U.S.C. § 2255*

Section 2255 provides federal prisoners with the statutory vehicle for collaterally challenging the lawfulness of their convictions. That section states in relevant part as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.
>
> * * *

15

> If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

28 U.S.C. § 2255.

As a general rule, relief under § 2255 is limited to errors which were jurisdictional, rose to the level of a constitutional violation, resulted in a "complete miscarriage of justice," or led to proceedings which were "inconsistent with the rudimentary demands of fair procedure." *United States v. Timmreck*, 441 U.S. 780, 783–84 (1979) (citing *Hill v. United States*, 368 U.S. 424 (1962)).

### *Basham's § 2255 Petition*

Basham's § 2255 petition was filed on June 1, 2011, just before the one-year statutory deadline established by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, 28 U.S.C. § 2255(f). All of the thirty-two claims filed in the initial petition as supplemented by the pleading filed on March 2, 2012, ECF No. 1465, are timely under the one-year statute of limitations.[7]

 Shortly before the § 2255 petition was filed, Basham filed a *pro se* "Waiver of any and all proceedings pursuant to 28 U.S.C. § 2255." The court held a status conference on June 29, 2011 and appointed a forensic psychiatrist, Dr. George Parker of Indianapolis, Indiana, to evaluate the defendant regarding his motion to withdraw his appeal and proceed with execution.

---

[7] As will be seen, some of the claims are barred for procedural, but not timeliness, reasons.

16

Dr. Parker visited with Basham on two occasions and rendered a written report that Basham was competent to make a decision to drop his appeals. Before the court could conduct a hearing on the *pro se* motion, Basham's § 2255 counsel lodged a number of procedural objections. Basham ultimately proved to be equivocal on the question of whether he wished to drop his appeal. At one point, Basham suggested that he would drop the appeal and proceed to execution if the court would intervene and allow his family to visit with him and direct the Bureau of Prisons to administer certain medications to him. Ultimately, this court entered an order in which it deemed Basham to have withdrawn his request to drop his appeal and the issue did not arise again.

### *The Interlocutory Appeal on Production of Attorney Records*

In an order dated April 4, 2012, this court granted the government's motion for access to all of the case-related files of trial counsel Swerling and Harris as well as to interview former counsel. ECF No. 1496. Basham opposed the ruling, and requested an immediate stay of that order so that he could take an interlocutory appeal of this court's action. By order dated April 10, 2012, this court allowed a limited stay of its April 4, 2012 order, with the stay to expire on June 11, 2012. ECF No. 1504.

The Fourth Circuit dismissed the interlocutory appeal, and its mandate was entered on May 30, 2012. Counsel for Basham and the government then interviewed both Swerling and Harris and reviewed all of their files.

### *Necessity for an Evidentiary Hearing*

"If [a § 2255] motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted . . . to determine

17

whether an evidentiary hearing is warranted." Rule 8, Rules Governing Section 2255 Proceedings for the United States District Courts.

"Section 2255 of Title 28 U.S.C. provides that unless the record conclusively shows that the prisoner is entitled to no relief, the district court should conduct an evidentiary hearing and state its findings and conclusions." *United States v. Young*, 644 F.2d 1008, 1013 (4th Cir. 1981). "A hearing is required when a movant presents a colorable Sixth Amendment claim showing disputed material facts and a credibility determination is necessary to resolve the issue." *United States v. Coon*, 205 Fed. Appx. 972, 973 (4th Cir. 2006) (citing *United States v. Witherspoon*, 231 F.3d 923, 925–27 (4th Cir. 2000)). Finding that some issues presented in the § 2255 petition contained a few disputes as to material facts, this court held an evidentiary hearing on the matter.

### *The § 2255 Evidentiary Hearing*

After the noted procedural delays, the court commenced the § 2255 evidentiary hearing on October 9, 2012. Arrangements were made to allow Basham to participate in the hearing via satellite from his place of incarceration, the Federal Correctional Institution in Terre Haute, Indiana. Basham was able to view the witnesses, the court, and the attorneys in real-time video conference, and was also provided a private telephone line through which he could conduct confidential communications with his counsel as the evidentiary hearing progressed. An attorney associated with Basham's § 2255 counsel was also present in the room with Basham for consultation and to ensure communication with counsel in the courtroom.

Unfortunately, as the court adjourned for the lunch break on the first day of the evidentiary hearing, Basham became involved in a scuffle with the security officers attending to him and it was reported to the court that Basham had injured two officers and bit a third officer.  The court then adjourned the hearing for the rest of the day, and commissioned Dr. Parker[8] to examine Basham for purposes of determining whether he was competent to proceed with the evidentiary hearing.

The following day, after examining Basham in person at Terre Haute, Dr. Parker rendered an opinion that Basham was competent to go forward with the hearing.  The court and attorneys for both the government and the defendant all questioned Dr. Parker.

Basham then offered the testimony of Dr. Thomas Hyde, a behavioral neurologist who had theretofore been unavailable to testify as to competency, but whose availability was arranged after it was determined that Dr. Parker would testify on the competency issue.  After hearing from both experts, as well as counsel, on the competency issue, the court found Basham competent to proceed with the hearing, and later memorialized its findings in an order dated November 11, 2012.  ECF No. 1550.

Later that same day, Basham left the hearing room where he was incarcerated in Terre Haute, indicating his desire not to further participate in the proceedings.  On the third day, he reappeared for a brief portion of the testimony, but then left the satellite hearing room and did not return.[9]

---

[8]  As noted previously, Dr. Parker had already studied Basham's records and examined him in connection with the aborted effort to drop his appeal.

[9]  When the hearing resumed on December 3, 2012, the court made the same arrangements for Basham to participate: a hearing room was made available and an attorney associated with Basham's § 2255 counsel was stationed in the room to assist Basham.  Telephonic communications were also provided.  Just

After the competency issue was resolved, the court proceeded to hear testimony from five witnesses over a six-day period ending on Thursday, October 18, 2012.  The parties and the court had previously agreed to adjourn the hearing at the conclusion of this testimony and resume the hearing on December 3, 2012, to hear from three additional witnesses who, for various reasons, were not available to testify in the first segment of the evidentiary hearing.

When the hearing resumed on December 3, 2012, the court heard two days of testimony from the additional witnesses.  The court then heard argument from counsel.  Upon the conclusion of the evidentiary hearing, the court took the matter under advisement.[10]  This order serves to announce the court's ruling on all thirty-two claims for relief.

As noted above, the court determined that an evidentiary hearing was necessary because factual disputes were present in at least some of the thirty-two claims for relief asserted by Basham.

Although the court heard from eight witnesses, the testimony of those witnesses, for the most part, did not involve disputed factual matters.  There were few factual issues presented amongst the thirty-two claims raised by Basham in his § 2255 petition.  In large measure, the issues raised by Basham's petition involve conclusions of law.

Because of the predominance of legal questions in this case, the court has determined that it would serve no useful purpose, and would more likely be counterproductive, for this court to set out its factual findings separate and apart from its conclusions of law.  A more

_____

as he had done with the first portion of the evidentiary hearing, Basham elected not to participate.

[10]  Subsequent to the evidentiary hearings, the court requested and received additional briefings on two issues.  See ECF Nos. 1570, 1572.

20

practical means for the court to comply with the mandates of 28 U.S.C. § 2255 is for the

court to proceed through the claims asserted by Basham in the order in which they are raised

in the petition.  Where a factual issue is squarely presented by one of Basham's claims, the

court will resolve that factual dispute with a factual finding embedded within the discussion

of the claim at issue.  All other aspects of this court's order constitute this court's conclusions

of law.[11]

## § 2255 CLAIMS

*Standard of Review for Ineffective Assistance of Counsel Claims*

The Supreme Court has held that to establish ineffective assistance a petitioner must

show both that his attorney's performance was objectively deficient and that such deficient

performance prejudiced his defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Specifically, the Supreme Court stated:

> A convicted defendant's claim that counsel's assistance was so defective as to
> require reversal of a conviction or . . . sentence has two components. First, the
> defendant must show that counsel's performance was deficient. This requires
> showing that counsel made errors so serious that counsel was not functioning
> as the "counsel" guaranteed the defendant by the Sixth Amendment. Second,
> the defendant must show that the deficient performance prejudiced the
> defense. This requires showing that counsel's errors were so serious as to
> deprive the defendant of a fair trial, a trial whose result is reliable. Unless a
> defendant makes both showings, it cannot be said that the conviction or . . .
> sentence resulted from a breakdown in the adversary process that renders the
> result unreliable.

*Id*.  It is axiomatic that if the claim or claims that counsel failed to raise are devoid of legal

merit, a defendant suffers no prejudice and cannot establish a claim of ineffective assistance

---

[11]  Although the Fourth Circuit has never squarely addressed the issue, several other circuits have concluded that a separate listing of findings of facts followed by a separate listing of conclusions of law is not required. *See, e.g.*, *United States v. Perera*, 932 F.2d 973, 1991 WL 73709 (9th Cir. 1991) (unpublished).

of counsel. *Id.*  In a case where a defendant enters a plea of guilty, the defendant in order to obtain § 2255 relief must show that (1) his or her counsel's representation fell below an objective standard of reasonableness demanded of attorneys in criminal cases; and (2) there is a reasonable probability that, but for counsel's errors, he or she would have proceeded to trial instead of pleading guilty.  *See Hill v. Lockhart*, 474 U.S. 52, 56–59 (1985).

The defendant bears the burden of proof as to both prongs of the *Strickland* standard. First, the defendant must show that counsel's representation "fell below an objective standard of reasonableness" as measured by "prevailing professional norms."  *Strickland*, 466 U.S. at 688.  Courts should be deferential in this inquiry, and have "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id*. at 689.  The defendant must therefore overcome the presumption that the representation "might be considered sound trial strategy."  *Id*. (citation and internal quotation marks omitted).

Second, the defendant must demonstrate that counsel's inadequate performance prejudiced him.  *Id*. at 687.  Thus, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  A reasonable probability, in turn, is defined as "a probability sufficient to undermine confidence in the outcome."  *Id*.  Additionally, courts may bypass the performance prong and proceed directly to the prejudice prong when it is easier to dispose of the case for lack of prejudice.  *Id.* at 697.

CLAIMS 1, 11, 12 &18:
ISSUES ARISING OUT OF BASHAM'S STATEMENT
TO SHERIFF HEWETT ABOUT "THE STRAP"

22

*Introduction*

These claims are all interrelated, and the court will therefore discuss them together. Claim 1 alleges that Basham was denied effective assistance of counsel when his then-lawyers (Littlejohn and Monckton) permitted him to speak with Sheriff Ronald Hewett during the November 28, 2002 search for Donovan's body outside their presence. During this conversation, Basham intimated to Sheriff Hewett about how Donovan was killed with the strap of a Liz Claiborne purse.

Claim 11 contends that the government engaged in misconduct when it failed to correct Sheriff Hewett's testimony about the strap that the government knew to be false in violation of the government's obligations under *Napue v. Illinois*, 360 U.S. 264 (1959).

Claim 12 faults Basham's appellate attorneys for failing to raise on appeal the issue of the government's alleged misconduct regarding Sheriff Hewett's testimony on the strap.

Claim 18 challenges Basham's trial counsel in terms of their cross-examination of Hewett and suggests that their cross-examination elicited damaging testimony from Hewett that had not been brought out on direct.

Claim 23, which also relates to the strap testimony, is discussed later in this order. That claim contends that Basham's due process rights were violated because the government presented a theory of the case that was inconsistent with the theory it presented at Fulks's trial, specifically in regard to which defendant used the strap to strangle Donovan.

The events leading up to, and the testimony concerning, Basham's statement to Hewett regarding the strap are discussed briefly in the introductory section of this order, but they merit more extended development here.

23

After the seventeen-day crime spree, Basham was arrested in Kentucky. There, he was provided with state-appointed counsel, and he was allowed to make statements to law enforcement regarding his involvement with Donovan's abduction and murder in South Carolina. As noted above, Basham, through counsel, had also informed investigators of his participation in the Samantha Burns murder. By this time, law enforcement authorities had also obtained a mirandized statement from Basham that he and Fulks abducted Donovan in the Walmart parking lot on November 14, 2002 and used her car as an escape vehicle. *See* Tr. 2/24/04, ECF No. 698 at 51–52, 57, 52, 80–81; Govt. Trial Brief, ECF No. 751 at 12–16. In other words, a strong case against Basham was beginning to coalesce even before the search for Donovan began and before Basham made the disputed statements to Sheriff Hewett.

Because it was possible that Donovan might still be alive, the FBI eventually transported Basham to South Carolina on Wednesday, November 27, 2002 and allowed him to participate in the following day's search for Donovan. A federal magistrate judge appointed Basham death penalty-qualified counsel, Littlejohn and Monckton. As indicated previously in this order, as soon as they were appointed, Littlejohn and Monckton were called into action, and they quickly concluded that because of the overwhelming evidence that had already been gathered against their client, the best way to avoid the death penalty was to allow Basham to help find Donovan, in the outside hope that she was still alive or, failing at that, to help find her remains so that her family could have some degree of closure.

24

From the outset, Assistant United States Attorney (AUSA) Rose Mary Parham made it clear to defense counsel that because of the strength of the government's case, any efforts by Basham to help with the search would have to be made with no promise of anything in return by the government.  That is to say, there was no concession that the government would not seek the death penalty in return for Basham's assistance, nor was there any other type of reward suggested to Basham or his counsel.  Faced with the stark reality that their client had essentially admitted his involvement in the abduction, rape, and murder of two women, Littlejohn and Monckton agreed to allow Basham to participate in the Thanksgiving Day search, hoping that Basham's cooperation with the government would yield some advantage to their client.

Early in the morning of Thanksgiving Day on November 28, 2002, Basham, Littlejohn, and Monckton joined at least six law enforcement officers and twenty volunteers in a search that centered around the Bee Tree Farms area of Brunswick County, North Carolina. On several occasions during the search, Basham, either speaking directly to law enforcement inside of the police van in which he was a passenger, or speaking through Littlejohn, his attorney, provided information regarding the search, which included a reference to the fact that Donovan was strangled with a Liz Claiborne purse strap and that locating the strap would enable the searchers to know they were at the right place.

At some point during the search, the van stopped and the participants got out to survey the area and attempt to locate the purse strap. During this stop, Basham walked away from Littlejohn and walked along with Sheriff Hewett.  Although the two were never out of

25

Littlejohn's sight,[12] they apparently walked far enough away such that Littlejohn could not hear what was being said. According to Hewett's testimony at Basham's trial, while they were away from Littlejohn and Monckton, Basham became emotional and tears welled up in his eyes. Basham then demonstrated to Hewett how Alice Donovan had been strangled and how Basham had thrown the strap away in the woods.

Sometime during the early afternoon, law enforcement officers confronted Littlejohn and told him that they believed that Basham was not being truthful and that the search was to be called off. Littlejohn asked for an opportunity to discuss the issue with his client and returned to the officers with what he termed a "hypothetical" statement providing more detail about the murder of Donovan. It was this hypothetical statement that caused the court to disqualify Littlejohn and Monckton from further representation. At the time, it appeared to the court that the hypothetical statement might be admissible at trial against Basham. Ultimately, even though the court disqualified Littlejohn and Monckton, the court did not allow Littlejohn's hypothetical statement into evidence at Basham's trial. ECF No. 691 at 4–5.

One final statement Basham made during the search bears mention. At some point during the van ride, a deer ran in front of the vehicle and Basham spontaneously stated, with no prompting from law enforcement or Littlejohn, "You know I have never even killed a deer and here I have . . . ." At that point, Littlejohn put his hand on Basham's knee and cautioned him to stop speaking.

---

[12] Referring to testimony by Sheriff Hewett, Tr. 2/25/04, ECF No. 330 at 67, 83, Swerling at one point estimated this distance to be "25 or 30 feet," *id*. at 83. However, the court has performed an independent measurement and estimates it to be approximately forty-five feet.

Sheriff Hewett's testimony regarding Basham's statement about the strap is the primary focus of Claims 1, 11, 12, 18, and 23. Sheriff Hewett discussed the strap on four different occasions: on direct and on cross-examination at the *Jackson v. Denno* hearing, and on direct and cross-examination at Basham's trial.

*Hewett's Testimony at the Jackson v. Denno Hearing*

Hewett testified at the *Jackson v. Denno* hearing and, on direct examination, gave the following narrative of the interaction between himself and Basham at the wood line of the cemetery when the strap was discussed:

A.    I believe, we walked back down to the cemetery. Brandon Basham, he was shackled at his hands, belly chained around the waist, and shackled at his feet. He walked down to the cemetery, he got tears in his eyes and tears rolled down his cheek. He showed me the length of the strap —

Q.    How did he do that?

A.    May I demonstrate?

Q.    Certainly.

A.    Like this. Because he couldn't pull his hands very — very far apart, he was shackled. He showed me the length of the strap. Says that he believed it to be a Liz Claiborne strap, and that he had thrown it in the woods. He then demonstrated the manner in which he threw it in the woods.

Q.    Would you stand up and do that for the court so the record is complete as well?

A.    Yes, sir, I will. We were standing at the corner of the cemetery, Brandon Basham is chained. I said, "Branden, how did you do that?" And he said, "Like that. And I threw it over there."

Tr. 2/25/04, ECF No. 330 at 66–67.

On cross-examination at the *Jackson v. Denno* hearing, in response to questioning

from defense counsel, Hewett returned to the subject of the strap:

Q.    I'm talking about the actual details of what actually happened.

A.    Yes, sir, he also did. "At the cemetery Basham told me
      personally, 'We pulled right in there and cut to the left behind
      the fence.'"[13]

Q.    Okay.

A.    "Basham described the Liz Claiborne 16 to 20-inch strap."

Q.    Okay.

A.    "And indicated by this motion that it was used to strangle Alice
      Donovan."

Q.    Okay. It wasn't said, it wasn't verbalized, it was just used in —

A.    Yes, sir.

Q.    Okay. And that is in your report?

A.    Yes, sir . . . .

*Id.* at 77–78.

*Hewett's Testimony at Basham's Trial*

Fulks's trial occurred first, and during that trial, Fulks's attorneys attempted to have

the court admit Basham's "deer statement" because it would have suggested to the Fulks jury

that Basham had essentially admitted being Alice Donovan's killer.  In arguing against

admitting the deer statement, AUSA Johnny Gasser pointed out the unfairness of admitting

Basham's allegedly inculpatory deer statement without admitting all of the rest of his

---

[13]  The quotation marks appear in the court transcript because Hewett was reading from his notes.

28

statements implicating Fulks with the murder.  In doing so, Gasser pointed out that Basham had told law enforcement authorities that, notwithstanding the deer statement, *Fulks* had strangled Donovan with the purse strap.  Notably, all of this discussion occurred outside the presence of the Fulks jury.

The court ultimately agreed with the government and sustained the government's objection to the admission of Basham's statement regarding the deer.  It struck the court in Fulks's trial as unfair to admit one statement by Basham (the deer statement, which arguably admitted complicity in killing Donovan), while disallowing Basham's several other statements to law enforcement officers indicating just the opposite, to wit: that Fulks had been the killer.  Significantly, Hewett was not subpoenaed as a witness at Fulks's trial.

Four months later at Basham's trial, however, Hewett did testify.  Hewett provided details regarding the organization of the search team after he received a call from FBI Agent Jeff Long who had been relaying information from both Basham and Richard Hughes, Basham's attorney in Kentucky.  Hewett confirmed AUSA Parham's testimony that the government made no promises to Basham in return for Basham's cooperation in the search.

Hewett also testified as to several substantive matters that Basham discussed during the search.  For example, at one point Basham and Littlejohn huddled together and whispered to each other.  Following this conversation, Littlejohn indicated his agreement for Basham to make a statement to the officers.  Following this conference, Basham told the officers, "You need to be looking for a strap.  It is about this long."  Basham then added, "It has 'Liz Claiborne' on the strap." Tr. 9/27/04, ECF No. 330 at 27–28.  Additionally, Hewett testified that Basham said, "Back at the cemetery.  You need to go back to the cemetery and look for

that strap." *Id*. He testified that Basham spread his shackled hands apart approximately sixteen to twenty inches to describe how long the strap was. When the group arrived back at the cemetery at the Bee Tree Farms area, Basham told the group to stop and indicated that in his opinion, they were at the right place. While at the cemetery, Basham stated, again in the presence of his attorney, that after dragging Donovan's body out of the car, he and Fulks pulled her into the woods and covered the body with leaves. *Id*. at 32.

Hewett then testified, on direct, regarding the now-hotly disputed subject of Basham's demonstration of how the strap was either used or thrown away following the murder. Because Hewett's precise testimony is critical to the issues under review, the court sets forth the testimony verbatim. Hewett's testimony in response to direct examination from AUSA Johnny Gasser was as follows:

> Q.    And what did he describe to you on Thanksgiving Day, the location that you have just described to the jury, tell this jury what Brandon Basham described to you as to what happened to Alice Donovan.
>
> A.    May I?
>
> Q.    You can demonstrate, if he demonstrated.
>
> A.    Brandon Basham had his hands like this once again. I have explained to you how he was shackled. *He took his hands together and did this (Indicating)*, "Then I threw it over there. Check in those trees right over there." Which, if you will look at how I am facing you, I am facing the semicircle. So, we walked to the area right here at the corner, and that is where he did this and did that. He couldn't throw very far because he was shackled. That is when he said, "Check over there." At that time, Sergeant Parker and Sergeant Sarvis, those were the two individuals that were with me, they began to look again, but that area had already been searched, and the strap was not to be found.

*Id*. at 39–40 (emphasis added).

Also on direct, Hewett testified as to the deer statement made by Basham in the van while the search was being conducted.[14]

Defense attorney Greg Harris cross-examined Sheriff Hewett. Armed with the notes Sheriff Hewett had made regarding the search, together with statements Sheriff Hewett made to FBI agents who interviewed him, Harris knew that there was nothing in the notes indicating that Basham was referring to himself as the person who actually strangled Donovan when Basham demonstrated with the strap. Because the testimony of Hewett regarding Basham's demonstration of how the strap was thrown could be somewhat damaging, Harris apparently attempted to confirm what the notes indicated. The colloquy went as follows:

> Q.    Now, at the cemetery, and I would like you to refer to your notes if that will help you.
>
> A.    Okay.
>
> Q.    There is nothing in your notes, nor is there anything in Lieutenant Crocker's notes that indicate that Brandon Basham told you that he used the strap, is there?
>
> A.    No, sir. He did not tell me he used the strap. *He demonstrated, though.*
>
> Q.    He demonstrated?
>
> A.    Yes, sir.
>
> Q.    Your notes, nor Lieutenant Crocker's notes say that he did that; isn't that true?
>
> A.    That is true because he didn't say. *He showed.*

---

[14] Although the court excluded the deer statement in Fulks's trial, the court admitted it in Basham's trial because under the Federal Rules of Evidence, it was an admission by a party opponent. *See* Fed.R.Evid. 801(d)(2)(a).

31

*Id*. at 53–54 (emphasis added).

During summation, AUSA Gasser sought to highlight Hewett's testimony regarding the strap as follows:

> Sheriff Hewett says he [Basham] didn't say "I killed Alice Donovan." Sheriff Hewett said to you in this courtroom in front of you, the jury, "No, he demonstrated it."
>
> * * *
>
> Ladies and Gentlemen, I wanted to finish with that because how would you go back in your jury room after listening to Sheriff Hewett and after seeing Sheriff Hewett demonstrate how Brandon Basham demonstrated how Alice Donovan was strangled, how do you listen to Clifford Jay when Brandon Basham told you jurors . . . we killed them and find him not guilty of carjacking, resulting in death? And find him not guilty of kidnapping, resulting in death? I have been up here for two hours, and the government submits those two witnesses and that limited testimony, alone, seals the deal.

Tr. 9/29/04, ECF No. 330 at 81–82.

As can be seen from the above, Sheriff Hewett's testimony was consistently ambiguous. Hewett was clear, using the active voice, to say that Basham showed how he (Basham) threw the strap away. Hewett's testimony regarding the motion used to strangle Donovan was much less clear, usually involving the passive voice.[15] Moreover, on two of the four occasions that he was asked about the strap, Hewett actually initiated the idea of demonstrating (rather than describing) to the attorney who was examining him.

---

[15] Sheriff Hewett did not write a report of the events of that day, but rather was interviewed by Lt. Crocker of Brunswick County, who then prepared a report about the events. Even Lt. Crocker's report of his interview with Hewett was vague and used the passive voice in describing the purse strap. ("Basham indicated how the (victim's) pocket book strap *was* used."). Nowhere in Lt. Crocker's report does it state that Basham indicated how *he* killed Ms. Donovan. The report also states only that "Basham demonstrates (visually) how he afterwards threw the strap into the wood line at the cemetery," and that Basham responded, "It is," in response to Hewett's question, "Is this where it happened?" Pet. Ex. 2, attached to Pet. at 00818. (Basham filed exhibits with his original § 2255 Petition and these exhibit numbers do not correspond to the petitioner's exhibit list from the § 2255 hearing. The court has attempted to differentiate these exhibits with the preceding cumbersome citation.)

32

In summary, Hewett addressed the interaction with Basham regarding the strap on four occasions.  The first time, direct examination at the *Jackson v. Denno* hearing, Hewett referenced only Basham's motion made to show how the strap was thrown away.  On cross-examination at that same hearing, Hewett included a cryptic reference to the motion that "was used to strangle Alice Donovan."  On direct at trial, Hewett's reference was ambiguous ("he took his hands together and did this [indicating] 'then I threw it over there.'").  Finally, on cross-examination at trial, when Harris tried to pin Hewett down on the fact that his notes did not reflect that Basham referred to himself as the cause of Donovan's death when Basham demonstrated the strangling motion, Hewett seemed to interject the most damaging of his four statements.  He suggested that although Basham did not *say* that he used a strangling motion to kill Donovan, "*he demonstrated though*."  At the § 2255 evidentiary hearing, neither side was able to provide a specific reason why both the government and the defendant shied away from the opportunity to ask Hewett to be more specific.

It thus appears that Basham used his hands to demonstrate two motions to Hewett: (1) a motion describing the strangling; and (2) a motion describing the tossing of the strap into the woods. The tossing motion is not in dispute in these claims; both sides apparently agree that Basham was indicating that it was he who did the tossing of the strap.  Moreover, it was essentially cumulative to the statement made earlier in the van with Littlejohn's advance approval, that locating a Liz Claiborne strap would help locate the body.

It is the other motion made by Basham—apparently depicting the strangling itself—that is the subject of Claims 1, 11, 12, 18, and 23.  For ease of reference in the duration of this order, the court will refer to Hewett's testimony about the strangling motion

(i.e., the disputed part of Hewett's testimony) as "the strap" testimony.

On this ambiguous record, the court must delve into the interrelated issues presented in Claims 1, 11, 12, and 18.

CLAIM 1:<br>BASHAM'S DEMONSTRATION TO SHERIFF HEWETT

In Claim 1, Basham contends that he was denied the effective assistance of counsel when his lawyers permitted him to speak with Sheriff Hewett outside of their presence and failed to advise Basham that his statements could be used against him.

At issue in this claim is the highly controversial strap statement Basham made to Hewett when the two of them, accompanied by two deputy sheriffs, wandered approximately forty-five feet away from Littlejohn during one of the searches at the cemetery. According to Basham, the admission he made to Hewett (which, viewed in the light most favorable to Basham for purposes of this motion, indicates that Basham admitted strangling Donovan) was the lynchpin of the government's case and was relied upon heavily in closing argument to convict Basham and secure the death penalty.

It should be noted at the outset that it was Littlejohn's understanding and intention that Basham was to provide "directional information only" during the search for Alice Donovan's body on Thanksgiving Day. Littlejohn and Monckton both testified at the § 2255 hearing that they were not aware of the fact that Basham had made the strap statement to Sheriff Hewett when he wandered off alone with Sheriff Hewett.[16]

---

[16] At the § 2255 hearing, Swerling could offer no explanation as to why Littlejohn and Monckton allowed Basham to venture away from them.

34

In opposing the ineffectiveness claim asserted in Claim 1, the government points out that prior to making the strap statement to Sheriff Hewett, Basham had been Mirandized at least four times.  As discussed in more detail below with respect to Claim 2, it appears that Basham received and acknowledged advice of his rights at least *five* times.   In any event, the government then asserts that, due to the unique circumstances surrounding Basham's involvement in the search, counsel had no obligation to "hold Basham's hand" during the eight-hour search.

In *Strickland*, the Supreme Court provided a "number of practical considerations [which] are important for . . . adjudicating a claim of actual ineffectiveness of counsel." *Strickland*, 466 U.S. at 696.  For example, the Court explained that although it "discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.  Consequently, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.*

As the Court explained in *Strickland*:

> When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent that it reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

35

*Id.* at 695.

An analysis of the degree of prejudice which resulted from Basham's strap statement and Hewett's testimony of same should begin with a careful examination of the statement itself. For some reason, perplexing as it is to a court reviewing a cold record more than eight years after the fact, Hewett was coy in his description of his interaction with Basham in counsel's absence. The first time he was asked, Hewett only said that Basham showed him how he threw the strap into the woods. The next two times he was asked, Hewett's testimony was unclear regarding the strangling motion apparently demonstrated by Hewett in the courtroom.

On the fourth and final statement, when Harris questioned Hewett about whether the law enforcement notes revealed that Basham had *told* the officers that Basham used the strap to strangle Donovan, Hewett's response still was not as clear as it could have been. Hewett responded, "He didn't tell me he used the strap. He demonstrated, though." Had Hewett's testimony been slightly more forthcoming (e.g., "He demonstrated *how he did it*, though"), the import of the testimony would be much easier to gauge. As the record now stands, however, it is somewhat difficult to evaluate the degree of prejudice arising from the alleged constitutional error because the testimony is not as clear as it could have been.

Basham argues that prejudice is shown in Claim 1 by simply referring to portions of the closing arguments AUSA Gasser made in the guilt and penalty phases of Basham's trial. In the guilt phase, Gasser referred the jury both to Hewett's testimony and to the testimony of Clifford Jay, who testified that Basham told him, "We killed them." Gasser then told the jury that "those two witnesses and that limited testimony alone, seals the deal." Tr. 9/29/04,

36

ECF. No. 951 at 81–82.  In the penalty phase of the trial, Gasser once again referred to Hewett's strap testimony, but only as part of a wide-ranging discussion of all of the damaging evidence against Basham.  Tr. 11/1/04, ECF No. 971 at 57.  Significantly, at the penalty phase, Gasser did not suggest to the jury that the Hewett testimony "seal[ed] the deal."

Important for purposes of the claim under consideration, however, is the fact that immediately preceding the passage quoted above, Gasser—in referring to the statement about the strap—was faithful to the record, using the passive voice both times he referred to the strap being used to strangle Donovan.  *See* Tr. 9/29/04, ECF No. 951 at 81–82) (". . . after listening to Sheriff Hewett and after seeing Sheriff Hewett demonstrate how Brandon Basham demonstrated how Alice Donovan *was* strangled . . .") (emphasis added);  Tr. 11/1/04, ECF No. 971 at 57 ("He [Basham] is shackled, he describes a purse strap, and he demonstrates to Sheriff Hewett how Alice Donovan *was* strangled.") (emphasis added). Thus, to the extent there was an ambiguity in Sheriff Hewett's testimony about the strangling motion and what Basham said about it, Gasser did not take advantage of that ambiguity in his summation, simply indicating in summation following both the guilt and penalty phases, that Basham demonstrated how Donovan "was" strangled.

After carefully reviewing the entirety of the trial record in this case, the court concludes that whatever prejudice inured from the Sheriff Hewett strap testimony, is not sufficient to satisfy Basham's burden under the second prong of *Strickland.*  If Littlejohn had successfully prevented Basham from making the purse strap remark to Sheriff Hewett (thereby eliminating that testimony from the trial), the evidence against Basham would have still been overwhelming, as the Fourth Circuit Court of Appeals noted on three occasions in

37

the direct appeal.

Moreover, earlier in the search Basham had, of his own volition and with Littlejohn's express consent, told the officers that Donovan was strangled with a Liz Claiborne purse strap. At that moment, Basham was once again changing his story from previous versions describing how Donovan was killed and was also admitting he was at least present when she was killed. Basham also made an inculpatory statement, while Littlejohn was present, when Basham described how he and Fulks dragged the body into the woods and covered it with leaves.

Gasser's summation during the guilt phase that the Clifford Jay statement, coupled with Basham's strap statement to Hewett, "seals the deal" cannot be read to suggest that the government's entire case would rise or fall on those two items of evidence alone. Indeed, in his lengthy summation, Gasser canvassed the considerable trial record, going into detail about the many crimes Basham and Fulks committed during their seventeen-day crime spree.

It should also be noted that from the very beginning of jury selection, the government took the position that it was not necessary to prove who exactly committed the specific act that resulted in Donovan's death. Much of the questioning and debate during jury selection centered on the question of whether jurors could conscientiously follow the law in a case where the government was not able to prove with certainty which of the two defendants "struck the fatal blow." Moreover, as discussed elsewhere in this order (*see* Claims 16 and 23), the government argued to the jury that Basham and Fulks worked together "in unison" to commit their crimes, even going so far as to suggest that neither one could have succeeded without the other, and concluding that "[t]hey are equally culpable." Tr. 11/1/04, ECF No.

38

971 at 44.

Indeed, the Fourth Circuit Court of Appeals, on direct review of Fulks's conviction, stated:

> Viewed in the context of the entirety of both proceedings, the government's core theory was that Fulks and Basham were equally culpable in Donovan's murder and similarly deserving of the death penalty regardless of which one ended her life.

*Fulks*, 683 F.3d at 524.

### *The Overwhelming Evidence Against Basham*

Finally, the government's case against Basham, viewed in its totality, was overwhelming. Basham and Fulks escaped from a jail facility in Kentucky and began a seventeen-day crime spree that spanned seven states from Michigan to South Carolina. During this time, they worked together and abducted, raped, and killed nineteen-year-old Samantha Burns in West Virginia, and three days later they abducted Alice Donovan in an episode depicted very clearly on the Walmart security videotape. Before raping and killing her, they forced Donovan to ride in the back seat of her own car in a sojourn into the State of North Carolina. Basham and Fulks disposed of both women's bodies in such a manner that Donovan's remains were not found until approximately six years after her murder, and Burns's remains have never been located.

Lest Basham's involvement in the murder of both women be questioned, it should be remembered that Basham told Clifford Jay, who had counseled Basham in school and remained a father figure to Basham "We killed them." Tr. 9/27/04, ECF No. 949 at 228–29. When being interviewed in Kentucky with counsel Richard Hughes at his side, Basham drew

a map for law enforcement interviewing him and indicated that the map showed where he

and Fulks had done "their thing."  Tr. 9/24/04, ECF No. 948 at 217.

In addition to these two women, several other individuals, including some who naively

sought to help Basham and Fulks, nearly suffered the same fate.  For example:

- Shortly after their escape, Basham and Fulks confronted James Hawkins in his home, convinced him that their car had broken down, and asked for a ride.  At some point during the ride, Basham and Fulks revealed their true intentions, then took Hawkins deep into the woods, and both Basham and Fulks participated in tying Hawkins to a tree where they left him overnight when the temperature was in the low 30 degrees. Fortunately, Hawkins was able to free himself fifteen hours later. Tr. 9/13/04, ECF No. 934 at 186–234; Tr. 9/14/04, ECF No. 936 at 11–25.

- On November 8, 2002, in Sturgis, Michigan, after Basham and  Roddy, Severance's friend, had separated from Fulks and  Severance (Fulks's girlfriend), two police officers began knocking on doors at the hotel where Basham and Roddy were staying. Basham opened his room door, saw the officers, and then closed the door and cocked his .22 caliber revolver that he had recently stolen.  Eventually, the officers left, and Basham made a comment to Roddy that "I was about to shoot me a mother-f***er cop, right.  I was going to blow the f***ing cop away." Tr. 9/15/04, ECF No. 936 at 180.

- The following day, with Basham and Fulks still separated, Basham met a group of teenagers in a parking lot of the local Kmart store and reported to Roddy that one of the teens had some money and that Basham wanted to kill him for it.  After purchasing sundries with stolen checks, Basham invited the teenagers back to the hotel room. Severance and Fulks arrived back at the hotel shortly thereafter, and the teenagers left before Basham could carry out his announced plan to kill the teenagers and steal from them.  *Id*. at 81–82.

- When attempting to steal firearms from the home of Conway, South Carolina resident Sam Jordan, Basham and Fulks encountered Carl Jordan (Sam's Father).  Basham and Fulks then pursued Carl Jordan and Fulks fired shots in Carl Jordan's direction.  Tr. 9/17/04, ECF No. 938 at 29–60.

40

- On the day he was apprehended, Basham had approached Deanna Francis's fifteen-year-old daughter at the Ashland Mall in Ashland, Kentucky, pointed a gun to the daughter's side of the car, and attempted to enter the car. Only after he observed that the young girl was talking on her cell phone did Basham back off and indicate that he had made a mistake. After Deanna Francis called the police, Ashland Police officer Matt Davis answered the dispatch, located Basham at the Ashland Mall, and began a foot chase. During the chase, Basham drew a gun, first fired a shot in the air, and then fired directly at Officer Davis. Tr. 9/27/04, ECF No. 949 at 246–270.

In addition to the foregoing victims and potential victims, the record at trial indicated numerous other citizens whose vehicles, license plates, firearms, pocket books, credit cards, checkbooks, and identities Basham and Fulks stole. Tr. 9/14/04, ECF No. 936 at 110–298; 9/15/04, ECF No. 937 at 10–159; Tr. 9/20/04, ECF No. 941 at 40–141; Tr. 9/21/04, ECF No. 19–84. In addition, Basham displayed an affinity for keeping belongings of his victims. For example, Donovan's knife was found in Basham's possession when he was arrested, Tr. 9/24/04, ECF No. 948 at 34–35 and he wore Burns's ring on a chain around his neck, Tr. 9/14/04, ECF No. 936 at 209.

When apprehended, Basham lied to authorities about his identity and then began giving a series of ever-changing stories about what happened to Donovan. First, Basham indicated to law enforcement that Donovan was still alive and was with Fulks. Tr. 9/24/04, ECF No. 948 at 148–49. Then he said that Fulks had dropped him off and had taken Donovan to a resort area where Fulks had killed her and left her. *Id*. at 177–79. Only later in the investigation did Basham reveal that he had been a participant in Donovan's abduction and murder, acknowledging, with the express consent of his attorney, that he had thrown into the woods the purse strap that was used to strangle Donovan (thereby revealing that he was

41

present at the time of the murder) and also that he and Fulks had dragged Donovan's body

fifty feet off the roadway and had covered it with leaves.  Tr. 9/27/04, ECF. No. 949 at 32.

Basham's behavior during the trial did not serve him well.  In a case where "future

dangerousness" to prison officials is one factor a jury may consider in deciding between the

death penalty and life imprisonment, Basham, acting contrary to the advice of his attorneys,

attempted to insist on his "right" to walk away from the trial, causing a scuffle that required

a full complement of eight deputy marshals to subdue him.  Tr. 9/20/04, ECF No. 941 at

148–53.  In the penalty phase of the trial, the jury saw the videotape of this scuffle and also

heard the audio tape of Basham shouting threats to the deputy marshals involved, minus the

gratuitous expletives that the court redacted for Basham's benefit.[17]

Also relevant to the question of whether Basham could adapt satisfactorily to prison

life if given a life sentence instead of the death penalty are Basham's own words to prison

guards.  The jury heard the following during trial:  While Basham was incarcerated at Butner

FCI, he told a nurse: "I am going to f*** you up the ass, Ms. Miosi. I am going to kill you,

psych bitch."  Tr. 10/15/04, ECF No. 957 at 91.  He scuffled with officers at Butner,

threatened correctional officer Lt. Ledford, and told officers: "I will show you mother

f***ers how to cause pain. You don't know how to cause pain." *Id*. at 14.  He also bragged

---

[17] This altercation was a direct result of the court's reversal of course in its attempt to assist Basham in paying attention and staying alert during the trial.  The court first promised the defendant smokeless tobacco (a substance undoubtedly unavailable to defendants serving life sentences in federal correctional institutions) and then told the defendant that although he would not be able to use that substance during the trial, it would substitute any number of other legal stimulants he desired.  Tr. 10/18/04, ECF No. 959 at 34–48.  After the scuffle, the court was provided with a note from the United States Marshal indicating that Basham had told another deputy marshal, prior to the scuffle, that he (Basham) did not care about having the smokeless tobacco, but rather he was attempting to aggravate Deputy Marshal Riley, an African-American. The court did not allow this racially-tinged aspect of the episode to be presented to the jury.

to prison personnel that a jury would never find him guilty, Tr. 10/14/04, ECF No. 956 at 206, and that "[t]he worst they can do is give me life." Tr. 10/15/04, ECF No. 957 at 21.

Five of the events related above (the escape, in addition to the Samantha Burns, Carl Jordan, James Hawkins, and Ashland Kentucky police officer episodes) were all listed on the verdict form as nonstatutory aggravating factors, and as to all five factors, the jury found "unanimously and beyond a reasonable doubt" that they occurred. ECF No. 805 at 4. All of the remaining factual assertions above were essentially undisputed at trial, though they were not the subject of special findings by the jury.

In explaining how courts should analyze the second *Strickland* prong, the Supreme Court has provided the following helpful guidelines:

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. *Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.* Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Strickland*, 467 U.S. at 695–96 (emphasis added).

Using the approach directed by the Supreme Court in *Strickland*, this court must determine the effect, if any, of the tainted evidence upon the aggravating and mitigating factors considered by the jury. Had Littlejohn prevented Basham from talking to Sheriff Hewett and thus demonstrating to Sheriff Hewett how Donovan was strangled with the Liz

43

Claiborne purse strap, then that portion of Hewett's testimony would not have been part of the trial record. What would have been left for the jury, however, was the issue of Basham's demonstration of the throwing motion[18] and other testimony indicating that Basham was present when Donovan was killed. For example, the jury would still have heard testimony about Basham and Fulks, together, dragging the body fifty feet off the roadway and covering it with leaves. They would have also heard Clifford Jay's testimony relaying how Basham told Jay, "We killed them." Significantly, elimination of the disputed portion of the strap statement would not have led the jury to the conclusion that Fulks was the one who strangled Donovan. Instead, the jury would have been left with an absence of testimony on the question of who did the strangling and a complete record of Basham and Fulks's seventeen-day cascade of misdeeds, which included two rapes and murders and at least five other attempted or potential murders.

The net effect of disallowing the disputed portion of the Hewett testimony about Basham's purse strap statement is problematic. Had the strap statement not occurred, none of the statutory or nonstatutory aggravating factors unanimously found by the jury would have changed. The only potential impact that a removal of the strap testimony from the case would have had relates to one of the nonstatutory mitigating factors. Specifically, Nonstatutory Mitigating Factor No. 1 read as follows: "Brandon Leon Basham played a lesser role than Chadrick Evan Fulks in the kidnapping and carjacking of Alice Donovan." None of the jurors found this factor to have been proven. But, as has already been noted,

---

[18] The throwing motion was directly related to the search for the body, and counsel cannot be faulted for allowing Basham to make that part of the demonstration because it was within the guidelines established for Basham's participation.

44

elimination of the strap statement would not have told the jury that Fulks was the one who strangled Donovan, thus assigning a lesser role to Basham. Elimination of the strap testimony would have left the jury with no evidence as to who *used* the strap, but all of the other evidence regarding Basham's presence at the time of death (tossing the strap; moving and covering the body; relating to law enforcement where Basham and Fulks did "their thing"; telling Clifford Jay "We killed them"; etc.) would have remained the same. It is not certain, then, that elimination of the strap statement would have caused the jurors to attribute more weight to nonstatutory mitigating factor one.

Additionally, there were no aggravating factors, statutory or nonstatutory, included on the verdict form under which the jury could have found that Basham was more culpable than Fulks. The reason there was no such factor was that the government maintained a consistent position throughout both cases that both defendants were equally culpable. Had the verdict form included such an aggravating factor, and had the jury found this factor to have been proved, Basham's argument in this § 2255 petition would be much stronger. As the record now stands, however, the only effect would have been as to Nonstatutory Mitigating Factor 1, and even as to that single factor the impact would have been less than significant.

On this record then, the court concludes that Basham has not satisfied the second prong of *Strickland.* Considering, as *Strickland* requires, the "totality of the evidence before the . . . jury," *id*. at 695, the elimination of the strap testimony would have potentially affected but one of the nonstatutory factors considered by the jury in making its death penalty decision. Although the court cannot conclude that the effect would have been "isolated" or

"trivial" as mentioned in *Strickland, id*. at 696, the effect was not substantial.  Even more important is the "overwhelming record support," *id*., justifying the death penalty in this case. After carefully and thoroughly analyzing the strap testimony and its potential impact on the verdict in this case, the court is left with the firm conclusion that Basham has been unable to show that "the decision reached [by the jury] would reasonably likely have been different absent the error[]." *Id*.

As the Fourth Circuit remarked in the direct appeal of Basham's conviction,  "the Supreme Court has observed that 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one.'"  *Basham*, 561 F.3d 339 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986)).  Even if the court were to assume that counsel were deficient in allowing Basham to leave their sides during the search, the error, viewed in the light of the totality of the circumstances in this lengthy and complex trial, does not rise to the level of prejudice required by *Strickland*.  Accordingly, the court finds no merit to Claim 1.

## CLAIM 11:
### GOVERNMENT'S ALLEGED INCONSISTENT POSITIONS
### REGARDING THE STRAP STATEMENT

In Claim 11, Basham contends that the government engaged in misconduct when it failed to "correct" Sheriff Hewett's trial testimony about the strap statement that the government knew to be false in violation of the government's obligations under *Napue v. Illinois*, 360 U.S. 264 (1959).

### *Procedural Default*

As an initial proposition, the government contends that this matter is not properly before this court because Basham did not raise this issue on appeal.  And, as the government

points out, an error can be attacked on collateral review only if first challenged on direct review. *United States v. Harris*, 183 F.3d 313, 317 (4th Cir. 1999). Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in a federal habeas proceeding only if the defendant can show both cause for and actual prejudice from the default, or that he is actually innocent. *Id*.

In response, Basham contends that his appellate counsel were constitutionally ineffective under the standard established in *Strickland* for failing to raise this issue on appeal, and that, for this reason, cause is established for the procedural default. *Williams v. French*, 146 F.3d 203, 215 (4th Cir. 1998). The court agrees with the government that Basham cannot show that ineffective assistance of appellate counsel was the cause for the procedural default, thus his claims of witness and prosecutorial misconduct asserted in Claim 11 should be dismissed.

It is well-settled that reviewing courts must afford appellate counsel "the presumption that he decided which issues were most likely to afford relief on appeal." *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000) (citation omitted). "Counsel is not obligated to raise all non-frivolous issues on appeal." *Id*. "Winnowing out weaker arguments and focusing on issues more likely to prevail is the hallmark of effective appellate advocacy." *Id*. (quoting *Smith v. Murphy*, 477 U.S. 527, 536 (1986)). Generally, only when ignored issues are clearly stronger than those that were presented on appeal will a presumption of effective assistance of counsel be overcome. *Id*.

As noted earlier, Basham's appellate counsel raised six issues.[19] Basham cannot show that the issues of alleged witness perjury and prosecutorial misconduct are "clearly stronger than the ones presented." This court has reviewed the six issues that were taken up on appeal and finds that they all were superior to the issue asserted in Claim 11. Basham enjoyed the services of ten appellate counsel, including eight who were working on this case from the firm of Jenner & Block. The fact that these fine attorneys were unsuccessful in the direct appeal in no way signifies that they did not chose the strongest issues to appeal. Accordingly, the court does not find ineffective assistance of counsel in terms of issues not raised in the direct appeal of Basham's conviction to be sufficient to support his cause and prejudice argument.

Even if the issue of alleged prosecutorial misconduct was properly before the court, it has no merit. Basham suggests that in Fulks's trial, the government took the position that Hewett's testimony was that it was *Fulks* who used the strap to strangle Donovan, whereas in Basham's trial, the government took the exact opposite position. Close examination of the relevant text of the transcripts of the two trials, however, reveals that this was not the situation.

*Napue* prohibits the government from using testimony known to be false in a criminal case. Here, it is argued that Sheriff Hewett's testimony regarding Basham's demonstration of how Basham allegedly used the strap to strangle Donovan was false and that the government knew it. Basham also argues that Hewett's reference to the strap was a central component of the prosecution's closing argument in Basham's trial. Because of this, Basham

---

[19] *See* note 6, *supra*.

argues that the government knowingly used false testimony to obtain a death sentence, because the testimony and argument was directly contradictory to the theory advanced by the government at co-defendant Fulks's trial.  In other words, Basham argues that "the government knew that Sheriff Hewett's testimony during cross-examination (indicating that Mr. Basham had been the actual killer of Ms. Donovan) was false." Pet. at 55–56.  Thus, Basham asserts that the government violated its obligations under *Napue*.

As support for the argument that the government took the position at Fulks's trial that Hewett said that Fulks strangled Donovan, Basham points to the argument made by AUSA Johnny Gasser *outside of the jury's presence* that *Basham* had said that Fulks strangled Donovan.  Gasser's statement was made while the court was hearing argument on whether it should admit Basham's deer statement at Fulks's trial.  Fulks's defense team, quite obviously, desired to use Basham's deer statement because of the inculpatory connotations it contained.  In arguing that the deer statement, in isolation, should not be admitted, Gasser was merely reminding the court that, notwithstanding the fact that Basham had made the deer statement, Basham had on numerous occasions indicated that Fulks was the killer.  Thus, Gasser was suggesting to the court that the rule of completeness as set out in Fed. R. Evid. 106 would have required that if Basham's deer statement were admitted in the Fulks trial, the remainder of Basham's statements (which squarely indicated that Fulks was the killer) should have been admitted at Fulks's trial as well.  Gasser's reliance on the rule of completeness during debate over an evidentiary issue does not, by any means, require a finding that at the Fulks trial the government adopted  Basham's self-serving statement that Fulks was the killer.

In Claim 11, Basham also references an April 22, 2003 appearance before the grand jury by FBI Agent Jeff Long, the agent in charge of the Basham investigation. In an attempt to obtain a superseding indictment against Basham, Long testified that, during the search of the Bee Tree Farms area on November 28, 2002, "Basham indicated, among other things, that Chadrick Fulks strangled Alice Donovan by the use of a purse strap."  Pet. at 54.  Basham points out that Long's testimony before the grand jury was consistent with the FBI 302 report he prepared immediately after the events of November 28, 2002.  In that 302 report, Long wrote: "After Fulks raped her, Fulks used a purse strap, which was approximately eighteen inches long, and strangled Donovan."  Pet. Ex. 3, attached to Pet.

Long's 302 report was not introduced as an exhibit at Basham's trial and merely memorialized Basham's self-serving statement during the investigation.  In no way does it reveal an inconsistent position or false testimony employed by the government at Basham's trial.

Based on the above, Claim 11 has no merit.

CLAIM 12:<br>
FAILURE TO APPEAL MISCONDUCT ALLEGED IN CLAIM 11

In Claim 12, Basham contends that his appellate attorneys negligently failed to raise in his direct appeal the issue of the government's alleged misconduct under *Napue v. Illinois*, 360 U.S. 264 (1959), in his direct appeal.  In its analysis of Claim 11, the court has determined that Basham's appellate counsel were not ineffective for failing to raise the government's alleged misconduct.  For this reason, Claim 12 must fail as well.

CLAIM 18:

HARRIS'S CROSS-EXAMINATION OF SHERIFF HEWETT

In Claim 18, Basham contends that defense attorney Greg Harris elicited damaging evidence on his cross-examination of Hewett, at trial, without a "sound strategy." Basham argues that this falls well below the objective standard of reasonableness of defense attorneys who cross-examine and that counsel was ineffective under *Strickland*.

This claim presents yet another issue arising from Sheriff Hewett's ambiguous testimony about the strap statement. As noted in the introductory section, during both the *Jackson v. Denno* hearing, and during his direct examination at trial, Hewett was very clear that Basham described to Hewett how Basham had thrown the strap into the woods after it was used to strangle Donovan. Beyond that statement, however, Hewett's strap testimony was ambiguous, to say the least. The one thing that was evident, however, was that nothing in the law enforcement notes[20] suggest that Basham had indicated or demonstrated to Sheriff Hewett how *he* (Basham) used the strap to strangle Alice Donovan.

Thus, when he began his cross-examination of Hewett, Harris understandably did not want to leave an unclear record as to exactly what Sheriff Hewett's testimony was regarding what Basham said about the strap being used to kill Donovan. It should be remembered that up until this point, Hewett's only testimony regarding the strap, which came out on direct, was that Basham had demonstrated to Hewett how Basham threw the strap away, coupled with Hewett's cryptic statement ["He took his hands together and did this (Indicating)"].

---

[20] As previously mentioned, Sheriff Hewett did not author a police report. Rather, Lieutenant Crocker interviewed Hewett and made a report from that interview. At trial, Hewett apparently referred to his own personal notes while testifying.

51

Hewett did not explicitly state that Basham said which of the two defendants, Basham or Fulks, used the strap to actually kill Donovan.

Rather than asking Hewett to simply clarify his answer (a question to which Harris probably did *not* know the answer), he chose the safest route possible, seeking to have the Sheriff concede that the existing notes in the law enforcement file did not reveal a statement by Basham that *he* had used the strap to kill Donovan.[21]

Hewett responded with yet another ambiguous statement, telling Harris that Basham did not *say* he killed Donovan with the strap, but that "*he demonstrated though*." Tr. 9/27/04, ECF No. 949 at 53 (emphasis added). Harris followed with essentially the same question, and after it appeared that Sheriff Hewett was not going to be shaken from his ambiguous testimony, Harris understandably moved on to other matters.

On this record, Harris cannot be faulted for his cross-examination strategy or the results thereof. To begin with, contrary to what Basham now asserts, Harris did not ask a question to which he did not already know the answer. Harris asked a leading question—permissible on cross-examination—designed to tie down Hewett as to what was revealed by the immutable notes in the police file, and Hewett gave a surprising, ambiguous response. The court finds no fault with Harris asking the question, nor with Harris's decision to move onto other matters after Hewett did not agree with the leading question.

Furthermore, even if the court were to find that Basham's trial counsel was ineffective in his cross-examination, the court may dispose of this issue under the second prong of *Strickland*, because Basham showed no prejudice as a result of his counsel's alleged

---

[21] The full colloquy between Harris and Hewett is set out at 31–32, *supra*.

improper cross-examination. Under *Strickland*, it is unreasonable to suggest that jurors in this case, after viewing the mountain of evidence adduced against Basham,[22] would have viewed Hewett's ambiguous statement during cross-examination or counsel's failure to more vigorously cross-examine Hewett and an FBI agent, as the tipping point favoring the death sentence. The court finds no merit to Claim 18.[23]

## CLAIM 2:
## THE *JACKSON V. DENNO* HEARING

Swerling and Harris moved to suppress most of the statements Basham made after being apprehended. In a motion filed on December 31, 2003 (ECF No. 228), Basham sought a hearing "to determine if the statements taken from him or attributable to him violate the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States."[24] Upon receipt of the motion, the court conducted a three-day hearing pursuant to *Jackson v. Denno*, 378 U.S. 368 (1964), to determine the admissibility of certain statements Basham made following his capture and arrest as well as certain statements made by Littlejohn and

---

[22] See this court's summary of the overwhelming evidence produced by the government in this court's treatment of Claim 1, pages 39–46, *supra*.

[23] As part of Claim 18, Basham points out that defense counsel had in its possession, as part of discovery, an FBI "302" report prepared by FBI Agent Jeff Long. This report notes that Basham had a conversation with his attorney, Littlejohn, and that Littlejohn conveyed to law enforcement that "a purse strap was used by Fulks to strangle Donovan. Basham threw the purse strap out of the window of the BMW as they left the cemetery." Pet. Ex. 3, attached to Pet. Basham contends that counsel erred in failing to ask Agent Long any questions on cross-examination about the notation in his 302 report that Fulks, not Basham, had wielded the purse strap to kill Donovan. This argument has no merit. Agent Long's notes merely refer to Basham's self-serving version of what happened—one of several different versions Basham gave to law enforcement during the investigation.

[24] John Blume, counsel for Basham's co-defendant Fulks, actually filed this motion. There was in effect, however, a "deemer" order which deemed any motion filed by one defendant to be joined in by the other defendant unless the other defendant opted out. It was a common practice during the early stages of this litigation, before the court severed the defendants for trial, for one lawyer or the other lawyer to file a motion which the other defendant adopted.

Monckton, said to be attributable to Basham.  In Claim 2, Basham acknowledges that the motion to suppress was made, but he contends that his attorneys were constitutionally ineffective when they failed to "prepare for and/or effectively litigate" the *Jackson v. Denno* hearing.  For the reasons which follow, the court finds Claim 2 to be unavailing.

As an initial matter, although it is not clear from the pleadings, it appears that Basham's present counsel asserts a constitutional challenge to all of the statements made by or on behalf of Basham on which the court heard testimony at the *Jackson v. Denno* hearing.

*Post-Arrest Statements*

Basham made some of these statements after he was arrested and prior to the search for Donovan's remains.  In particular, these statements occurred during police and FBI interviews of Basham in Boyd County, Kentucky on November 17, 2002, the day he was arrested; on November 19–20, 2002; and on November 25, 2002.  Additionally, Richard Hughes, Basham's attorney at the time, made certain statements to FBI Agents Maley and Ciccarelli on November 26 and 27, 2002 with Basham's authorization and knowledge that the statements could be used against him.

*Day of Search Statements*

The remainder of Basham's statements occurred following the FBI's transfer of him to Florence, South Carolina, on November 27, 2002.  On November 28, 2002, Basham, along with attorneys Monckton and Littlejohn, participated in the search for Donovan's body in Brunswick County, North Carolina.  Basham made certain additional statements to law enforcement officers, both in a law enforcement van and at a cemetery.[25]  Most of these

---

[25]  These statements are discussed more fully above with respect to Claim 1.

54

statements were directional statements, authorized by counsel, indicating where the officers

should go to attempt to locate Donovan's body. Also, while in the van, Basham authorized

Littlejohn to advise the law enforcement officers that they should be looking for a Liz

Claiborne purse strap and that if they located the strap, the officers would know that they

were in the right place. Notably, however, after conferring with Basham, Littlejohn also

made a series of statements to law enforcement related to details of the murder on a

"hypothetical basis."[26]  It was these hypothetical statements by Littlejohn that prompted the

---

[26]  While Basham's statements generally focused on directions to the body and landmarks to aid the authorities in their search, Littlejohn's hypothetical statements went right to the heart of the crimes in this case. Littlejohn told law enforcement that, hypothetically speaking,

> The cemetery where [the search party was] currently located was in fact the cemetery where Basham and Fulks had stopped at. Donovan was not taken outside the vehicle but remained in the back seat of the BMW. Fulks raped Donovan in the back seat. Donovan was only wearing a top. After Fulks raped her, Fulks used a purse strap, which was approximately 18 inches long, and strangled Donovan. Fulks and Basham took Donovan out of the back seat and placed her in the trunk. Fulks also took Donovan's panties and threw them in the trunk. As Fulks drove the BMW out of the cemetery, Basham threw the purse strap out the window. Fulks drove around the area for what seemed to Basham to be as much as an hour. Fulks became concerned that if Donovan was still alive in the trunk, she may punch out the tail light or pull the wires out. Fulks found a dirt road in the area of what Basham believed was an animal park or some type of wildlife area. Basham recalled Fulks using the word "park" and ask[ing] Basham if the "park" would be okay. Basham agreed, and Fulks turned onto a wide, smooth dirt road. Fulks drove down the road for approximately five to ten minutes before coming to a stop in the road. As Basham was moving around outside the BMW, he stepped in a hole and cut his leg on a metal stake. At some point between leaving the cemetery and dumping Donovan's body, Fulks stabbed Donovan and slit her throat. Basham recalled Fulks taking the knife and placing it between Fulks'[s] thigh and [the] driver's seat of the BMW.
>
> Both Fulks and Basham dragged Donovan's body approximately fifty feet into the tree line. They covered her body with leaves, sticks and light brush. Shortly after leaving the area where they dumped Donovan's body, Fulks threw the knife out of the car window. Donovan's pants and panties were disposed of after leaving the area where they dumped her body. Basham did not know the location where the clothing could be found . . . .
>
> Basham recalled seeing a sign, described as being green with white writing, with the word "park" and or "animal" on it. The dirt road where Fulks and Basham dumped Donovan's body was located approximately fifteen feet past the "park" sign.

Govt. Trial Br. 19–20.

court to disqualify both Littlejohn and Monckton and appoint Swerling and Harris.[27] Further detail regarding the content of all of the statements on which the court heard testimony is set forth in the government's pretrial brief in this case. *See generally* ECF No. 751 at 10–20 (summarizing statements).

The *Jackson v. Denno* hearing in this case took place on February 24–26, 2004. Before the hearing could begin, however, the court adjourned so that two medical professionals could examine Basham to assure the court that Basham was in fact competent to proceed with the hearing. Upon receiving confirmation that Basham was competent, the court proceeded to hear testimony from the following witnesses, all of whom participated in some way in the interrogation of Basham after he was apprehended and detained in Kentucky, following his transfer to South Carolina, and during the search for Donovan's body in North Carolina: Captain William Todd Kelly, an officer with the Ashland Police Department in Kentucky; Robert Brunty, a policeman with the Ashland Police Department; Dan Mooney, a policeman with the Ashland Police Department; Special Agent Scott Vito, an FBI Agent with the Ashland, Kentucky FBI Office; Special Agent Patrick James Maley, an FBI Agent who was then assigned to the Louisville, Kentucky Division as Supervisor of the Covington Region; Agent Jeff Long, an FBI Agent who was then assigned to the Myrtle Beach resident agency; Sheriff Ronald E. Hewett, the then-Sheriff of Brunswick County, North Carolina; William H. Monckton and Cameron B. Littlejohn, the attorneys initially

---

[27] The court's reasons for the disqualification are set forth in full in its order dated April 9, 2003, *see* ECF No. 69, but it suffices for purposes of discussion here to say that the court was concerned that if the government later sought to introduce Littlejohn's hypothetical statements, counsel would be conflicted because Littlejohn and Monckton would be both potential witnesses and counsel of record at the same time.

56

appointed to represent Basham upon Basham's arrival in South Carolina; and Rose Mary Parham, an Assistant United States Attorney from the Florence, South Carolina office. The court also heard stipulated statements from Lieutenant David Slone, an officer with the Ashland Police Department, and Richard Hughes, the attorney initially appointed to represent Basham in Kentucky. With the exception of the stipulated testimony, all of these witnesses testified in person.

With regard to all of Basham's statements (post arrest on the day of the search), some of which were exculpatory and some of which were inculpatory, the officers performing the questioning of Basham testified in detail regarding their efforts to properly apprise Basham of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). The officers acknowledged that they were aware during the initial interview on November 17, 2002 that Basham had used cocaine and marijuana earlier that day. They also acknowledged that one initial interview of Basham on November 19, 2002 went into the early hours of the morning, beginning at 1:58 a.m. and terminating at 3:19 a.m. The officers explained that the reason for the late night and early morning questioning was that, at the time, law enforcement officials thought that Donovan might still be alive and that Basham could assist in her rescue. Notwithstanding the fact that Basham had admitted that he used controlled substances and the fact that one round of questioning lasted for approximately one hour into the early morning, all officers who testified indicated that Basham was coherent and alert.

They also testified that Basham appeared to understand his *Miranda* rights. *See, e.g.*, Tr. 2/24/04, ECF No. 698 at 9, 14, 17, 27, 34–35. In this regard, it is notable that Basham actually signed or initialed a written acknowledgment of being Mirandized on at least five

57

occasions.  By way of example, on one occasion when Basham stated "maybe I might need an attorney," all questioning by the officers stopped.  *Id*. at 33.  Thereafter, when Agent Vito was assigned to the case, Agent Vito (after conferring with his legal counsel) took additional statements from Basham.  Importantly, during each of the three interviews by Agent Vito, Basham read, acknowledged he understood, and signed or initialed an "advice of rights" form.  *Id.* at 47–48, 60–61, 76–77.

On another occasion during an interview, Barbara McGuire, an investigator with the Public Defender's Office for Boyd County, Kentucky, asked for an opportunity to speak with Basham, and the officers stopped questioning Basham for an hour and a half to allow McGuire (who was not an attorney) to speak with Basham.  Separate and apart from the advice of rights forms that the FBI had Basham sign, McGuire also had Basham sign a form indicating that he understood and was waiving his rights.  Tr. 10/11/12, ECF No. 1555 at 350–51.

Basham made more damaging statements during an interview with FBI Agent Maley, who had received a collect phone call from Basham indicating Basham's desire to once again speak with law enforcement.  At this time, attorney Richard Hughes had been appointed to represent Basham, and the subsequent interview was undertaken with Hughes's full consent.  Moreover, during this interview Basham once again read, acknowledged he understood, and signed an advice of rights form.  Tr. 2/24/04, ECF No. 698 at 94.

At the *Jackson v. Denno* hearing, Harris and Swerling cross-examined some, but not all, of these law enforcement witnesses regarding the circumstances surrounding Basham's statements to law enforcement.  On occasion, this court asked additional questions of the

officers in an effort to fully develop the record regarding the voluntariness of Basham's statements. During the hearing, at appropriate intervals when the court had heard all of the testimony relative to each statement, the government would proffer the statement as admissible, and the court turned to Swerling and Harris for a response. With regard to the first series of post-arrest statements by Basham, after Officer Mooney testified, Swerling gave this response to the court:

> Judge, we have no evidence to present. Based on what we previously advised the court about Mr. Basham's, I think, limited intellectual ability and mental capacity, that the statements presented to the court for a ruling, under Rule 104, as to whether or not the totality of the circumstances he was given his warnings and whether or not he waived his warnings—waived his rights.

*Id.* at 40.

Swerling's response to later offers of statements by the government were equally tepid. Following the testimony of Agent Vito, Swerling stated:

> No, Your Honor, we are not going to present any testimony. As previously stated, the matter has been presented to you for a ruling under Rule 104, as to whether or not he was advised of his rights and whether or not he waived those rights.

*Id*. at 57. After a second series of statements relayed by Agent Vito was introduced, Swerling stated:

> Judge, there would be no evidence presented. Basically the same position we have had in the last statement, that we would ask you to make your threshold ruling under Rule 104 as to whether or not the statement is admissible, whether or not he got his rights, and whether or not he knowingly waived his rights.

*Id*. at 72.

Importantly, however, Swerling and Harris strenuously argued that the court should exclude the damaging hypothetical statement Littlejohn made near the conclusion of the

59

search for Donovan.  Whereas their responses to the motion to suppress regarding the earlier statements were admittedly facile, the debate about the admissibility of the hypothetical statement consumed over forty pages of transcript.  Tr. 2/25/04, ECF No. 898 at 5–46.

Following the *Jackson v. Denno* hearing, the court denied the motion to suppress all of the statements Basham made and took under advisement the motion to suppress Littlejohn's hypothetical statements attributable to Basham.  ECF No. 335.  The court later granted the motion to suppress the hypothetical statements.  *See* ECF No. 691 at 4–5.  Thus, even though the court had taken the prudent course of action in disqualifying Littlejohn and Monckton, the disqualification ultimately proved to be unnecessary because the court, again acting out of an abundance of caution, disallowed the hypothetical statement in evidence.

Based on the above, Basham contends that his counsel did not properly prepare for or "effectively" litigate the *Jackson v. Denno* hearing.  At the evidentiary hearing on the § 2255 motion, counsel for Basham advanced little argument that his attorneys did not *prepare* for the hearing.  They instead focused most of their attention on the manner in which the *Jackson v. Denno* hearing was argued.  In other words, conceding as he must, that a proper motion was filed, Basham is left with the argument that his attorneys did not try hard enough to have all of the incriminatory statements excluded.

Turning first to the statements Basham made, Swerling and Harris filed the proper motion and cross-examined the witnesses, vigorously at times when the occasion called for it.  The fact that they did not say more by way of argument was undoubtedly occasioned by the fact that the officers' testimony had clearly and unequivocally demonstrated that Basham was properly Mirandized each and every time he was questioned prior to the Thanksgiving

60

Day search; no threats or promises were made to induce his statements; and that the statements were completely voluntary and not the product of any undue influence or other improper factor.  Moreover, many of the statements at issue were made after Basham was represented by an attorney.  Faced with this record, there is little that Swerling or Harris could have argued under the circumstances.

In this respect, the suppression hearing in Basham's case was quite similar to *Jackson v. Denno* hearings this court has conducted in other criminal cases.  Frequently, defense attorneys file a motion to suppress in an effort to have the law enforcement officers who will be testifying at trial brought into the courtroom so that their testimony can be heard and the witnesses seen firsthand, and so that defense counsel can cross-examine these officers in an effort to conduct something in the nature of a discovery deposition.[28]  In this court's experience, it is rare for a defendant to take the stand at a *Jackson v. Denno* hearing and attempt to elucidate the issues regarding the voluntariness of his statements.  Thus, in most cases on this court's criminal docket, defense counsel are left in the unenviable position where Swerling and Harris found themselves.  They filed a proper motion to suppress, put the government to its proof regarding the voluntariness of the statements and the question of whether their client was properly Mirandized, and, after unsuccessfully attempting to shake the law enforcement officers from their statements on cross-examination, had little left to say by way of argument.

---

[28]  Indeed, this was one of Swerling and Harris's strategies at the *Jackson v. Denno* hearing in the present case.  Tr. 10/11/12, ECF No.1555 at 356.

61

Still, it is important not to overlook trial counsel's efforts regarding the highly damaging hypothetical statements Littlejohn made. It was here that Swerling and Harris focused most of their firepower and here that they secured a partial victory at the *Jackson v. Denno* hearing, when they obtained a ruling excluding Littlejohn's statements. In selectively saving their strongest arguments for what was of critical importance, Swerling and Harris were perhaps mindful of an observation made by the late Francis Murgnahan of the Fourth Circuit Court of Appeals:

> Resourceful lawyers . . . often desire to be thorough and to overlook nothing in their commendable zeal to afford first class representation. Consequently in many cases they tend to excess as they inundate us with a plethora or arguments, some good and some not so good. Sometimes one wonders whether such lack of selectivity is not counterproductive, for a party raising a point of little merit exposes himself to the risk of excessive discount for a better point because of the company it keeps.

*United States v. Computer Sciences Corp.*, 689 F.2d 1181, 1183 (4th Cir. 1982), overruled in part on other grounds by *Busby v. Crown Supply, Inc.*, 896 F.2d 833 (4th Cir. 1990). It thus could have been that Basham's trial counsel recognized the futility of making a strong argument against the admissibility of Basham's statements based upon the record produced. It could have been counter-productive to advance strong arguments about constitutional violations where none have been shown. Swerling and Harris focused on what was important to the trial and succeeded. This court should not second guess their strategy at the *Jackson v. Denno* hearing with the 20/20 view of hindsight.

Moreover, this court, embarking upon a federal capital prosecution, was well aware of what lay before it when this case commenced. This court earnestly and conscientiously attempted to receive the testimony of the law enforcement officers regarding the

62

voluntariness of the statements and made its decision based upon the evidence produced at the *Jackson v. Denno* hearing.  The fact that Swerling and Harris may not have "tried harder" to suppress the damaging statements played no part in the court's ultimate decision to admit Basham's statements.

Nevertheless, the discussion in Claim 2 includes several arguments as to what Swerling and Harris should have done or said in an effort to keep the incriminatory statements out.  First, Basham asserts that "[u]pon information and belief, defense counsel were aware of . . . factors demonstrating the coercive nature of the interrogations . . . , including the denial of food and medicine."  Pet. at 24.  This allegation appears to be based on notes Swerling took during an interview with Basham, allegedly prior to the *Jackson v. Denno* hearing.  Tr. 10/11/12, ECF No. 1555 at 456–63.  Also, Basham argues that Swerling and Harris failed to fully develop his "documented history of intellectual, psychological, and emotional difficulties."  Pet. at 19.  Although counsel brought out both issues at the *Jackson v. Denno* hearing,[29] Basham contends that counsel could have more strenuously argued the issues in favor of his suppression motion.

However, Swerling's and Harris's testimony regarding their strategy at the *Jackson v. Denno* hearing somewhat undercuts Basham's arguments.  In particular, Swerling and Harris learned during their investigation that, with the exception of Littlejohn's hypothetical statements, it would be difficult to argue that many of Basham's statements to law

---

[29]  For example, during Harris's recross of Agent Vito, Harris asked Agent Vito a series of questions to determine whether medication was withheld from Basham.  Tr. 2/24/04, ECF No. 698 at 85–86. Also, Swerling represented to the court on at least two occasions that they were seeking a determination of voluntariness based in part on Basham's "mental history," "his low intellectual and intelligence capacity," and his "many, many commitments to different institutions."  *Id.* at 11–12.

enforcement were involuntary. Further, in view of the overwhelming evidence of their client's guilt, they quickly accepted that there would likely be a penalty phase of the trial. Therefore, Swerling and Harris decided to "embrace" most of Basham's statements to law enforcement in an effort to avert the death penalty. In Harris's words, their strategy was to "elicit as much information as we could from the officers to prove that Brandon Basham, from the moment that he was fished out of the river by law enforcement officers, began to attempt to assist law enforcement in the location of the body of Alice Donovan." Tr. 10/10/12, ECF No. 1553 at 275; *see also* Tr. 10/11/12, ECF No. 1555 at 355–56, 466–70; Tr. 10/15/12, ECF No. 1556 at 638–53. Said another way, counsel attempted to get the law enforcement officers to concede that Basham cooperated to the best of his ability so that they could argue this fact in mitigation.

Additionally, Swerling's and Harris's testimony indicates that although they considered the arguments advanced above, *see* Tr. 10/11/12, ECF No. 1555 at 349, 474, 478; Tr. 10/15/12, ECF No. 1556 at 655–56, they reasonably found the arguments to be either lacking in evidentiary support or unlikely to be successful. In particular, during their investigation to prepare for the *Jackson v. Denno* hearing, Swerling and Harris interviewed Basham's attorneys during the interrogations, Richard Hughes and Public Defender Hewlett, and the investigator for the Public Defender's Office, Barbara McGuire. Additionally, Swerling and Harris interviewed Basham's South Carolina attorneys, Monckton and Littlejohn. Importantly, none of these witnesses corroborated Basham's new allegations of coerced interrogation, and none indicated that Basham was incompetent during the interrogations. Tr. 10/11/12, ECF No. 1555 at 350–56, 475; Tr. 10/15/12, ECF No. 1556 at

64

647–50.    And, as developed at the *Jackson v. Denno* hearing, the testimony of law enforcement officers was consistent with Swerling and Harris's investigation.  *See, e.g.*, Tr. 02/24/04, ECF No. 698 at 65, 78 (Agent Vito testified that Basham received nourishment and breaks throughout the interviews).

The officers all testified that Basham repeatedly affirmed that he understood, read, and agreed to waive his rights and that he spoke coherently and appeared to understand the unfolding interrogation.  Indeed, as noted above, Basham arguably understood his right to counsel, as he at one point stated during questioning stated "maybe I might need an attorney." Notably, the only evidence that law enforcement withheld food and/or medicine came from an interview in which Basham changed his story of his interrogations, which as Swerling pointed out, was not uncommon for Basham.[30]    *See* Tr. 10/11/12, ECF No.1555 at 457. Therefore, it was not ineffective assistance of counsel for Swerling and Harris to adopt the strategy they did at the *Jackson v. Denno* hearing.

Still, Basham also contends that his attorneys labored under a fundamental misconception regarding trial procedure and constitutional law which caused them to pull their punches at the *Jackson v. Denno* hearing.  Basham suggests that by not vigorously arguing that Basham's statements were involuntary, Harris and Swerling thought they were preserving the opportunity to argue Basham's voluntary cooperation with law enforcement authorities as a mitigating factor at the penalty phase of the trial.  During the *Jackson v. Denno* hearing, government counsel suggested to the court that "they may be boxing

---

[30] Basham's history of manipulation is detailed elsewhere in this order. *See infra* at 97, 100, and 147.

themselves into a position that they can't claim later that he was attempting to assist law enforcement when he provided those statements." Tr. 2/24/04, ECF No. 896 at 8.

In response, this court suggested that the defendant's position of seeking to keep out the statements while at the same time maintaining his right to argue the voluntariness of his statements in mitigation could be a "two-edged sword," but then the court hastened to add that it was not ruling on the question of whether Basham would be allowed to take inconsistent positions regarding voluntariness. *Id.* at 8–9.

The court agrees with Basham's habeas counsel that a defendant does not have to waive one constitutional right in order to assert another. Basham could have argued the suppression motion and still used the statements of law enforcement as a mitigating factor at the sentencing phase. Thus, the government's suggestion that Basham could not have it both ways was unfortunate. However, after a full review of the entire transcript of the *Jackson v. Denno* hearing, this court is left with the firm conclusion that trial counsel provided effective assistance to Basham. Harris and Swerling concentrated their efforts on the most damaging of the statements at issue and obtained a favorable ruling thereon. Further, as discussed above, after acknowledging the weakness of any potential argument regarding voluntariness, counsel adopted a reasonable strategy to cross-examine law enforcement witnesses to obtain evidence of Basham's cooperation, thus potentially strengthening their case in mitigation.

Finally, Basham argues that his trial counsel should have moved to suppress the evidence obtained as a result of Sheriff Hewett's questioning of him outside the presence of counsel, including the verbal statements he made to Sheriff Hewett and the nonverbal

66

demonstrations he made of how the purse strap was used to strangle Donovan and how it was thrown in the nearby woods, as violative of the Supreme Court's holding in *Edwards v. Arizona*, 451 U.S. 477 (1981).[31]  Basham did not raise this issue in his § 2255 petition, instead raising it for the first time during the evidentiary hearing on the petition.  *See* Tr. 10/11/12, ECF No. 1555 at 488–92.  Although the government objected to this issue as untimely, *see id.* at 491–92, the court found that the issue was properly before it as within the scope of Claim 2, *id.* at 492.  Because of this, the court provided the parties with the opportunity to brief the issue after the evidentiary hearing.  *See* ECF No. 1572.  Both Basham and the government submitted supplemental briefing, *see* ECF Nos. 1575, 1576, and thus the court now turns to the merits of the *Edwards* violation.[32]

In *Edwards*, the Court held that "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484–85. Thus, "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he

_____

[31]  As an initial matter, the court notes that although trial counsel did not identify or argue the *Edwards* issue at the *Jackson v. Denno* hearing, Swerling did argue that this court should exclude everything that "was said during the course of the day outside the direction issue."  Tr. 02/25/04, ECF No. 898 at 8; *see also* Tr. 10/15/12, ECF No. 1556 at 651.  To the extent the questions Sheriff Hewett asked Basham were not directional, then, Swerling arguably did move to have the statements at issue excluded.  The government argues that the statements were directional, *see* ECF No. 1576 at 4–5, but there is some indication that Swerling viewed the statements as non-directional at the time, *see* Tr. 02/25/04, ECF No. 330 at 76–78.  In any event, as discussed in more detail below, it is not necessary to determine whether trial counsel in fact moved to suppress the statements to dispose of this argument.

[32]  The government renewed its objection to the timeliness of Basham's claim of ineffective assistance of counsel based on a failure to raise the *Edwards* issue in its supplemental brief.  *See* ECF No. 1575, at 1 n.1.

responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.* at 484. In *Minnick v. Mississippi*, 498 U.S. 146 (1990), the Court extended this holding, noting that the Fifth Amendment protection from reinitiation of questioning of an accused who has requested the assistance of counsel is not terminated or suspended once the suspect has consulted with an attorney; officials may not reinitiate interrogation without counsel present. *Id.* at 153.

Basham and the government dispute whether an *Edwards* violation occurred in this case. First, though, both parties agree that Basham had invoked his right to counsel. Richard Hughes, who negotiated Basham's transfer to South Carolina, had been appointed to represent Basham in Kentucky. And after Basham's transfer to South Carolina, Littlejohn and Monckton had been appointed to represent Basham the day before the Thanksgiving Day search. Littlejohn and Monckton testified that they made clear to law enforcement that Basham was not to be interrogated except for questions asking for directional information regarding the location of Donovan's body. *See, e.g.*, Tr. 2/25/04, ECF No. 330 at 112–14, 138, 140–41.

However, Basham and the government disagree on whether any improper questioning occurred and, assuming it did, whether it occurred outside the presence of counsel. As Basham points out, and as recognized elsewhere in this Order, Sheriff Hewett offered several varying accounts of his encounter with Basham allegedly outside the presence of Littlejohn and Monckton. From the record, though, it appears that Hewett asked Basham at least two questions during this encounter.

68

First, Hewett testified at the *Jackson v. Denno* hearing that, after Basham demonstrated the manner in which he threw the Liz Claiborne purse strap into the woods at the cemetery, he asked Basham, "Branden, how did you do that?" *Id.* at 66–67. According to Hewett, Basham responded, "Like that. And I threw it over there." *Id.* at 67. Second, Hewett testified that Basham stated something to the effect of "this is the place," apparently referring to the place at which Donovan was strangled. *Id.* at 83. Although Hewett did not testify to the question which elicited this response, according to Lieutenant Crocker's report, Hewett asked, "Is this where it happened"? Pet. Ex. 2, attached to Pet. at 00818. Crocker's report provides a slightly different version of Basham's response, stating that Basham replied, "Yes, this is it." *Id.*

The government argues that the first question ("How did you do that?") was directional in nature, as Basham, upon the advice of counsel, had already told the officers about the purse strap, *see* Tr. 12/04/12, ECF No. 1569 at 1256–57, and the manner in which Basham threw the strap may have indicated the distance into the woods the strap traveled, and thus its approximate location, *see id.* at 1257, 1330. Similarly, the second question ("Is this where it happened?") is at least arguably directional in nature, as the answer would be indicative of the general location of Donovan's body.

Even if the questions were directional, however, this argument misses the point: although Littlejohn and Monckton may have authorized law enforcement to ask directional questions of Basham, they did not give law enforcement authorization to do so outside of their presence. And *Edwards* and *Minnick* do not appear to contemplate that once counsel has authorized law enforcement to ask a specific type of question, law enforcement may then

do so when counsel is not present. Rather, the Court emphasized that counsel should be present for *any* questioning subsequent to the accused's invocation of his Fifth Amendment rights. *See Minnick*, 498 U.S. at 152. Thus, the more important issue is whether Sheriff Hewett asked the questions outside the presence of counsel.

The government argues that no *Edwards* violation occurred because counsel was "present" with Basham at all times during the Thanksgiving Day search. Basham's habeas counsel disagree, arguing that Monckton and Littlejohn were not present with Basham during the above-described encounter with Sheriff Hewett. In this regard, Hewett testified that when he asked the above-recited questions of Basham at the cemetery, Littlejohn and Monckton "were back at what I described earlier as the horseshoe circle, talking with other law enforcement officials, including Chief Hendrick of Conway." Tr. 2/25/04, ECF No. 330 at 67. According to Hewett, he and Basham were away from Littlejohn and Monckton by a distance approximately equal to the distance between his position in the witness stand and the "bush at the back of the courtroom."[33] *Id.* at 67, 83. Hewett testified that, while he was away with Basham, he could not hear the conversations of Littlejohn and Monckton with the other law enforcement officials. *Id.* Basham also notes that both Littlejohn and Monckton testified that they were unaware that Sheriff Hewett had walked off with their client without their permission. *See* Tr. 12/04/12, ECF No. 1569 at 1242–44 (Littlejohn); Tr. 10/09/12, ECF No. 1561 at 43 (Monckton). Still, the government points out that Littlejohn testified that, though Basham was not "always within [his] hearing" and "might have wandered off with Sheriff Hewett for a few moments," Basham "wasn't too far away from [him] at any

---

[33] As explained above, the court estimates this distance to be approximately forty-five feet.

time" and in any event was always within his sight.  Tr. 12/04/12, ECF No. 1569 at 1243–44, 1265–66.

Thus, it appears that during the Hewett/Basham encounter, although Basham's counsel were relatively near to him and could see Basham and Hewett, counsel could not hear the questions asked by Hewett or Basham's responses thereto.  In fact, the record suggests that Littlejohn and Monckton were preoccupied at that time, talking to other law enforcement.

At the evidentiary hearing on the § 2255 petition, Basham called Larry Hammond as an attorney and expert witness on the standard of care under *Strickland*.  *See* Tr. 10/16/12, ECF No. 1558 at 824 .  In testifying on the standard of care as to the permissible distance between a defendant and his attorney during a search for a body, Hammond used the analogy of an umbilical cord.  *See id.* at 843–44, 909–10.  More particularly, in Hammond's opinion, the distance between an attorney and his client should be "small enough so that there could not be conversations that you couldn't control . . . between the client and law enforcement." *Id.* at 910.  This is because, where a greater distance occurs, the lawyer can neither hear the questions law enforcement asks of his client nor communicate with his client regarding the client's response.  *Id.* at 910–12.  Likewise, Hammond posited that a defendant should not be away from his attorneys for any length of time during a search for a body.  *Id.* at 910.

Without adopting any specific standard, the court at least agrees with the proposition that, for counsel to be "present" within the meaning of *Edwards v. Arizona*, counsel must at least be able to hear the questions asked of the defendant and provide guidance to the defendant regarding a response.  Notably, Littlejohn and Monckton could not do either

71

during the encounter between Basham and Sheriff Hewett, despite being only a relatively short distance away. Accordingly, the court finds that they were not present when Hewett asked the above two questions of Basham within the context of *Edwards* and *Minnick*.

Because Basham invoked his right to counsel on the Thanksgiving Day search and because he was interrogated that day without counsel present, an *Edwards* violation occurred unless Basham (a) initiated further discussions with law enforcement; and (b) knowingly and intelligently waived the right he had invoked. *See Smith v. Illinois*, 469 U.S. 91, 94 (1984). The Court in *Edwards* recognized that where a defendant initiates contact with law enforcement, some type of verbal exchange will likely occur. *See Edwards*, 451 U.S. at 486 n.9. In such an event, the court should look to the totality of the circumstances to determine whether the defendant waived his right to counsel prior to making an incriminating statement. *Id.* As the Court explained:

> If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be "interrogation." In that event, the question would be whether a valid waiver of the right to counsel and the right to silence has occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.

*Id.*

Upon reviewing the record and the totality of circumstances in this case, the court agrees with the government that the Basham/Hewett encounter at issue here is factually distinct from the *Edwards* decision. Basham was never told he had to speak with law enforcement; it appears he desired to do so. For example, Basham called Agent Maley from

jail and asked to speak with him. *See* Tr. 2/24/04, ECF No. 698 at 92–93, 101–02. Also, it is clear that Basham initiated the Thanksgiving Day search and desired for it to continue when law enforcement became frustrated with its lack of progress. *See* Tr. 2/25/04, ECF No. 898 at 3; Tr. 2/25/04, ECF No. 330 at 96, 102–05, 107, 116, 118, 144. Further, there is no indication in the record that Basham made his demonstration of how Donovan was strangled in response to Hewett's two questions recited earlier. Indeed, there is testimony that on several occasions Basham spoke out or volunteered statements during the Thanksgiving Day search. *See, e.g.*, Tr. 10/09/12, ECF No. 1561 at 37.

Additionally, Sheriff Hewett testified at trial that it was Basham who initiated the encounter with Sheriff Hewett when they walked to the wood line at the cemetery. In particular, when Hewett was asked to tell the jury what happened when the search party returned to the cemetery near Bee Tree Farms, he testified: "He, being Brandon Basham, wanted to walk over towards the wood line and to show the area where the strap was thrown."[34] Tr. 09/27/04, ECF No. 949 at 37–39. Lieutenant Crocker's report is corroborative of this testimony, as it states: "Basham then walks to the left front edge of the cemetery (along with Sheriff Hewett and Conway Officers Sgt Parker and Sgt Sarvis. [sic] Basham demonstrates (visually) how he afterwards threw the strap into the wood line at the

---

[34] Basham interprets Hewett's *Jackson v. Denno* hearing testimony as indicating that *Hewett* initiated the walk down to the wood line, but his testimony at that hearing is susceptible to more than one interpretation. In particular, when the prosecutor asked whether Hewett "want[ed] to know more information about the purse strap and how it was used and where it might be located," Hewett answered in the affirmative. Tr. 02/25/04 at 66, ECF No. 330. The prosecutor then stated: "Wanting that to occur, tell the judge what you did with Mr. Basham." *Id.* Hewett responded that he, Basham, "and the two Conway sergeants . . . we walked back down to the cemetery." *Id.* Although *the prosecutor* suggested that Hewett took some affirmative action with Basham, Hewett nowhere testified that he in fact initiated the walk down to the wood line. Indeed, his testimony can be read as consistent with his trial testimony—Basham wanted to walk to the wood line, and wanting to know more, Hewett walked with him.

cemetery." Pet. Ex. 2, attached to Pet. at 00818.

Based on the above, the court concludes that, although he had invoked the right to counsel, Basham reinitiated contact with law enforcement on several occasions. He initiated both the Thanksgiving Day search in general and the specific encounter during the day which led to the statements at issue. The court also finds that Basham knowingly and intelligently waived his Fifth Amendment rights. The atmosphere during the search was "cordial," *see* Tr. 2/25/04, ECF No. 330 at 60, 69–70, and, with the exception of the encounter with Sheriff Hewett, Basham was able to speak with counsel the entire day, *see id.* at 15. Importantly, although Basham did not actually receive the *Miranda* warnings on Thanksgiving Day, *see, e.g.*, *id.* at 39, 58, as explained above he had received and acknowledged advice of his rights numerous times in the several days prior and nonetheless continued to provide statements to law enforcement without hesitation or reservation.

Consequently, based on the totality of the circumstances as shown in the record in this case, the court concludes that no *Edwards* violation occurred. For at least this reason, then, trial counsel's performance was not deficient in failing to raise the issue on appeal or at the *Jackson v. Denno* hearing. Likewise, because the statements were properly admitted, Basham cannot have been prejudiced thereby.

However, even if the court had reached the opposite conclusion, i.e., that an *Edwards* violation did occur and that trial counsel's performance was deficient for failing to raise the issue to this court, the court finds that Basham still could not show the prejudice required under *Strickland*. This is because, even had this court excluded the statements at issue, the result in this case would not have been different for at least the reasons discussed above with

74

respect to Claim 1.  The evidence against Basham was overwhelming, and, as habeas counsel concedes, the jury was not required to find that Basham was Donovan's actual killer in order to sentence him to death.

For all of the reasons discussed above, the court finds that trial counsel's performance in preparing for and litigating the *Jackson v. Denno* hearing was not ineffective under *Strickland*.

CLAIM 3:
JURY SELECTION ISSUES

In Claim 3, Basham asserts that the court violated his right to an impartial jury by erroneously excluding four potential jurors because of their concerns about the death penalty. At issue is the court's determination that jurors Kathy Roberts, Michael Williams, Rubina Kahn, and Susan Jackson were all disqualified by reason of their responses to the questions propounded to them by the court or by counsel.  Basham also faults his appellate counsel for failing to raise this issue on appeal.

Before discussing the factual and legal issues relating to Claim 3, the court should set out briefly the procedures followed and a somewhat unique aspect to the voir dire conducted in this case.  Several hundred jurors were randomly selected pursuant to the Jury Selection Plan for this district, divided into groups, and scheduled to appear at the courthouse on preselected days.  The grouping allowed approximately ten jurors to present themselves at the courthouse each day.

Along with the juror summons, prospective jurors were sent a detailed questionnaire to complete and return so that the questionnaires could be copied and disseminated to counsel

prior to the jurors' pre-determined voir dire date. Because disclosing to the jurors that they were being considered for a capital murder case might cause the jurors to structure their answers so as to avoid jury service, the questionnaire mailed to the jurors' homes did not reveal the nature of the case to be tried. On the day the jurors reported for service, a second questionnaire was administered, asking specific questions to seek the jurors' views on the death penalty. These questionnaires were also copied and disseminated to counsel prior to questioning the jurors.

The jurors were then brought into the courtroom on an individual basis and the court asked a series of generic questions designed to ensure that each juror could be fair and open minded in a case that carried the death penalty as a potential punishment. Often times, the court's lead-off questions involved responses that had been provided to the second questionnaire seeking the jurors' views on the death penalty. After the court finished its examination, the court permitted the attorneys for both sides to engage in attorney conducted voir dire. Occasionally, the court asked follow up questions to the questions posed by the attorneys.

The unique aspect of the voir dire concerns the fact that the attorneys persuaded the court to ask two non-traditional questions of the jurors. The questions were somewhat fact specific and resulted in the disqualification of a large number of jurors. The government requested the court to ask the jurors if they would have any difficulty imposing the death penalty—assuming it was justified by the facts of the case—if the government was not able to prove which of the two defendants "struck the fatal blow," that is to say, which of the two defendants actually brought about the murder of Alice Donovan.

76

Basham's trial counsel, on the other hand, suggested that once the court had asked a sufficient number of questions to satisfy itself that each juror could be fair and impartial in a traditional death penalty case, that the court go further and ask the jurors whether—if it was shown in the evidence that the defendant had participated in not one, but two murders—that would be the "tipping point" which would cause the juror to always impose the death penalty at the conclusion of the case.

These two additional questions were proposed by the attorneys as a package. In other words, the government did not object to the court asking the defendant's "two murders" question and defense counsel did not object to the court asking the government's requested "fatal blow" question. Because both parties agreed to these two questions, the court went along with the request, but the procedure presented significant difficulties for the court. The questions were fact-specific and seemed to, in some respects, ask the jurors to render an advisory opinion as to what would they do based upon the facts of the case.

Nevertheless, the court acceded to the requests of counsel for both sides and asked the two fact-specific questions. As noted previously, asking these two questions resulted in the disqualification of a significant number of jurors. Some of the disqualified jurors said that although they could be fair and open-minded regarding the death penalty generally, if they were not certain who struck the fatal blow, they would not be able to impose the death penalty. Other jurors indicated that although they could be fair in a general sense, if it was revealed during the trial that the defendant had participated in two murders, the juror would always vote to invoke the death penalty.

After carefully reviewing the transcript of the voir dire relating to the four disputed jurors, the court determines that it was correct in its discretionary finding that all four of these prospective jurors harbored concerns about the death penalty that would substantially impair their ability to abide by the court's instructions and their oath as jurors. This court was in a position not only to judge the substance of the prospective jurors' answers on voir dire, but also to observe their demeanor and to assess their credibility. Faced with ambiguous and often contradictory answers from these venire members, this court validly exercised its discretion to remove these individuals for cause. Accordingly, appellate counsel had ample reason not to raise this issue in Basham's appeal.

In *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968), the Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." As the Court put it in subsequent cases, "'a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 419 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). The prosecution "'may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the Court.'" *Id*. (quoting *Adams*, 448 U.S. at 45). Accordingly, a prospective juror in a capital case "must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to [render a verdict] without conscious distortion or bias." *Adams*, 448 U.S. at 46. The prosecution "does

78

not violate the *Witherspoon* doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality." *Id*.

Whether a venire member's reservations concerning the death penalty amount to a "'substantial impairment' is perforce committed in the first instance to trial court discretion based upon the voir dire inquiry." *United States v. Tipton*, 90 F.3d 861, 880 (4th Cir. 1996). "[W]hat is being inquired into is a state of mind whose determination turns largely on assessments of demeanor and credibility, matters peculiarly within the province of trial judges . . . ." *Id.*

### *Cathy Roberts*

Cathy Roberts was excused for cause because her answers to the juror questionnaire and to voir dire questioning, although inconsistent at times, indicated that her opposition to the death penalty would substantially impair her ability to abide by her oath and the court's instructions.

On the supplemental juror questionnaire, Roberts indicated that the death penalty was used "too seldom" while affirming that she was "strongly opposed to the death penalty" and "would have a difficult time voting to impose it, regardless of the facts and law in the case." Tr. 8/30/04 , ECF No. 918 at 105–06. Roberts attributed this apparent inconsistency to her being "confused" or "nervous." *Id*. at 108. When the court asked her if she could put aside her personal beliefs and "follow the law as the judge announces," Roberts replied, "I believe I can." *Id*. at 109.

But when the court asked Roberts whether she could "consider the possibility of imposing the death penalty against someone, even if that person didn't strike the fatal blow

if it was supported by the facts and the law of the case," Roberts twice announced, "I'm not 100 percent sure if I could." *Id*. at 112–13. When the court rephrased the question, Roberts equivocated, "I don't know.  If it was my civic duty, I would. I mean, [if] selected I would follow the law." *Id*. at 113.  The court noted Roberts's "hesitancy" and "body language" and that she seemed "to have some difficulty with this idea[.]" *Id*. at 114. Roberts affirmed that was true "to a degree." *Id*.

In its voir dire, the government asked Roberts,  "[I]s it fair to say, ma'am, that given your pretty strong opposition to the death penalty in general, that as you sit there today you couldn't sentence somebody to die if they didn't actually take another person's life; isn't that true, Ms. Roberts?" *Id*. at 125.  Roberts answered,  "Yeah, that's true." *Id*.  Likewise, Roberts said that it was "a fair statement" that "in every single case, if life in prison without parole was one of the options, [she] would feel that that would be the appropriate sentence in every case where somebody didn't actually kill someone . . . ." *Id*. at 128.  Finally, she affirmed that although she "could give the death penalty under a certain set of circumstances, . . . [she] would draw the line when the person did not even kill someone . . . ." *Id*. at 128–29.

Viewed in their overall context, Roberts's statements indicated that her views on the death penalty would substantially impair her duties as a juror.  True, Roberts's answers were contradictory at times.  But jurors "cannot be expected invariably to express themselves carefully or even consistently.  Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially." *Patton v. Yount*, 467 U.S. 1025, 1039 (1984).  Thus, "where the prospective juror's response, as

captured in the transcripts, reflects some ambiguity in the state of mind of the juror, then the determination made by the trial court, based on its eyeing the juror, is presumed to be consistent with the applicable standard." *Maynard v. Dixon*, 943 F.2d 407, 415 (4th Cir. 1991).   Despite her inconsistencies, Roberts "expressed reservations, never retracted, sufficient to warrant this  court's determination that they would substantially impair [her] performance of duty to vote for the death penalty if the evidence and law so dictated." *Tipton*, 90 F.3d at 880.

### Michael Williams

As it did with Ms. Roberts, this court excused Michael Williams for cause based on contradictory answers he provided regarding his ability to render a fair verdict on the death penalty.

During voir dire from the court, Williams initially affirmed that he could decide the case "based solely on the evidence produced at trial and in the context of the rules of law . . . ." Tr. 09/07/04, ECF No. 1002 at 201–02.  He agreed that he fell in the "middle category" of potential jurors who were not pre-committed to impose or reject the death penalty.  *Id*. at 202–03.  He likewise affirmed that he understood that someone could be eligible for the death penalty even if he did not personally strike the fatal blow.  *Id*. at 206–07.  When the court asked if there was any reason why he could not be fair and impartial, Williams answered, "I really am not sure about the death penalty part, but other than that, I could be fair."  *Id*. at 207.  Williams affirmed, however, that he could set aside his opinion on the death penalty and conscientiously follow the law as pronounced by the court.  *Id*. at 207–08.

81

Upon questioning by government counsel, Williams articulated a different position. When asked what he had meant when he said he could be fair "except for the death penalty part," Williams explained, "I am not really sure I could do it. I guess after the judge explained the law, I would have to do it, what the law says to impose the death penalty." *Id*. at 217–18. He acknowledged that he had "some problems emotionally or personally because of some of [his] previously-held beliefs about the death penalty . . . ." *Id*. at 218. Williams stated that it was a "difficult situation" to sign one's name to a death penalty verdict "[b]ut the judge says you got to go by what the law says." *Id*.

Government counsel then explained to Williams that even if he found that the government had proved its case, he would not be required to impose the death penalty; he would still have to make a "personal judgment" about whether the death penalty was appropriate in the case. *Id*. at 220. Government counsel then asked Williams if he "could ever come out of that balancing test and decide that the death penalty is the appropriate sentence . . . ." *Id*. Williams answered: "I really am not sure." *Id*. Williams affirmed that the balancing process would be even more difficult if the defendant did not strike the fatal blow. *Id*. at 220–21. Government counsel then asked if Williams could "meaningful[ly] consider and have that balancing test come out in favor of the death penalty" in such a case. *Id*. at 221. "I don't think I would," Williams replied. *Id*.

To follow up, this court clarified that determining the sentence was not a "mathematical calculation" in which the jurors were required to impose the death penalty if the government proved certain facts. *Id*. at 222. The court emphasized that it needed to know whether Williams fell into an "extreme category" of jurors—whether he was "so

82

strongly opposed to the death penalty he couldn't vote for it under any circumstance . . . ." *Id*. at 223. Williams again answered, "I am really not sure, Your Honor. I guess I feel uncomfortable knowing I will be signing my name on something for somebody to die." *Id*. After hearing argument from the attorneys on whether Williams should be excused for cause, the court called for Williams to return to the courtroom and asked if his discomfort with signing a death verdict would "impede [his] ability to be fair to both sides . . . ." *Id*. at 230. Williams responded:

> I am really not sure, Your Honor.  In certain cases, in the Susan Smith[35] case, you know, to me, there is no doubt what she did to her two boys, she should have gotten the death penalty.  And maybe it is because kids were involved, I don't know.  But I feel, you know, I would have to be honest, I would still feel very, very uncomfortable signing the document saying the death penalty.

*Id*. This court then excused Williams for cause. *Id*.

Thus, at both the beginning and the end of voir dire, Williams expressed that he was "not sure" he could be impartial in light of his reluctance to hand down a verdict of death. He did state that he could follow the law as explained by the court. The totality of his answers, however, indicated that he initially thought he would be required to impose the death penalty in certain situations. Once it was explained to him that he would never be required to reach a death verdict but would instead have to make a personal judgment on the propriety of the sentence, Williams expressed uncertainty about whether he could ever impose the death penalty.

---

[35] The Susan Smith case was a highly publicized South Carolina trial involving a young mother who killed both of her infant children.

In light of these answers, this court did not abuse its discretion in finding that Williams's views on the death penalty would substantially impair his ability to follow his oath and the court's instructions.

### *Rubina Khan*

When the court explained to venire member Rubina Khan that the court was looking for jurors who were not pre-committed to impose or reject the death penalty, Khan stated, "Well, I do strongly oppose it, but I guess I could be able to put aside my views." Tr. 08/31/04, ECF No. 919 at 271. When asked if she was "so strongly opposed" to the death penalty that she could never vote for it under any circumstances, Khan answered, "No, I don't think I fall in that category." *Id*. Later, the court explained to Khan that, if the jury returned a verdict of death, all the jurors would have to sign their names to the verdict. *Id*. at 275. Upon learning this, Khan stated, "I don't know if I would be too easy about that." *Id*. at 276. Khan expressed a concern that she might be pressured into reaching a verdict with which she did not agree. *Id*. at 276–77.

After momentarily excusing Khan and hearing argument from counsel, the court asked her some follow-up questions. *Id*. at 279. The court reiterated that if the jury decided upon the death penalty, all of the jurors (not just Khan) would have to sign their names to the verdict. *Id*. at 280. The court asked Khan if she "had some problems" with that requirement. *Id*. "I don't think I can vote for capital punishment, I don't think I can," Khan replied. This court then excused her for cause. *Id*.

Basham argues that the district court erred in dismissing Khan without giving defense counsel the opportunity to rehabilitate her. Pet. at 33. Basham points to no authority

84

suggesting that a court must provide an opportunity to rehabilitate a potential juror who has given disqualifying answers. In fact, the Fourth Circuit has expressly declined to create such a rule. *Boggs v. Bair*, 892 F.2d 1193, 1201 (4th Cir. 1989) ("[W]e decline to introduce into the law the rule argued for by *Boggs* which would say that a trial judge has a constitutional duty to try to rehabilitate by his personal questioning any juror who has been shown to be disqualified . . . .").

Moreover, Basham can only speculate whether Khan, upon questioning from defense counsel, would have retracted her statement that she did not think she could vote for capital punishment. If the court had allowed defense counsel to ask rehabilitative questions, it presumably would have allowed the government to ask questions as well. The government's questions likely would not have been geared towards "rehabilitation" and may well have shown Khan's reservations to be even more pronounced.

In any event, even if the court had allowed rehabilitation by the defense, and even if Khan retracted her earlier statements, the court would be left with a venire member who had given contradictory responses. As it did with other potential jurors, the court would have been justified in excusing Khan in the face of such contradictions.

*Susan Jackson*

Susan Jackson stated in her written questionnaire that she was "strongly opposed to the death penalty and would have a difficult time voting for it, regardless of the facts and law in the case." Tr. 09/03/04, ECF No. 922 at 72. She also wrote, "Taking a life under any circumstances is reprehensible." *Id*. During voir dire, the district court asked Jackson whether she could "set those beliefs aside and conscientiously follow the law as announced

by the trial judge . . . ." *Id*. at 73. Jackson replied, "I don't think I can, sir." *Id*.

After some discussion with the attorneys, the court called Jackson back in for further questioning. *Id*. at 74. At that time, Jackson informed the court that she "probably" should have checked the questionnaire box which indicated that she was "personally morally or religiously opposed to the death penalty and would never vote to impose it, regardless of the facts and law . . . ." *Id*. at 74–75. "After sleeping on it," Jackson concluded that she actually fell in the disqualifying category. *Id*. at 75. The court then disqualified her. *Id*.

Basham argues that the district court should have allowed defense counsel an opportunity to rehabilitate Jackson. Pet. at 33. But as explained above, there is no requirement that the court grant such an opportunity. Jackson was forceful and direct in explaining that her opposition to the death penalty would hinder her ability to follow her oath and instructions. In fact, the more she thought about it, the stronger her opinion became that she could never impose the death penalty, regardless of the circumstances. There is no indication that additional questioning would have led Jackson to recant her position or, even if that occurred, that additional questioning would have satisfied the court that Jackson could be a fair and impartial juror.

*Failure to Raise the Disqualification Issue on Appeal*

In addition to challenging the court's decision on the four disputed jurors, Basham also challenges the decision of appellate counsel not to include the juror disqualification issue as one of those presented to the Court of Appeals in the direct appeal.

Any appellate challenge to their disqualification would have been weak. Basham recognizes that "weeding out of weaker issues is widely recognized as one of the hallmarks

86

of effective appellate advocacy . . . ." Pet. at 36. Basham maintains, however, that the "weeding" principle "has little or no applicability in capital cases—for appellate counsel in a capital case has a duty to consider all potentially available claims . . . ." *Id*. at 36–37. He offers no support for this proposition. To be sure, it would be practically (if not theoretically) impossible for appellate counsel to include every conceivable issue in a capital appeal, even if there were no word or page limits. If perceived errors in the trial proceedings are not filtered by the merits of challenges to those errors, there will always be one more challenge to raise. Because an appellate challenge to the exclusion of the challenged jurors would have been without merit, appellate counsel was not deficient for declining to raise this issue.

For the same reason, Basham cannot demonstrate any prejudice. Even if his appellate lawyers had raised the issue, there is no reasonable probability that doing so would have changed the outcome of his appeal.

In sum, Basham cannot show that this court was not correct in disqualifying the four jurors, nor was counsel ineffective for not raising the issue on appeal. Claim 2 is without merit.

## CLAIMS 4, 5, 6 & 7:
### BASHAM'S COMPETENCY

### *Introduction*

Four of Basham's claims relate to his competency at the time of his trial. More specifically, Claim 4 alleges that Basham was tried and sentenced while legally incompetent, and Claims 5, 6, and 7 allege that his trial counsel, the court, and his appellate counsel, respectively, all violated Basham's rights by failing to raise the issue of competency at trial.

87

This court spent much of the § 2255 evidentiary hearing listening to testimony about Basham's competency. The court heard from Basham's initial team of attorneys (Littlejohn and Monckton) about their assessment of Basham's mental state. The court also heard from Basham's trial counsel (Swerling and Harris) about their impressions of Basham's competency and about the findings from numerous experts they retained to assess Basham's competency. Further, the court heard from two experts about Basham's competency at the time of his death penalty trial. In preparing this order, the court has also reviewed reports and testimony from experts who evaluated Basham before and during his trial. Needless to say, the court feels well-informed of both the lay impressions of Basham's mental state given by his attorneys, and the diagnostic impressions of Basham's competence given by the many experts who have evaluated Basham since this case began in 2002.

Littlejohn and Monckton filed a motion for a mental competency evaluation only a few weeks after Basham was arrested. *See* ECF No. 22. However, their motion provides little insight into the particular reasons for their request. Before the court was able to address the motion, Littlejohn and Monckton were disqualified from the case, and Swerling and Harris took over as Basham's defense attorneys.

Once they entered the case, Swerling and Harris retained numerous mental health experts to treat Basham and to assess his mental state, deciding it was better to have their own experts examine Basham rather than to go forward with the government-sponsored competency evaluation requested by Littlejohn and Monckton. Some of the experts Swerling and Harris relied upon included forensic psychiatrists Donna Schwartz-Watts and Donald

Morgan,[36] neuropsychiatrist Tora Brawley, and neurologist William Brannon.  Dr. Schwartz-Watts alone interviewed Basham forty times, spending a total of over 200 hours with him. Neither Dr. Schwartz-Watts nor any other expert ever made a finding that Basham was incompetent and unable to go forward with the trial.

As examinations and evaluations by defense experts began, trial counsel requested that Basham be moved out of the Richland County Detention Center and transferred to Columbia Care Center, a secure facility with medical treatment capabilities.  Dr. Schwartz-Watts apparently approved the transfer believing that "Basham [needed to] be moved from the detention center to the Columbia Care Center for more appropriate treatment and monitoring."  ECF No. 95 at 2.  In response to the request, the government asked that Basham undergo a competency evaluation, a motion that trial counsel opposed.  ECF No. 99. According to trial counsel's motion, Basham was competent, as "[w]ith the necessary therapy, Defendant Basham has been able to assist in his defense and to understand the gravity of the charges he faces."  *Id.* at 2.  At a hearing on Basham's motion to transfer to Columbia Care Center, trial counsel noted that Dr. Schwartz-Watts was examining Basham "for the purpose of establishing competency" and that a transfer to Columbia Care Center "would allow her to complete her evaluation and to make a determination so that she [could] properly advise [trial counsel] as to his competency and his ability to stand trial."  Tr. 6/18/03, ECF No. 260 at 3.  At the same hearing, the government made the following uncontradicted observations:

---

[36] An additional expert, Janet Vogelsang, worked with Basham's trial counsel to recreate and then convey to the jury a biopsychosocial assessment (or family background history assessment) of Basham.  See Tr. 10/11/12, ECF No. 1555 at 343–344; Tr. 10/15/12, ECF No. 1556 at 629.

89

> In [trial counsel's] response . . . it states that there is no current intention on their part to suggest that [Basham] is not competent to stand trial . . . .  We have reviewed discovery pertaining to the Defendant.  We have reviewed statements that he made.  We have gotten correspondence that he sent to third parties and there is nothing there to suggest that he is not competent to stand trial.

*Id.* at 5.

Once trial counsel confirmed that they were not raising competency as an issue at that time, the government withdrew its request for a competency determination and agreed to have Basham transferred to Columbia Care Center.  The court ordered that Basham be transferred to Columbia Care Center for thirty days.  At trial counsel's request, the court subsequently permitted Basham's continued stay at Columbia Care Center for an additional month, until October 15, 2003.

As noted above, Dr. Schwartz-Watts interviewed Basham at least forty times, for a total of more than 200 hours.  Tr. 10/27/04, ECF No. 968 at 114–17, 264.  There is nothing to suggest that Dr. Schwartz-Watts found Basham to be incompetent.  In fact, at the *Jackson v. Denno* hearing on February 24, 2004, the court interrupted the proceedings to allow Dr. Schwartz-Watts to examine Basham yet again, and she found him to be competent.  Tr. 2/24/04, ECF No. 698 at 3.

On September 20, 2004, during the guilt phase of the trial, Basham became upset after the court told him that he could not have smokeless tobacco during trial.  After that, Basham "refused to comply with the district court's instruction to take his seat" and "a tussle ensued in the courtroom between the defendant and the marshals."  *Basham*, 561 F.3d at 333; Tr. 9/20/04, ECF No. 941 at 149–53.  After the situation was under control and Basham was sent

90

to a holding cell, trial counsel asked for a continuance to allow Dr. Schwartz-Watts to examine Basham to determine his competency. *Id.* at 153–54. ("We would ask for a delay . . . . We have a doctor on the way . . . . We are concerned about the competency."). The court granted this delay. Dr. Schwartz-Watts examined Basham both that afternoon and the next morning. Immediately following the tussle, Dr. Schwartz-Watts met with Basham for "about 15 or 20 minutes" after which she testified that she had "concerns about his competency." *Id.* at 162. However, she noted that "with a little time, perhaps by tomorrow, there would be no reason that I can foresee that he wouldn't be calm enough that we can proceed." *Id.*

The next morning, at the start of court, Swerling announced that Basham was "competent this morning according to Dr. Watts." Tr. 9/21/04, ECF No. 942 at 6. Dr. Schwartz-Watts affirmed that she had "spent about 45 to 50 minutes with Mr. Basham" that morning and had determined that he was "back to his baseline this morning . . . [and] able to make decisions." *Id.* The court then asked counsel if they were "satisfied [that their client was] competent to go forward," and Swerling answered, "[t]here is no question about competency." *Id.* at 7.

A month later, Dr. Schwartz-Watts testified for two days at the mitigation phase of the trial. She testified extensively about Basham's mental state, including his conduct at trial, but she never hinted that Basham was incompetent. In fact, Dr. Schwartz-Watts testified that although Basham had major mental illnesses, "none of these illnesses affected his ability to distinguish right from wrong." Tr. 10/28/04, ECF No. 969 at 97. Dr. Schwartz-Watts further testified regarding Basham's altercation with the deputy marshals in the

courtroom, opining that it was "not at all" the result of a panic attack. *Id.* at 98.

CLAIM 4:
BASHAM'S COMPETENCY AT THE TIME OF HIS TRIAL

In Claim 4, Basham contends that he was tried and sentenced while legally incompetent in violation of the Fifth, Sixth, and Eighth Amendments. He claims that "at the time of trial, he lacked the 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.'" Pet. at 39 (citing *Dusky v. United States*, 362 U.S. 402 (1960)).

The government asserts that Claim 4 is procedurally barred and must be dismissed because it is a direct appeal issue and not an appropriate claim in a § 2255 motion. This court must disagree. The claim that Basham was incompetent during his trial is a type of claim known as a "substantive competency claim," and "this kind of claim 'is not subject to procedural default and must be considered on the merits.'" *Battle v. United States*, 419 F.3d 1292, 1298 (4th Cir. 2005) (quoting *Medina v. Singletary*, 59 F.3d 1095, 1106, 1111 (11th Cir. 1995)). As such, the court addresses the merits of this claim below.

The Fourth Circuit has expressed the burden of a § 2255 petitioner attempting to prove a substantive incompetency claim as follows:

> [A] petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his incompetency by a preponderance of the evidence. Not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges. Likewise, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial.

*Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000) (quotations and citations omitted).

92

In this case, though the court must concede that some of Basham's behaviors at trial were bizarre, volatile, and irrational, this court does not believe that the evidence indicates that Basham was incompetent and thus unable to assist his trial counsel or to understand the charges against him.

*Altercation Between Basham
and United States Deputy Marshals on September 20, 2004*

Basham asserts that he was incompetent on September 20, 2004 during the courtroom altercation between himself and eight United States deputy marshals. As evidence of his incompetence, Basham offers the statements of his trial counsel and of Dr. Schwartz-Watts. Immediately after the altercation, Greg Harris expressed concern about Basham's competency, stating that Basham's actions "[l]ooked like someone who didn't have the ability to control the simple function of sitting down in a seat. That is why we have a concern about competence today." Tr. 9/20/04, ECF No. 941 at 157–58. As previously discussed, Dr. Schwartz-Watts also expressed her concerns about Basham's competency to the court.[37] Basham asserts "that, at the very least, on September 20, 2004, [he] was incompetent during his trial." Reply at 31. Of course, the jury was not present at the time of the altercation, and, out of an abundance of caution, the court adjourned for the day

---

[37] At argument on this motion, the government suggested that Dr. Schwartz-Watts's testimony was not clear as to whether she believed Basham was incompetent at the time of the altercation or whether she believed that he got worked up from the altercation and was incompetent as a result. She testified as follows:

> I do have concerns about his competency. It is my opinion right now that because of his mental defect that he can't assist his attorneys. Now, the problem with that and the good news probably is, his mental state fluctuates, and there is going to be times [sic] in this trial where he has competence fluctuation. With a little time, perhaps by tomorrow, there would be no reason that I can foresee that he wouldn't be calm enough that we can proceed.

Tr. 9/20/04, ECF No. 941 at 162.

thereafter.  As such, the jury did not witness the scuffle as it was happening, nor did they see

Basham again that day.  However, the tussle was caught on videotape and audiotape, and the

court allowed excerpts of those tapes to be played for the jury during the penalty phase of the

trial.[38]  Basham contends that "the Court deprived him of his right not to be tried while

incompetent when it allowed the government to use his incompetence to its own advantage."

Reply at 32.

Not believing that Basham's outburst was a sign of incompetency, the government

argued that the scuffle was an attempt at manipulation on Basham's part.  However, the court

did not make a specific finding as to whether Basham was incompetent either during or after

the altercation or whether he was merely manipulating the court.  Rather, the court decided

to adjourn for the day to "let everybody cool down" with the plan to bring Basham back the

next day to "see how he does."  Tr. 9/20/04, ECF No. 941 at 163.  The next day Basham

returned, and the trial resumed after Swerling assured the court that there was not an issue

with Basham's competence.

There is some evidence that during the scuffle with the deputy marshals, Basham was

not competent.  For example, during the tussle and right before Basham was led out of the

courtroom, Basham addressed one of the reasons that he had been refused smokeless

tobacco,[39] saying "Judge, if I was going to spit, as mad as I am now, I would be spitting now.

---

[38]  The court notes that the full audiotape of the altercation was not played for the jury.  It was
selectively redacted to include enough information so that the jury could understand the context of the fight
but to exclude portions that were prejudicial.  *See* Tr. 10/15/04, ECF No. 957 at 229–36.

[39] The United States Marshal advised the court against providing Basham with tobacco dip to keep
him alert during trial.  According to the Marshal, Basham had a history of flinging bodily fluids, and the
deputy marshals were concerned that Basham might spit the dip at them.  The court informed Basham that
he would not be allowed to use dip during trial, citing the spitting hazard as a reason for its decision.

They just made that up." Tr. 9/20/04, ECF No. 941 at 153. Basham apparently had the presence of mind to make a last-ditch argument as to why he should have been allowed smokeless tobacco, even as he was being escorted out of the courtroom. Additionally, the government offered some evidence that Basham may have planned to act out in court. A United States Marshal testified that shortly before the altercation, when the Marshal and two other deputies were bringing Basham up from the holding cell, Basham announced, "I am not going to be up there for that long. I am coming back down here." *Id*. at 166.

The court is not bound by the testimony of Dr. Schwartz-Watts in making its determination as to Basham's competence at the time of the altercation during trial. Based on all of the evidence before this court—including Basham's own statements made prior to and during the altercation—this court does not believe that Basham was incompetent at the time of the courtroom scuffle. As such, Basham's constitutional rights were not violated when the government later showed both videotape and audiotape of the altercation to the jury during the penalty phase of his trial.

*Basham Improperly Medicated on October 26, 2004*

Basham claims that he was incompetent on October 26, 2004, during the penalty phase of his trial. The morning of October 26, the court learned that Basham was not given Seroquel, his antipsychotic medication, the night before at Richland County Detention Center where he was housed. Because Basham's medication was not properly administered, the court ordered him to take his medicine the morning of trial, and the court delayed the trial until 1 o'clock in the afternoon to allow the medicine to take effect. The court then gave Swerling and Harris an additional fifteen minutes to work with their client—even after the

95

trial was set to resume. But after those delays the government insisted that the trial continue. When the court ultimately decided to resume the trial over counsel's objections, the court expressed the need to balance any jury prejudice that would result from further delays—which the court surmised the jury would assume were Basham's fault—with any jury prejudice from going forward "with him appearing to be a little bit disheveled over there." Tr. 10/26/04, ECF No. 965 at 16.

Though Basham's trial attorneys stated that they were concerned with the appearance of their client, they presented no evidence that Basham was incompetent after taking his medicine. The record indicates that Basham was agitated when he arrived in court that morning and that he appeared sleepy during testimony that day, but those behaviors are consistent with the way Basham acted throughout trial.

In his § 2255 petition, Basham urges the court that the improper administration of psychiatric medication can render a defendant incompetent. *See United States v. Quintieri*, 306 F.3d 1217, 1233 (2d Cir. 2002). However, there is a lack of evidence that Basham was incompetent on that date (October 26, 2004). If there had been any indication that he was incompetent, the court would have sought the testimony of a doctor on Basham's competency, as this court did on other occasions. At an *ex parte* hearing before Basham took his medication, the court indicated that it was particularly cognizant of the possibility of a § 2255 action if Basham received the death penalty, conveying its understanding of the need for Basham to be not only competent, but also in a good state of mind for trial. Tr. 10/26/04, ECF No. 966 at 5 ("There is no doubt in my mind, if the defendant receives the death penalty, if he does, and if it is upheld on appeal, there will be a 2255 action challenging the

96

fact that he was not dispensed medicine properly and could not participate in his defense.").

*Basham's General Behavior at Trial*

Basham submits that throughout the trial there were occasions where his incompetence was evident, and Basham cites to the trial transcript to show numerous instances where his counsel or the court discussed Basham's behavior.

For example, Basham contends that he had trouble staying awake at some points during the trial.[40] He also obsessed over dip[41] according to the trial notes and § 2255 hearing testimony of his trial attorneys. Tr. 10/15/12, ECF No. 1556, at 588; Pet.'s Ex. 94.

As further evidence signifying incompetence at the time of trial, Basham cites to a specific occasion on October 22, 2004, when his condition deteriorated during the testimony of one of his former social workers, Penny Titzer. The court excused the jury late in the afternoon, after a full week of trial when Basham's trial counsel requested a break for their client. At that time, Basham expressed his frustration and stated "I'm out of emotions. I

---

[40] Though, at the § 2255 hearing, Basham introduced some evidence that he tried to sleep through trial, the weight of the evidence shows otherwise. Harris and Swerling testified that they prevented him from trying to sleep and that the court also stopped Basham from sleeping. Tr. 10/11/12, ECF No. 1555 at 293 ("I would think almost every occasion where we did see him sleeping we made that known to the court . . . ."); Tr. 10/15/12, ECF No. 1556 at 584 ("I don't recall that he was sleeping. There were a couple of occasions where, as the court just reported, that he would close his eyes . . . ."). During the trial, the court took upon itself the task of making sure Basham was alert and awake, providing coffee, caffeinated soft drinks, and smokeless tobacco (during breaks) to Basham. The court noted the following:

> I became concerned that if the defendant slept through the proceedings, that six years from now, when all of the lawyers have moved on to other things, law clerks are all gone, one person left would be me still in this case. There will be a suggestion from the defendant, if he is convicted and gets the death penalty, that he slept through his whole trial . . . . I want to avoid that at all costs.

Tr. 10/15/04, ECF No. 957 at 224–25.

[41] As discussed earlier, the court refused to allow Basham to have smokeless tobacco in the courtroom. However, in an attempt to keep Basham alert, the court allowed Basham to have smokeless tobacco during the morning and afternoon breaks from trial.

97

don't even know how to express it."  Tr. 10/22/04, ECF No. 963 at 213.[42]

Basham asserts that his poor behavior during trial indicated that he was incompetent at that time.  However, this court believes that all of Basham's misbehavior at trial can be explained by the various mental diseases and defects that he has been diagnosed with—none of which render him incompetent.

For example, Basham has been diagnosed as having Attention Deficit Hyperactivity Disorder (ADHD) by a number of doctors since he was a child, which could explain his failure to pay attention during his trial.  Dr. Richard L. Frierson, M.D., who evaluated Basham for purposes of the § 2255 evidentiary hearing, noted the following:

> He continues to display difficulty attending to tasks.  Although he was able to focus on our five-hour evaluation, we had to take frequent breaks because he would be easily distracted.  At times, he appeared not to pay attention to questions being asked and questions had to be repeated.  He often avoids or is reluctant to engage in tasks that require sustained mental effort.  This is also clearly evident in his appearances in the courtroom.

Govt's Ex. 251 at 13.  Basham's expert for his § 2255 petition, Dr. Thomas Hyde, M.D., Ph.D., also recognized Basham's severe attention problems and explained that Basham's problems lead to anxiety, frustration, and confusion, which can manifest as angry emotional outbursts.

---

[42]  During the § 2255 evidentiary hearing, habeas counsel proposed that Titzer's testimony was traumatic for Basham because he had had a sexual relationship with her when he was only fourteen or fifteen years old and she was his counselor.  Habeas counsel then attempted to draw a connection between Basham's behavior on October 22, 2004 and the episode on October 26, 2004 when Basham arrived at the courthouse without having taken his medication.  Habeas counsel stated that the October 26th incident occurred on the very next day that court was held, stating, incorrectly, that court was not held October 25th and suggesting an association between Basham's mental distress on Friday, October 22nd and his behavior on October 26th.  However, habeas counsel was incorrect in their statement of the facts.  Trial did go forward on October 25th, and Titzer finished her testimony without incident.  Thus, the connection between the events of October 22nd and October 26th is more attenuated than habeas counsel led the court to believe at argument.

Despite diagnosing Basham with ADHD and a host of other mental issues,[43] Dr. Frierson ultimately concluded that there was insufficient evidence to suggest that Basham was incompetent at the time of trial. Dr. Hyde, on the other hand, opined that "Basham is permanently incompetent on the basis of attention deficit disorder, bipolar disorder, and organic brain damage resulting from closed head injury, and polysubstance abuse (especially the toxic consequences of the inhalation of inorganic solvents)." Pet.'s Ex. 103 at 11–12.

This court agrees with Dr. Frierson's impression and finds that the instances of poor behavior cited by Basham are not sufficient to show that Basham lacked sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding[44] at the time of his trial.

Basham has not shown by a preponderance of the evidence that he was incompetent at the time of his trial. As such, Claim 4 is denied.

CLAIM 5:
TRIAL COUNSEL'S FAILURE TO RAISE
INCOMPETENCE ISSUE AT TRIAL

In Claim 5, Basham alleges that his trial attorneys rendered ineffective assistance of

---

[43]  Dr. Frierson diagnosed Basham as having the following:  ADHD; cognitive disorder, not otherwise specified; malingering of psychotic symptoms; alcohol abuse; inhalant dependence, in full sustained remission; cannabis dependence, in a controlled environment; cocaine dependence, in a controlled environment; learning disorder, not otherwise specified, by history; antisocial personality disorder; and chronic back pain.

[44]  At the § 2255 evidentiary hearing, the court learned that one way Basham communicated with his trial counsel was through the use of notes.  In one note, he asked Swerling for the juror questionnaires and indicated that he wanted to have someone else look over the questionnaires with him so that he could give his opinion on the potential jurors. Govt. Ex. 247. In another note, his trial counsel (presumably, Swerling) asked Basham if he wanted his attorneys to concede his involvement in the Samantha Burns case.  Basham appears to have responded, "No, no." *Id.* These notes, among others, presented at the § 2255 evidentiary hearing show that there was communication going on between Basham and his trial counsel and that he was actively participating in his case.

counsel by failing to request that the trial court determine Basham's competency to stand trial. Alternatively, they argue that trial counsel was ineffective for failing to request a delay in trial until such time that Basham became competent.

As previously mentioned, Swerling and Harris became Basham's trial counsel in April 2003, and, soon after, they had Basham transferred to Columbia Care Center to have Dr. Schwartz-Watts evaluate him. In September 2003, Basham's trial counsel had his stay at Columbia Care extended on the advice of Dr. Schwartz-Watts. According to Basham, the "record is devoid of any evidence that, between September 2003 and the commencement of Mr. Basham's trial in September 2004, defense counsel took any further steps to confirm Mr. Basham's competency to stand trial." Pet. at 51. Basham further asserts that, even during trial, his trial counsel "failed to inform the Court of their concerns about Mr. Basham's competency, and took no steps to delay or terminate Mr. Basham's trial because of his incompetency." *Id.* at 52.

This court must disagree with the allegations made by Basham with regard to this ineffective assistance of counsel claim. Rather than showing that trial counsel were inactive in their investigation of Basham's competency, the record reveals that Swerling and Harris were thorough in having Basham's competency assessed.

At the § 2255 evidentiary hearing, Swerling stated that he had experts evaluate Basham "several times," Tr. 10/15/12, ECF No. 1556 at 662, and those "experts were saying he was competent," *id*. at 659. Moreover, to say that trial counsel failed to raise the issue of competency to the court is simply not true. For example, trial counsel brought their concerns about Basham's competency to the court during the morning of the *Jackson v. Denno* hearing

100

on February 24, 2004.  Tr. 2/24/04, ECF No. 896 at 3 ("I think to be safe and prudent, somebody ought to look at him and see if he is okay and if he's competent to assist us today, and understands the nature of the proceedings and can assist us.").  Months later when Basham tussled with United States deputy marshals in the courtroom, trial counsel asked that Basham be evaluated.  Tr. 9/20/04, ECF No. 941 at 157–58.  Contrary to Basham's assertions, his trial counsel raised the issue of competency before the court multiple times, and each time that trial counsel questioned Basham's competency before the court, the court suspended the proceedings until Basham's own expert found him ready to go forward.

Though trial counsel clearly raised the issue of competency when they felt it was necessary, the government suggests that trial counsel had strategic reasons for not making a general claim that Basham was incompetent.  The government argues that Swerling and Harris did not want the government doctors to have unfettered access to Basham during the pretrial stages of the case.  Of course, the absence of any expert opinion that Basham was incompetent suffices to show why trial counsel did not raise the issue of competency.  However, at the 2255 evidentiary hearing trial counsel acknowledged that they were concerned about "the battery of tests that would be administered if the government got a hold of him."  Tr. 10/14/12, ECF 1555 at 358.  In other words, though Swerling and Harris were able to work with Basham in preparing his case, they certainly could not always control what he did and said, and they were concerned about what Basham might do or say while government doctors evaluated him.  Thus, trial counsel arguably had an additional reason not to claim that Basham was incompetent.

Basham takes issue with the government's argument and points out that "[c]ompetency to stand trial is not a 'defense;' it is a 'rudimentary' and 'fundamental' constitutional aspect of due process of law." Reply at 49 (quoting *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996)). The court agrees with Basham that competency is a constitutional requirement. However, in this case, where trial counsel's "own experts were saying he was competent[,] . . . there really would have been no logical reason to let the government pass on that issue . . . ." Tr. 10/15/12, ECF No. 1556 at 659.

Based on trial counsel's performance during Basham's trial and based on their testimony at the § 2255 hearing, this court concludes that Swerling and Harris were well-aware of their ongoing obligation to bring to the court's attention any concerns that they had about Basham's competency. In fulfilling that obligation, trial counsel decided that rather than assert a claim that Basham was incompetent with no evidence to support such claim, they would proceed in their representation of Basham and raise the issue of competency whenever they saw a genuine issue. At the § 2255 hearing, Swerling explained his position, stating:

> [T]he whole goal here was to save Brandon Basham's life, so there would be absolutely no reason at all for me not to pursue it if it was there, if somebody was saying it was or if anybody observed that he was incompetent. . . . Everybody thought he was competent.

Tr. 10/15/12, ECF No. 1556 at 676–77.

For purposes of this claim, the court is not to consider whether a court or some other attorney thinks that counsel should have raised the competency issue; the court must ask whether trial counsel was "unreasonable" in concluding that under the circumstances they

should not have raised such a defense.  This court cannot conclude that trial counsel's decision to not pursue a competency defense was unreasonable when there is no evidence that Basham failed to understand the proceedings or that he was unable to cooperate with counsel.  *See Robidoux v. O'Brien*, 643 F.3d 334, 340 (1st Cir. 2011).  Accordingly, this court cannot find ineffective assistance by trial counsel as to Claim 5.

CLAIM 6:<br>THE COURT'S OBLIGATION TO ENSURE COMPETENCY

In Claim 6, Basham argues that the court abdicated its obligation under 18 U.S.C. § 4241(a) to ascertain whether he was competent to stand trial, despite the fact that considerable evidence was presented to the court that he was, in fact, unable to assist properly in his defense.  Basham further claims that regardless of § 4241, the court was obligated under *Pate v. Robinson*, 383 U.S. 375 (1966), to conduct a competency evaluation in this case.

This challenge is unavailing and fails because:  (1) this is a direct appeal issue that Basham procedurally defaulted; (2) there was not reasonable cause to believe that Basham was incompetent; and (3) Basham's trial counsel resisted such an order for strategic reasons and affirmatively told the court that Basham was not incompetent.

A trial court is required to order a competency hearing when the court finds "reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  18 U.S.C. § 4241(a).  Similarly, a trial court's failure to inquire into

103

competency, *sua sponte*, where there is reason to doubt a defendant's competency, violates due process because it deprives the defendant of his right to a fair trial. *Drope v. Missouri*, 420 U.S. 162, 172 (1975); *Pate*, 383 U.S. at 385–86. But barring indicia of incompetence, due process does not require that a competency hearing be held. *Godinez v. Moran*, 509 U.S. 389, 402 n.13 (1993). Because evidence of a defendant's demeanor at trial is relevant in determining competency, a district court may determine informally whether reasonable cause exists by observing the defendant's demeanor and assessing his statements during colloquies and other interactions with the court. *United States v. Jones*, 642 F.3d 1151, 1161 (D.C. Cir. 2011); *United States v. Weathington*, 507 F.3d 1068, 1073 (7th Cir. 2007); *United States v. Grimes*, 173 F.3d 634, 636 (7th Cir. 1999). If the preliminary inquiry does not establish reasonable cause to believe the defendant is incompetent, a hearing is not mandatory. *United States v. Graves*, 98 F.3d 258, 261 (7th Cir. 1996).

Basham did not challenge the district court's failure to order a competency hearing pursuant to 18 U.S.C. § 4241 during trial. Moreover, Basham did not raise this issue on direct appeal but brings this challenge for the first time in this § 2255 proceeding. Alleged violations of 18 U.S.C. § 4241 are not cognizable under § 2255. *See United States v. Williams*, 819 F.2d 605, 607 (5th Cir. 1987). Claim 6 is a procedural competency claim, and because it was not raised on direct appeal, it has been waived. *Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005). If a defendant fails to raise an issue at trial or on direct appeal, he must show cause excusing the procedural default and actual prejudice resulting from the alleged error to prevail under § 2255. *United States v. Frady*, 456 U.S. 152, 167–68 (1982); *United States v. Dunham*, 767 F.2d 1395, 1397 (9th Cir. 1985).

104

Basham admits that, to the extent that this claim invokes 18 U.S.C. § 4241, it could be found to be procedurally defaulted. However, Basham contends that there is both "cause" and "prejudice" in this case that excuses the procedural default. Basham argues that his appellate counsel's ineffective assistance of counsel, which is the subject of Claim 7, is the "cause" for his failure to raise the § 4241 claim earlier. Basham further submits that he was prejudiced by his appellate counsel's failure to raise this claim. Additionally, Basham argues that even if a petitioner's § 4241 claim is barred, he may raise in a § 2255 proceeding that "closely related" claim, premised on *Pate*, that "the evidence before the trial court presented a 'bona fide doubt' as to his competency and therefore the court was required to hold a competency hearing before proceeding with trial . . . ." *Williams*, 819 F.2d at 607; *cf. Battle*, 419 F.3d at 1298 (finding *Pate* claims to be waived if not raised on direct appeal).

This court believes there was no cause or prejudice to excuse the procedural default in this case and that the instant claim is barred. However, out of an abundance of caution, the court discusses the merits of Basham's entire Claim 6, below.

Even if this claim were not defaulted, this court did not err or abuse its discretion in refusing to order a competency evaluation or hold an evidentiary hearing to determine Basham's competence to stand trial. As explained earlier, Basham's behavior, though strange, did not suggest that he was incompetent. Moreover, trial counsel and Dr. Schwartz-Watts informed the court at different times that Basham was competent. *See United States v. Clark*, 617 F.2d 180, 186 (9th Cir. 1980) (fact that defendant's attorney considered defendant competent to stand trial was significant evidence that defendant was competent). Furthermore, Basham's trial counsel affirmatively sought to prevent the court from ordering

a competency evaluation and hearing. *Hernandez*, 930 F.2d at 718 (trial counsel in best position to evaluate client's comprehension of the proceedings).

Basham argues that this court ignored facts raising a bona fide doubt as to his competency. He points to October 26, 2004 and asserts that the court, "because of scheduling concerns, elected to proceed despite Mr. Basham's obvious, erratic behavior and his attorney's expressed concern about his competency to proceed." Reply at 55–56. However, the record shows that Basham's trial counsel never told the court that they were concerned about their client's competency that day.

As discussed in Claim 4, after Basham received his medicine, Swerling and Harris expressed their concern that he would not be able to "sit in the courtroom and pay attention to the testimony, remain silent." *Id*. at 14. Additionally, Harris stated, "I just don't think that he is in a state, frame of mind to go forward today." *Id*. at 16. However, they expressed no concerns about Basham's competency though they had done so in the past when they recognized that issue. The record also shows that the court acknowledged that Basham looked "a little bit disheveled." *Id*. However, the court clearly did not see any evidence of incompetency, as it had repeatedly demonstrated its willingness to halt proceedings to ensure that Basham was competent.

Under such circumstances, the court cannot be faulted for failing to order a competency hearing, *sua sponte*. *See e.g.*, *Jermyn v. Horn*, 266 F.3d 257, 298 (3d Cir. 2001) (no competency hearing required "where there were no medical opinions on competency submitted to the trial court, no signs from trial counsel that the defendant's competence was in doubt in his view, and the defendant's behavior, while strange, was not sufficiently

106

indicative of [an] individual who was incapable of understanding the nature of the proceedings, communicating with counsel or assisting in his defense"). Accordingly, the trial court did not err in refusing to order a competency hearing, *sua sponte*.[45]

CLAIM 7:
APPELLATE COUNSEL'S FAILURE TO RAISE
THE ISSUE OF BASHAM'S INCOMPETENCE ON APPEAL

In Basham's Claim 7, he asserts that his appellate attorneys negligently failed to raise on direct appeal both the issue of incompetency and the issue of the court's failure to fulfill its *sua sponte* obligation under 18 U.S.C. § 4241(a) to order a competency hearing.

The selection of which issues to present on appeal is, almost by its very nature, a strategic decision. *See Burket v. Angelone*, 208 F.3d 172, 189 (4th Cir. 2000) ("[A]ppellate counsel is given significant latitude to develop a strategy that may omit meritorious claims in order to avoid burying issues in a legal jungle."); *Haynes v. United States*, 451 F. Supp. 2d 713, 722 (D. Md. 2006) ("Limiting the issues to the stronger or strongest ones while winnowing out the weaker is sound appellate strategy."). "Effective assistance of appellate counsel does not require the presentation of all issues on appeal that may have merit, and [the court] must accord counsel the presumption that he decided which issues were most likely to afford relief on appeal." *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008)

---

[45] Although not advanced by the government in its brief in the § 2255 proceeding, at trial the government introduced a thirty-nine foot long rope that Basham had improvised while staying at Columbia Care Center in pretrial incarceration. The government suggested that Basham intended to use the rope in an escape attempt. The rope was made out of bed sheets carefully torn into strips approximately one inch wide, which were then twisted into a filament using the crank handle on the bed in Basham's room. These filaments were then woven into a rope approximately three-fourths of an inch in diameter that closely resembled ropes available at traditional hardware stores. Tr. 10/12/04, ECF No. 954 at 242–57. The government stretched out the rope across the courtroom for cross-examination of defense witnesses who suggested that Basham's mental and physical limitations were significant impediments to impose a death sentence.

(alterations, quotations, and citations omitted). "Winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy," and "counsel's failure to raise a weak constitutional claim may constitute an acceptable strategic decision designed to avoid diverting the appellate court's attention from what [counsel] felt were stronger claims." *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000) (alterations, quotations, and citations omitted). Consequently, while it is conceivably possible to bring an ineffective assistance claim premised on an appellate counsel's failure to raise an issue, "it will be difficult." *Id.* (alterations and quotations omitted). "'Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.'" *Lawrence*, 517 F.3d at 709 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

No less than ten attorneys made up the appellate team that researched, wrote, and argued the claims presented in Basham's direct appeal to the Fourth Circuit. Tr.10/9/12, ECF No. 1561 at 88–89. Appellate counsel submitted a thorough and well-reasoned 164-page opening brief, which set forth six issues, and a subsequent 64-page brief. The appeal of Basham's trial and sentencing resulted in a lengthy opinion. *See Basham*, 561 F.3d 302 (4th Cir. 2009).

Basham asserts that appellate counsel rendered ineffective assistance of counsel when they "unreasonably chose to forego [competency claims] in favor of other, much weaker arguments . . . ." Reply at 57. Specifically, Basham believes that appellate counsel presented a weaker issue when they argued that the court should have allowed trial counsel

to present evidence from the Fulks trial—namely, evidence of Fulks's prior actions and of the government's description of Fulks at his trial. According to Basham, that argument is weaker than a stand-alone competency claim because the court deferred ruling on the admissibility of the Fulks trial evidence, and trial counsel never renewed their motion during trial. Thus, the trial court never issued a ruling on that issue, and the Fourth Circuit could not even review the objection for plain error. *Basham* 561 F.3d at 335.

It is disingenuous for Basham to imply that appellate counsel chose to forego a competency claim completely. It is clear from the evidence presented at the § 2255 hearing that appellate counsel considered including the competency issue in various ways in their appellate brief, and, ultimately, they decided that it was best to include the competency issue as part of the disqualification section of their brief regarding this court's disqualification of Littlejohn and Monckton. Additionally, appellate counsel's argument regarding the Fulks trial evidence was not raised as a stand-alone issue either. Rather, it was merely one argument made in the part of the appellate brief challenging a variety of evidentiary rulings made in the penalty phase of Basham's trial.

This court cannot find that appellate counsel rendered ineffective assistance to Basham. On the contrary, this case presents a textbook case of "[w]innowing out weaker arguments on appeal and focusing on those more likely to prevail." *Bell*, 236 F.3d at 164. It is clear from the evidence presented to this court that appellate counsel thoroughly considered the issue of competency and decided that it was best to include it in their brief as part of the disqualification issue. The court cannot fault appellate counsel for that strategic decision. In these circumstances, appellate counsel were not ineffective for failing to raise

109

competency as a stand-alone issue on appeal, and appellate counsel's decision to raise the issue elsewhere did not prejudice Basham.

CLAIM 8:
MEDICATIONS ADMINISTERED TO BASHAM
DURING THE TRIAL PROCEEDINGS

Claim 8 was withdrawn by Basham prior to the evidentiary hearing.

CLAIM 9:
TRIAL COUNSEL'S CONCESSIONS ON GUILT

As noted previously, the FDPA provides for a bifurcated trial proceeding.  In phase I, the jury determines guilt or innocence.  If the defendant is found guilty, the jury determines whether the death sentence or life imprisonment without parole is the appropriate punishment in phase II.

A capital defendant has three options regarding phase I: (a) plead not guilty and put the government to its proof on both guilt and the penalty to be imposed; (b) plead guilty and proceed straight to the penalty phase; or (c) concede that the defendant was present at the time of the crime and perhaps even participated in some way, but deny some essential elements of the crime such as the requisite mental state.

As noted previously, Basham's co-defendant, Chad Fulks, chose option (b) above and in the Fulks § 2255 proceeding, Fulks's post-conviction counsel argued that the strategy choice was a poor one.  In Fulks's case, defense counsel offered a nationally recognized expert witness who testified that in a capital case, the defendant should *always* plead not guilty, thus requiring a guilt phase trial.  The advantages of this approach, according to Fulks's trial counsel and expert witness, involve "front loading" all of the especially

110

damaging testimony regarding the commission of the crime, so that by the time the jury reaches the penalty phase (assuming the defendant is found guilty), the negative inferences from the sometimes gruesome testimony has dissipated in the minds of the jurors.  It was also argued that by denying guilt the defendant may benefit—if one or more jurors are somewhat reluctant to find the defendant guilty, but acquiesce in a guilty verdict, those jurors may have some "residual doubt" that will cause them to hold out for a life sentence rather than the death penalty in the second phase.  Indeed, two of Fulks's trial counsel have authored a law review article advocating approach (b) above in appropriate cases.[46]

In Basham's case, Swerling and Harris opted for a hybrid approach.  That is to say, Basham pled not guilty to Count 1 (carjacking resulting in death) because, according to his attorneys, he lacked the requisite mental state to be guilty of a capital offense as charged in Count 1.  In all other respects, Basham admitted his guilt.  In other words, he admitted the capital offense charged in Count 2, together with the non-capital offenses charged in Counts 3 through 8.  Basham's counsel signaled their intention in this regard during jury selection, suggesting to the jury that there would "probably" be a penalty phase to the trial for which they were being considered.

Then, prior to the opening statements at the guilt phase, Swerling asked for an audience with the court, ex parte, so that he could put on the record that the decision to admit

---

[46] "Sometimes the tension between contesting guilt and acknowledging responsibility can be bridged by partial defenses; a defendant may contest his mental state, or his role in a multi-defendant crime without necessarily incurring the jury's wrath when he "switches" to a focus on mitigation in the penalty phase. Likewise, a defense that acknowledges involvement in the killing but denies that the defendant was guilty of capital murder appears to escape this backlash, at least where the defense is plausible on the facts." John H. Blume, Sheri Lynn Johnson & Scott F. Sundby, *Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation*, 36 Hofstra L. Rev. 1035, 1044–45 (2008) (emphasis added).

all charges except the mental state requirement on Count 1 was a strategic one.  Swerling related to the court that he had discussed the issue thoroughly with Basham, and that Basham's mental health expert concluded that "as a matter of strategy, we think this is the best approach."  Tr. 9/13/04, ECF No. 934 at 2–3.  After hearing Swerling's explanation, the court had a short colloquy with Basham to confirm that he agreed with counsel's strategy.  After advising the court that he had discussed the issue thoroughly with Harris and Swerling, Basham agreed with the course of action proposed by his attorneys.  *Id.* at 5.

In Claim 9, Basham challenges Swerling's strategic decision.  He suggests that Swerling's ex parte explanation of his strategy with the court was "an attempt to immunize himself from a later claim of ineffective assistance of counsel."  Pet. at 47.  Basham contends that he received ineffective assistance of counsel within the meaning of the federal constitutional and statutory law when trial counsel conceded Basham's guilt to virtually all of the charges against him, including the capital offense of kidnapping resulting in death as charged in Count 2.  In other words, without contesting the charge in Count 2, Basham admitted that he was death eligible.  Basham argues that "no reasonable strategy justified the concessions made by counsel."  Pet. at 49.

Basham argues that if his trial counsel had followed Fulks's approach of pleading guilty to all counts and proceeding directly to a penalty phase trial, "the jury would have at least been spared an approximately three-week trial involving the testimony of more than 90 witnesses."  Pet. at 50.  Further, Basham argues that defense counsel told the jurors that their client was guilty, but then necessarily implied that Basham was nevertheless going to require them to sit through weeks of trial "on what was actually a *fait accompli*."  Pet. at 50.

112

According to Basham's argument, by conceding that Basham was guilty of kidnapping resulting in death, defense counsel acknowledged that their client was death-eligible. Basham contends that defense counsel risked incurring the jurors' ire by requiring a guilt phase trial that was technically unnecessary.

The court is constrained to reject these arguments. To begin with, if Basham had elected to proceed in the same fashion as Fulks and plead guilty to all counts, it would not have prevented the jury from hearing from the eighty-nine witnesses who testified in the guilt phase of the case. Instead, the jury would have had to hear the gruesome details of the seventeen-day crime spree even when considering the penalty to be imposed because the severity of the Basham and Fulks's conduct was necessarily a factor for the jury to consider in its decision.

Secondly, there was a reasonable basis on which Swerling elected to deny guilt on Count 1 only. The requisite mental states for Count 1 and Count 2 are different. Thus, there was a principled reason to admit guilt on Count 2, but not Count 1.[47]

Regarding the three options available to a capital defendant referenced earlier in this section, it is clear that there are different schools of thought, each of which has its vocal adherents in the criminal defense bar. Decisions such as these are quintessentially the type of strategy decisions that are best left to skilled trial counsel. It has already been noted in this order that Swerling is a highly experienced criminal defense lawyer, having tried more than 100 homicide cases, four of which involved the death penalty.

---

[47] Count 1 required a showing that *at the time of the carjacking* the defendant intended to cause death or serious bodily harm. Count 2 did not contain a similar intent requirement focusing on the precise moment of the kidnapping.

As the government observes in its response brief:

In considering a Sixth Amendment ineffectiveness claim, a reviewing court does not "grade" the lawyer's trial performance; it examines only whether his conduct was reasonable under prevailing professional norms and in light of the circumstances. Because it may be tempting to find an unsuccessful trial strategy to be unreasonable, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Carter v. Lee*, 283 F.3d 240, 248–49 (4th Cir. 2002) (quotations and citations omitted).

In *Florida v. Nixon*, 543 U.S. 175 (2004), the Supreme Court held that counsel has the authority to concede the defendant's guilt in the guilt/innocence phase of a death penalty trial even without receiving consent from the client. The Court's decision in *Nixon* turned, in part, on its assessment that skilled criminal defense lawyers sometimes employ the strategy of conceding guilt in capital trials. *Id*. at 191–92. The Court pointed out that renowned trial advocate Clarence Darrow employed this strategy. *Id*. at 192. If counsel has the authority to concede guilt in an appropriate case even without the client's consent, certainly counsel was not ineffective here. After thoroughly discussing the matter with Basham and his mental health expert, counsel made a strategic move that did not prolong the trial of the case. Furthermore, counsel's decision held out the hope that some type of residual doubt from a finding of guilt in Count 1 might work to Basham's benefit in the penalty phase conducted later. The court finds no error as to Claim 9.

## CLAIM 10:
### BASHAM'S REQUEST TO BE ABSENT FROM THE TRIAL

As noted in the section of this order discussing competency, both the guilt phase and

the penalty phase of this trial were punctuated by interruptions necessitated by Basham's needs and desires. On several occasions when Basham attempted to daydream or fall asleep, the court interrupted the proceedings to advise the defendant that he needed to be awake and alert so as to properly assist his attorneys in the trial of the case. On many occasions, the court offered short recesses, soft drinks, and other stimulants such as caffeinated beverages to help Basham remain alert.

Shortly after the beginning of the penalty phase of the trial, the court was informed, by way of Basham's counsel, that if the court would permit him to use smokeless tobacco or "dip" in the courtroom during trial, it would help keep the defendant awake and also calm his nerves. This request occurred late in the week, and the court thereupon indicated to Basham that the following Monday he would be allowed to have dip in the courtroom during the proceedings.

To this end, the court had its law clerk purchase a can of tobacco dip which was available for the start of proceedings the following Monday. Prior to the commencement of the trial, however, the court was informed by the United States Marshal that security concerns would not permit Basham to use dip during the trial. The Marshal explained that use of dip by a defendant in custody, with a history of altercations with prison guards, could be considered a "bio-hazard" because the defendant could spit an expectorant containing the dip into the faces of the guards who were assigned to accompany him. The court reluctantly accepted the Marshal's recommendation and then advised Basham that it would not be possible, after all, for him to receive the dip. The court did, however, offer Basham other stimulants such as caffeinated beverages. Tr. 9/20/04, ECF No. 941 at 3–4.

115

Basham was informed of this development following the lunch break on September 20, 2004, on the fifth day of testimony in the guilt phase of the trial.[48]  In response, Basham immediately informed the court, "I would like to go back downstairs, if I may.  I don't feel good."  Tr. 9/20/04, ECF No. 941 at 148.  The court then informed Basham that it was "not possible" for him to go back to the holding cell because he "need[ed] to be here to help your lawyers defend this case."  *Id*. at 149.

While the court dealt with an administrative matter, Basham apparently advised his attorney of his need to leave the courtroom because shortly before the jury was brought back into the courtroom, Swerling indicated that Basham's absence during trial would be "against my judgment, my wishes."  Tr. 9/20/04, ECF No. 941 at 149.  Basham continued to plead with the court, stating that all he was asking was to be able to go downstairs so he could lie down.  *Id*. at 149–50.  According to Basham, court officers then grabbed Basham, and a struggle ensued in the courtroom out of the jury's presence.  In actuality, the record should reflect that while the colloquy discussed above was ongoing, Basham was standing.

After the court made it clear that Basham would not be permitted to leave the courtroom, the court informed Basham that he should be seated so that the jury could be brought back into the courtroom.  *Id*. at 149.  After the court repeated its request for Basham to be seated two more times, *Id*. at 149–50, one of the United States deputy marshals assigned to provide security in the courtroom walked up behind Basham and placed his hands

---

[48]   After the lunch recess, the court read a note provided by the Marshal stating that Basham had told another deputy marshal that he did not actually care about having chewing tobacco, but that he just wanted to make Deputy Marshal Riley, an African-American, mad.  Basham then told of the alleged causes for his inability to get along with Deputy Marshal Riley.

116

on Basham's shoulders to require him to be seated. Basham then turned and began a struggle with the deputy marshal, a struggle which was soon joined by seven other deputy marshals. During the ensuing fracas, Basham shouted several obscenities at the deputy marshals who were attempting to subdue him. Eventually, order was restored and the court adjourned the trial for the remainder of the day.

Later in the penalty phase of the trial, the government argued, successfully, that the video of Basham's struggle with the deputy marshals was relevant on the question of future dangerousness if the defendant were to be given a life sentence. The court allowed the audio and video to be viewed by the jury, minus the audio portion of the tape which contained the obscenities shouted by Basham during the struggle.[49]

On this record, Basham argues that his constitutional rights were violated when the court refused to allow him to exit the courtroom as he requested. Basham suggests that the prejudice resulting from the courtroom scuffle seen by the jury is unquestionable. He argues that this court's refusal to permit him to leave and his attorney's failure to advocate on his behalf led to the jury seeing the videotape of the scuffle.

Although it is well-settled that the Sixth Amendment to the United States Constitution guarantees a defendant's right to be present in the courtroom during the trial of his case, *see Lewis v. United States*, 146 U.S. 370–72 (1892), Basham seeks to assert the opposite right—the right to absent oneself from a capital trial at his whim. Although Basham cites to Rule 43 of the Federal Rules of Criminal Procedure to support his argument, this Rule may

---

[49] The video, which was from the courtroom security camera, was government's exhibit 469(a) during the trial. The redacted audio, which came from the court reporter's back-up audiotape, was government's trial exhibit 469(b).

117

actually require a capital defendant's presence in a capital case, at least during the sentencing proceeding. It appears to this court that it is unsettled whether a capital defendant can waive his presence at trial except when it is purposefully disruptive. *See Near v. Cunningham*, 313 F.2d 929, 931 (4th Cir. 1963); *United States v. Tipton*, 90 F.3d 861, 873–74 (4th Cir. 1996); *see also L'Abbe v. DiPaolo*, 311 F.3d 93, 97 (1st Cir. 2002) (observing that "the Supreme Court has never directly ruled on the issue of whether a criminal defendant can waive his right to presence in a capital case"). Because the law on this issue is so unclear, trial counsel cannot be faulted for insisting that Basham be present for his capital trial.

In short, trial counsel was not ineffective when they insisted that Basham be present in the courtroom. In this claim, Basham asks the court to take an inappropriate approach and employ 20/20 vision of hindsight in evaluating trial counsel's actions. There is no way that Swerling and Harris could have predicted that the courtroom scuffle would have ensued when the court refused to allow Basham to leave the courtroom.

Finally, it should be noted that when the court was planning the procedures relating to the § 2255 evidentiary hearing, Basham's § 2255 counsel strongly advocated Basham being brought from the federal death row in Terre Haute, Indiana to Columbia, South Carolina for purposes of assisting his attorneys in reviewing alleged legal errors for what is basically a settled trial record.[50] The court learned that to require Basham's presence would have necessitated five armed guards flying from Indiana to South Carolina, with attendant

---

[50] In a letter to the court prior to the hearing, counsel also informed the court that Basham "has repeatedly requested that he be allowed to be physically present for the hearing." Letter from Michael L. Burke to Judge Joseph F. Anderson, Jr. dated September 21, 2012, filed under seal, ECF No. 1537. Yet shortly after the hearing began, Basham stormed out of the room where the satellite transmission was arranged and made only one more brief appearance thereafter.

118

security concerns while Basham was housed locally.  In spite of this, § 2255 counsel continued to advance the argument that Basham needed to be present.  Ultimately, the court decided to use satellite conferencing with a separate confidential telephone line to § 2255 counsel as described earlier in this order.  If Basham's current counsel believe strongly that his presence was necessary at the § 2255 hearing, they cannot at the same time be heard to fault trial counsel for insisting that he be present at the trial where arguably Basham's involvement in the decision-making process was much more critical.

Claim 10 is therefore without merit.

CLAIM 13:
THE FAILURE TO ARGUE TO THE JURY THAT BASHAM'S
STATEMENTS TO LAW ENFORCEMENT WERE INVOLUNTARY

In Claim 13, a claim very similar to Claim 2, Basham contends that his trial attorneys were ineffective for failing to argue to the jury that his post-arrest statements to law enforcement officers were involuntary.  Pet. at 57–58.

Claim 13 fails for the same reason Claim 2 fails. First, there is no evidence that Basham's statements were involuntary. The court has thoroughly discussed the testimony produced at the *Jackson v. Denno* hearing in its treatment of Claim 2, *supra.*  It would serve no useful purpose to repeat that information here.

Moreover, counsel's failure to argue to the jury that Basham's statements were involuntary was clearly reasonable in light of the fact that the court had already determined that the statements should be admitted and the fact that Basham's attorneys needed to preserve their ability to argue to the jury in mitigation that Basham had been cooperative with law enforcement.  Indeed, this was one of the few factual arguments available to Basham at

the penalty phase of his trial.  To have earlier urged the jury to reject his statements as involuntary would have run the risk of alienating the jury and forfeiting what might have been the most persuasive mitigation argument available in the case.  For these reasons, Claim 13 fails.

CLAIM 14:
DEFENSE ATTORNEY JACK SWERLING'S
ALLEGED PERSONAL CONFLICT OF INTEREST

In 2002, the same year of the crimes at issue in this case, Jack Swerling, his wife, and his daughter were held at gunpoint and then tied up in their home by two masked men.  One of the hostage-takers was Jimmy Causey, a former client of Swerling.  Swerling began representing Basham in late April 2003.  Less than one month later, the perpetrators were charged with the kidnapping of Swerling, his wife, and his daughter.  Both Swerling and his wife testified about the home invasion and their abduction by the perpetrators.  Apparently during Jimmy Causey's trial, Causey's attorneys intimated that Swerling's daughter was somehow secretly working with the perpetrators.

The jury reached its verdict in the case, finding Causey guilty, on February 12, 2004.  Because Swerling's ire had been provoked when Causey's attorneys suggested that his daughter was in collaboration with the home invaders, Swerling became emotional immediately following the verdict when Causey refused to return to the courtroom to hear the verdict or to be sentenced.  Causey's absence from the courtroom triggered an eruption from Mr. Swerling who arose, pointed his finger at the three public defenders in the case, and suggested that the defendant and his team of lawyers "ought to be embarrassed."  Eventually, the trial judge prevented Swerling from saying anything further.  Swerling later wrote a letter

to the judge and other court personnel to apologize for his actions.

As noted previously, the *Jackson v. Denno* suppression hearing in Basham's criminal case began in this court on February 24, 2004, a scant twelve days after the verdict in the Causey case.

On this record, Basham asserts that Swerling's "personal conflict of interest" rendered him ineffective in his representation of Basham and that Basham was prejudiced as a result.

At the conclusion of phase I of the evidentiary hearing in this case, the court invited counsel to comment briefly upon Claim 14. Specifically, the court inquired of Basham's § 2255 counsel (1) whether they contended that Swerling's unfortunate home abduction incident rendered him per se incapable of rendering effective assistance of counsel in *any* case involving allegations of abduction and potential homicide or (2) whether the gist of Claim 14 was that Swerling's experience colored his judgment and affected his mental processes to such an extent that he did not live up to the high standards he had established for himself in previous criminal cases. The court pointed out that if the answer to the court's inquiry was number (2) above, then the court would be right back to an analysis of whether Swerling's performance was effective under *Strickland.* In other words, if Swerling was not per se disqualified from handling all similar criminal cases, and if Basham is required to show that Swerling's performance was deficient in some respect, then Claim 14 adds nothing to the substance of this case. It might merely go to show the *reason behind* Swerling's alleged deficient practice, but it does not prove that his representation was below the standard established by *Strickland*. Counsel responded that they could not, in good conscience, argue that Swerling was per se disqualified from all similar cases, and that actual prejudice would,

therefore, have to be shown. Because Claim 14 requires that Basham show Swerling's performance was deficient in some respect under *Strickland*, and because the court has found in other parts of this order that Swerling's performance did not fall below this level, Claim 14 must be denied.

CLAIM 15:
EVIDENCE REGARDING THE KIDNAPPING
AND DEATH OF SAMANTHA BURNS

In Claim 15, Basham argues that his trial attorneys rendered ineffective assistance of counsel when they failed to properly object to the admission of unfairly prejudicial prior act evidence during the guilt phase of his trial. He also contends that appellate counsel were similarly ineffective in failing to raise this issue on appeal.

At issue in Claim 15 is the fact that the court allowed, in the guilt phase of Basham's trial, evidence regarding the abduction, kidnapping, and murder of Samantha Burns on November 11, 2002, which occurred in West Virginia some three days before the abduction, rape, and murder of Alice Donovan in South Carolina.[51]

At a pretrial conference held on August 4, 2004, the government informed the court and defense counsel that it intended to offer evidence of the Samantha Burns murder during the guilt phase of Basham's trial, suggesting that the crimes against Burns were "intrinsic" to the Donovan case, and the evidence was therefore admissible under Rule 404(b) of the Federal Rules of Evidence. Three weeks later at a subsequent pretrial hearing, defense counsel appeared to concede that the facts of the Burns crimes were, in fact, intrinsic to the

---

[51] The criminal acts against Samantha Burns were prosecuted in the District of West Virginia. Basham pled guilty and was sentenced to life imprisonment.

Donovan case.  Trial counsel added, however, "I don't want the court to think the record is reflecting that we are waiving an objection."  Tr. 8/25/04, ECF No. 916 at 114.

Early in the guilt phase of Basham's trial, the government began to present evidence of the crimes against Samantha Burns.  Defense counsel did not object, and several witnesses, including several members of the Burns family, were called to testify about her disappearance.  During this testimony, the court suggested that the testimony could be considered 404(b)-type testimony and asked defense counsel if they wished to have a limiting instruction suggesting that the evidence was being admitted for one of the limited purposes recognized in Rule 404(b).  The government responded by once again suggesting that the Burns evidence was intrinsic to the crimes on trial, and defense counsel did not offer a position on whether Rule 404(b) applied or whether a cautionary instruction should be given.  During this exchange, the court noted that, in its experience of twenty-six years on the trial court bench, it is rare for a defense attorney to request a Rule 404(b) cautionary instruction, apparently because the conventional wisdom is that such a cautionary instruction simply highlights the testimony for the jurors.  In any event, defense counsel did not object to the evidence coming in, and never requested a Rule 404(b) instruction.[52]

At the outset, it should be noted that to the extent that Basham suggests in Claim 15 that evidence regarding Burns's death should not have been admitted at all, this claim has been foreclosed by the decision of the Fourth Circuit Court of Appeals in Basham's direct

---

[52]  It can thus be seen that the record was left unclear as to whether testimony regarding the Burns murder was admitted as being intrinsic to the crimes charged, or was admitted for one of the not-for-character purposes allowed under Rule 404(b).  As indicated above, the government urged its admission as being intrinsic to the crime, and defense counsel never objected and did not respond to this court's suggestion that a Rule 404(b) limiting instruction be given.  Thus, this court was not directly called upon to make a decision as to the basis on which the evidence was being admitted.

appeal of his conviction.

Specifically, in his direct appeal, Basham contended that this court committed error when it permitted "evidence that Basham and Fulks carjacked, kidnapped, and murdered Burns." *United States v. Basham*, 561 F.3d 302, 329 (4th Cir. 2009). Basham also contended that this court impermissibly let the government use this evidence in its closing argument not to prove intent under Rule 404(b), but to impermissibly prove criminal propensity. *Id*. As to the admission of this testimony, the Fourth Circuit stated:

> We find no error, let alone plain error, on this claim. The government referred to both incidents in its closing arguments during a list of incidents showing that Basham possessed "intent to harm and threat[en], and cause serious bodily harm and death."
>
>                                           \* \* \*
>
> A full examination of this closing argument . . . reveals that the government tied this evidence entirely to a discussion of Basham's intent. Accordingly, there was no error, let alone plain error in allowing the government's closing argument on this point.

*Id.* at 330.

Thus, to the extent Claim 15 can be read as challenging this court's admission of the testimony regarding the circumstances surrounding Burns's death, the Fourth Circuit Court of Appeals has already determined that the admission of this evidence was proper to show intent under Rule 404(b). More specifically, Basham's primary, if not sole, defense in this case was that at the time he and Fulks kidnapped Alice Donovan, he (Basham) did not have the requisite intent. Thus, the fact that Basham and Fulks had only a few days earlier committed similar acts of violence against another woman, using a similar modus operandi, was relevant to show intent.

In Claim 15, Basham also seems to allege a subordinate argument by suggesting that in allowing testimony regarding the Burns murder, the court improperly allowed "extended testimony" from Burns's family and friends which was not calculated to prove anything in the case, but rather was presented to engender sympathy from the jury. At the § 2255 evidentiary hearing, Basham's § 2255 counsel suggested, or at least implied, that this court improperly allowed "victim impact"-type evidence from emotional members of Burns's family. Close examination of the transcript of the testimony of these family members, however, reveals that this is not the case.

The prosecution team called Samantha Burns's aunt, her parents, her brother, and two friends during the guilt phase of the trial. All of these witnesses, in some way, had information pertaining to Burns's disappearance and her relationship with her family. Quite obviously, the government wanted to disabuse the jury of any notion that Burns was a renegade teenager who might have run away from home, eloped with a boyfriend, or disappeared for reasons of her own. Therefore, it was necessary for the government to provide for the jury the precise details relating to Burns's disappearance and also to develop the fact that she was a college student who lived at home and maintained a normal relationship with family members. Except for one question, discussed below, none of the testimony of these witnesses can be said to be "victim impact" evidence or evidence designed to elicit sympathy from the jury.

Melissa Jeffers, Burns's aunt, was with Burns on the night she disappeared from the Huntington Mall in West Virginia. In addition, Jeffers testified about a "very close relationship" between Burns and her extended family. Tr. 9/15/04, ECF No. 937 at 164.

125

Jeffers indicated that Burns was attending Marshall University and held a part-time job at J.C. Penney's at the Huntington Mall. She described the clothes that Burns was wearing on the night of her abduction.

Kandi Burns, Samantha's mother, described her daughter as "my very best friend." *Id.* at 171. She then testified about the comings and goings of her daughter and about her relationships with other teenagers in her circle of friends. She testified that if her daughter went out at night and found that she was going to be returning later than indicated, Samantha would always let her know. Kandi then testified about a cryptic telephone call from her daughter at approximately 9:45 p.m. on the night she was abducted. She said that her daughter spoke in an unusual way and that she told her daughter to stop and purchase a pack of cigarettes for her father on her way home. She testified that her daughter never returned home and then described the search efforts that were conducted in the days following her daughter's disappearance. In addition, Kandi testified about law enforcement authorities finding her daughter's burned automobile, and she testified as to some personal belongings of her daughter's that had been retrieved when Basham and Fulks were arrested.

Whitney Collins, a classmate of Burns's at Marshall University, who considered Burns to be "my best friend" testified that she had never heard Burns talk about wanting to run away from home. *Id*. at 252. She testified that Burns would always call her mother to let her know "where she was going to be and when she would be home." *Id*. She testified as to her interactions with Burns on November 10, 2002, the day before Burns was abducted, and indicated that she attempted to call Burns the following day, but her efforts to reach Burns were unsuccessful. She also testified as to her participation in the searches for Burns in the

126

weeks following her disappearance.

Kristen Pritchard, who also described Burns as "one of my best friends," *id*. at 258, testified that Burns was "very close with her family," that she was "very open with her family," and that Burns was "happy-go-lucky," id. at 259. Specifically, Pritchard testified that she never heard Burns talk about wanting to leave her hometown. *Id*. at 260. She also talked about her interactions with Burns on November 9, 2002, two days before her abduction.

Wesley Burns, Samantha's brother, testified that he and his sister got along well together and then described his sister selling candy as part of a school fundraiser on Veteran's Day weekend prior to her abduction. He described a candy box that she used in this effort, a box which was later recovered when Basham and Fulks were arrested. According to Wesley's testimony, he was asked to join his sister and aunt on the trip to Huntington Mall, but he declined. He was the one who received the phone call from Burns at 9:30 p.m. on November 11 and passed the call along to his mother. He indicated that Burns did not seem to be herself during the brief period of time he spoke with her on the phone. Furthermore, he described his efforts in the search activity.

Finally, John Burns, Samantha Burns's father, testified about Burns's activity during the daylight hours of the Veteran's holiday on Monday, November 11, 2002. That night, he had gone to bed before Samantha was scheduled to return home. When he awoke early the next morning to go to work, he learned that his daughter had called in at 9:30 the previous evening and had not yet returned home. He then described the decision that he and his wife made to call law enforcement in order to involve them in a search for their daughter. He

127

described the search efforts by law enforcement, volunteers, and members of their church congregation. He discussed the contact he received from law enforcement, who had found his daughter's burned automobile, and he also identified the personal belongings of his daughter that were found in the possession of Basham and Fulks when they were arrested. John testified that he had told his children that if they ever found themselves in the situation where they were being robbed, that they should "give them the car, give them whatever, whatever they want, give it to them. Cooperate with them and just give them anything they want." *Id.* at 290. He further testified that his daughter was athletic and feisty. *Id.*

All of these witnesses gave information that was relevant to Basham's case. This court has read the testimony of all of the family and friend witnesses, and with the one exception noted below, finds that none of their testimony was designed to improperly appeal to the sympathy of the jurors.

There is one reference during the testimony of Kandi Burns, Samantha's mother, that the court has determined was improper. While on the stand and under direct examination, Kandi Burns was asked about the mobile home that the family resided in at the time of the abduction. She was also asked about the fact that she and her husband were personally constructing a new home for the family. This exchange then followed:

Q.    Do you, and John, and Wesley now live in that house?

A.    Yes.

Q.    Samantha never got to?

A.    No.

*Id.* at 172.

There was no objection at trial to this passage. It appears to this court that this question was improper and should not have been asked. The court finds the error to be harmless beyond a reasonable doubt, however. As indicated above, this court has carefully combed the transcript of the testimony of all of the family and friend witnesses and finds that this is the only improper appeal to sympathy of the jurors. It was but one statement in a trial that lasted for five weeks, and the court has no difficulty concluding that the error was harmless beyond a reasonable doubt. For all the foregoing reasons, the court finds that Claim 15 fails.

CLAIM 16:
GOVERNMENT COMMENTS AT FULKS'S TRIAL

In Claim 16, Basham raises an issue occasioned by the court's granting of the joint motion by the defendants for separate trials.

Prior to trial, Basham's trial counsel filed a motion placing the government on notice that they intended to introduce "relevant factual assertions from the government's closing argument" in the Fulks case pursuant to Federal Rule of Evidence 801(d)(2)(D). Trial counsel wanted the Basham jury to hear that during the summation in the Fulks case, the government said that "he [Fulks] is the leader . . . Brandon Basham was a puppet, and Chad Fulks was pulling his strings throughout a lot of this crime spree." Tr. 6/24/04, ECF No. 739 at 66.

In response, the government suggested that the motion was premature. The government argued to the court that the motion should be held in abeyance and ruled upon only after the government had presented its case and Basham had identified which

government assertions, if any, were allegedly inconsistent.

The court agreed with the government, indicating that once the government's case was closed in the Basham trial, the court would "take a time out" and "see if the defense attorneys can show me in some way that the prosecutors have been inconsistent or taken contrary positions in this case from the first case." Tr. 9/10/04, ECF No. 1000 at 11. Swerling agreed with this proposal responding, "Judge, that works for us." *Id*.

At the conclusion of the government's case in the penalty phase of Basham's trial, trial counsel never renewed the motion to admit selected portions of the government's argument from the Fulks trial. Basham now contends that trial counsel were constitutionally ineffective for failing to reassert the issue at the appropriate time. On direct appeal, Basham's appellate counsel argued that the court had abused its discretion by not admitting the government's statements about Basham being a puppet. The Fourth Circuit held that Basham had waived that argument. *United States v. Basham*, 561 F.3d 302, 335 (4th Cir. 2009).

Basham now contends that the jury's verdict would have been different had the government's statements during closing arguments in the Fulks trial been introduced at his own trial and that he at least would have preserved the issue for appellate review.

The court agrees with the government that there was no evidentiary basis for the court to admit into Basham's trial any of the government's closing argument from the Fulks trial, even under the liberal evidentiary standard applicable to the penalty phase of a capital case. As this court explained to the jury on several occasions, what the lawyers say during closing argument is not evidence. The trial attorneys are not under oath, do not have firsthand

130

knowledge of the facts, and are not subject to cross-examination. For this reason, courts have allowed the submission of a party's prior jury argument if "the prior argument involves an assertion of fact, inconsistent with similar assertions in a subsequent trial." *United States v. McKeon*, 738 F.2d 26, 30 (2d Cir. 1984). However, "speculation[s] of counsel, advocacy as to the credibility of witnesses, arguments as to weaknesses [in the opponent's] case, or invitations to a jury to draw certain inferences should not be admitted." *Id*.

Even giving Basham the benefit of the doubt, and assuming that the government's "puppet" statement was an unambiguous admission of fact, it would have been inequitable to admit only isolated portions of the Fulks trial closing argument that were favorable to Basham. Had the court admitted the "puppet" statement, this court probably would have also given the government the corresponding opportunity to admit portions of its closing argument, wherein the government indicated that Fulks and Basham were equally culpable of the charged crimes.

The court has determined in regard to Claim 23 that the government did not present contradictory theories at the two trials but presented a consistent theme of equal culpability between the two defendants. On appeal from the denial of Fulks's § 2255 petition, the Fourth Circuit Court of Appeals determined that the government's "core theory" in both cases was that Fulks and Basham's culpability was equal. The court said:

> Viewed in the context of the entirety of both proceedings, the government's core theory was that Fulks and Basham were equally culpable in Donovan's murder and similarly deserving of the death penalty, regardless of which one physically ended her life. For example, the government told Fulks's jury that he and Basham "acted together as one in concert with one another . . . . They could not have done things that they did . . . without acting in unison." The story was the same at Basham's trial: "Their actions, their conduct, their

131

choices were made as a team. Brandon Basham could not have carjacked and kidnapped Samantha Burns or Alice Donovan without Chad Fulks. And Chad Fulks could not have carjacked and kidnapped Samantha Burns and Alice Donovan without Brandon Basham. They are equally culpable."

*United States v. Fulks*, 683 F.3d 513, 524 (4th Cir. 2012) (internal citations omitted).

The court also observed that the quotations in its cited opinion were "only an example or two for illustrative purposes." *Id*. at 525. Indeed, the court could have cited yet additional portions of the transcript from both cases to indicate that the government's theory was consistent.

Moreover, the Fourth Circuit stated that to the extent that there were "tangential inconsistencies relating to inferences drawn from the undisputed evidence," they were not so serious as to constitute a violation of due process. *Id*.

Although the Fourth Circuit briefly summarized the gist of the government's argument in both trials, a fuller discussion of the statements made in the penalty phase of each trial bears mention here.

AUSA Johnny Gasser laid out this theme early in his closing argument at the Fulks trial:

On November 14th, 2002, if Chad Fulks and Brandon Basham had been alone, Alice Donovan would be alive today. Alice Donovan would be enjoying her daughters, and her grandchildren, and her great marriage with Barry. That is an absolute fact. Make no mistake about it. It required the actions and the conduct of both Chad Fulks and Brandon Basham.

The two of these men acted together as one in concert with one another. They were a two-man death squad. Two men, forming one team. They could not have done things that they did to Samantha [Burns], and they could not have done the things they did to Alice [Donovan] without acting in unison, without acting as one.

132

The Government is not saying Chad Fulks is more culpable than Brandon Basham. And the Government is not saying that Brandon Basham is more culpable than Chad Fulks. They are equally culpable. Any objective view of the evidence and testimony that you saw, any reasonable juror looking at this objectively, not looking at it from the point of view of Chad Fulks, not looking at it from the point of view of Brandon Basham, if you look at it objectively, there is but one conclusion: These two men were acting together as one. But for the conduct of Chad Fulks and but for the conduct of Brandon Basham, Alice Donovan and Samantha Burns would be alive today.

Fulks Tr. 06/29/04, ECF No. 739 at 24–25.

AUSA Gasser then emphasized that the jury did not have to make a finding as to which of the two men actually killed Alice Donovan, because that determination was impossible to make.

There is one point that is very important. This is a very important point, ladies and gentlemen. For you jurors to sentence Chad Fulks to death, you do not, you do not have to find, beyond a reasonable doubt, that he actually killed Alice Donovan. Judge Anderson is going to give you the charge on the law. And there is one thing he is not going to tell you. He is not going to tell you, ladies and gentlemen of the jury, if you don't find that it was Chad Fulks's hand that killed Alice Donovan, then you can't sentence him to death. You are not going to hear that from Judge Anderson. Because that is not the law.

And there is a reason for that. There is a reason why Congress has passed the Federal Death Penalty Statute. And it is a situation involving brute violence. When two or more people combine together to kill, to take a human life, and they do so in an isolated area, and they leave no eyewitnesses, and the crime is not caught on videotape or camera, and the person does not confess, in those situations, it is impossible, it is impossible to determine, beyond a shadow of a doubt, who the actual killer is. It is impossible.

\*\*\*

The fact of the matter is, with no eyewitnesses, when the case isn't caught on videotape, and with no confession, it is, virtually, impossible to, with direct evidence, to prove who the killer is. That is why the Government does not have to prove that. It is common sense. And it is justice.

*Id*. at 25–27.

Then, near the end of his closing argument at the Fulks trial, AUSA Gasser argued that both Fulks and Basham intentionally killed Alice Donovan.

> They needed each other to abduct Alice Donovan. They both carjacked her, both kidnaped her, both raped her. Do you honestly believe that, at one point in time, that the two of them were not going to act together? Circumstantial evidence, both of them, ladies and gentlemen, intentionally killed Alice Donovan, the Government submits to you.

*Id*. at 107.

Had this court admitted the government's single sentence regarding Fulks being the leader and Basham being a puppet, it is quite possible that the court would have admitted all of the language quoted above so that the government's "puppet" statement would not be given undue influence, given its relative position in the argument as a whole.  In other words, it would be hard to single out one or a few sentences from the above-quoted paragraphs to balance out the "puppet" statement.  Thus, the jury would have heard a long recitation of closing argument in the Fulks case, which essentially told them the same thing they would eventually hear in the summation of Basham's case: Basham and Fulks were equally culpable in Alice Donovan's death.

Perhaps more importantly, AUSA Gasser, in his summation in the guilt phase of the Basham trial, actually admitted that Fulks was the leader.  Tr. 9/29/04, ECF No. 951 at 82. ("No question, Chad Fulks was the leader in many aspects of this seventeen-day spree . . . but there is also no question, the government submits, that Brandon Basham was a willing, eager, and reliable foot soldier.")

Gasser told the Fulks jury that Fulks was a leader and Basham was a puppet.  In Basham's trial, Gasser told the jury that there was "no question" that Chad Fulks was the

134

leader and that Brandon Basham was a "foot soldier."    It can thus readily be seen that Gasser's statements to the two juries were not inconsistent.  In one, he referred to Basham as a "puppet," and in the second, he referred to Basham as a "foot soldier working for his 'leader,' Chad Fulks."

Additionally, it should be noted that several of the trial witnesses, including two of the government's own witnesses, candidly admitted that Fulks was the leader and Basham was the follower during their seventeen-day crime spree.  For example, Chris Schaffer, Chief Deputy of the Hopkins County Jail, testified regarding Fulks and Basham's escape from his facility in Kentucky.  On cross-examination in response to a direct question as to whether Basham was more of a follower or a leader, Schaffer replied, "Basham definitely didn't have leadership qualities, he was more of a follower."  Tr. 9/13/04, ECF No. 934 at 140.  In a similar vein, Dian Blair, Deputy Jailer at the Hopkins County Jail, was questioned on cross-examination as to whether Basham was "a leader or follower."  She responded, "I would say a follower."  *Id*. at 172.

When Sheriff Ronald Hewett was on the stand responding to direct examination by the government, he testified that on two occasions, Basham had told him that Fulks was the leader of the operation.  Tr. 9/13/04, ECF No. 934 at 31, 53.

Three defense witnesses all agreed that Basham was a follower.  Jewel Dickerson, a captain in the Hopkins County Jail, testified that Basham "was more of a follower than a leader."  Tr.10/25/04, ECF No. 967 at 125; Kathy Terrell, yet another employee of the Hopkins County Jail, testified that "Brandon has no leadership qualities . . . Brandon was a follower."  *Id*. at 176; Kelly Mullins, a social worker with the Charter Ridge Hospital in

135

Lexington, Kentucky, testified that Basham was "more of a follower."  Tr. 10/21/04, ECF No. 962 at 92.  Finally, Swerling actually used the puppet analogy in the concluding portion of his closing argument ("Chad Fulks used him like a puppet.").  Tr. 11/1/04, ECF No. 971 at 150.

For all the foregoing reasons, the court finds no error with regard to Claim 16.

CLAIM 17:
CROSS-EXAMINATION, IMPEACHMENT, AND ARGUMENT
REGARDING THE CREDIBILITY OF CLIFFORD JAY

At trial, Clifford Jay, a teacher's aide who served as Basham's school counselor, and with whom Basham apparently remained close, testified on direct examination that, on Christmas Eve 2002, Basham called him from jail after being arrested for Alice Donovan's murder.  Jay testified that Basham told him that he was "in a lot of trouble."  Tr. 9/27/04, ECF No. 949 at 228.  Jay testified that he responded, "Did you do—I just want to know if you did what they say you did?"  *Id*.  According to Jay, Basham replied, "Yes sir, we killed them."  *Id*.  Upon being pressed by the government, Jay testified that he specifically remembered Basham using the word "them" because it struck Jay by "complete and utter surprise" because he had previously been aware only of the Alice Donovan case.  *Id*. at 228–29.

Jay also testified that he told Basham he needed to "cooperate with the authorities and tell them everything that they need to know about finding this body."  *Id*. at 232.  Jay then asked Basham, "Do you know where the bodies are?"  *Id*. at 232–33.  Jay testified that Basham had responded, "We tied her to a tree."  *Id*. at 233.  Jay acknowledged that he subsequently reported the conversation to someone in the Sheriff's Department in

Madisonville, Kentucky although he could not remember the officer's name.

On cross-examination, Swerling focused primarily on the question of whether Basham told Jay "we killed *them*" or "we killed *her*." *Id*. at 238–40. Jay remained firm in his insistence that the operative word was "them." *Id*. at 238. Swerling then refreshed Jay's memory about the person with whom he spoke from the Madisonville Sheriff's Department, and Jay acknowledged that it was David Morris. *Id*. at 239. Swerling also questioned Jay as to whether he had spoken with Detective Addison from the Myrtle Beach Police Department. *Id*. Jay confirmed that he had spoken with a Myrtle Beach police officer but could not recall his name. *Id*.

The government concluded its case-in-chief shortly after Jay's testimony, and the following day, the court heard oral argument on Basham's Rule 20 motion for judgment of acquittal. In opposing the motion, the government relied heavily upon Jay's testimony. In the ensuing colloquy, the court noted aloud that it wondered at the time if the jury would hear from the two law enforcement officers who might have heard a slightly different version of Basham's statement to Jay. Tr. 9/28/04, ECF No. 950 at 8. In addition, the court inquired as to whether there was a good faith basis for Swerling's asking the questions of Jay on cross-examination. *Id*.

In response to the court's inquiry, Swerling responded that he had a good faith belief for the question, indicating that the defense team had checked with both of the officers and confirmed that Jay never told them about Basham using the word "them" in his statement to Jay. *Id*. Swerling added, however, that he had opted not to present the officers at that stage of the trial but left open the possibility that he might present testimony from the officers at

137

Basham's penalty phase. *Id*. In furtherance of the court's question about the good faith belief for the cross-examination, Swerling averred that he and Harris had interviewed Jay and Jay had conveyed to them that Basham had said "We killed her." *Id*. at 9–10. Ultimately, Morris and Addison were not called to impeach Clifford Jay's testimony.

On this record, Basham argues that his counsel were constitutionally ineffective for not "effectively" cross-examining Jay, for failing to call Morris and Addison to impeach Jay, and in failing to adequately respond to the government's argument regarding Jay's testimony.

At the evidentiary hearing on the § 2255 petition, Swerling testified that he had contemplated calling Morris and Addison but decided that, on balance, the risk associated with calling these law enforcement officers outweighed any potential gain from their testimony. To begin with, according to Swerling, Morris and Addison would have been two witnesses who would remind the jury about Clifford Jay's damaging testimony. Moreover, it is not at all clear from the record before this court that Morris and Addison would have actually contradicted or impeached Jay's testimony. According to Swerling, the officers' notes associated with Morris's and Addison's involvement in the case did not specifically refer to whether Jay used the word "them" or "her" when repeating his conversation with Basham. Viewed in this light, the additional testimony from the two officers might have had minimal impeachment value for Basham and would have certainly served to remind the jury of the damaging phone call made by Basham to Jay.

Swerling also advanced a second theory as to why Jay was not strongly cross-examined or impeached. It is quite evident from the record that Jay enjoyed a long-standing, cordial relationship with Basham. He actually served as a father figure to Basham. Swerling

138

held out the hope that at some juncture during the trial, perhaps in the penalty phase, Jay could be used to help Basham evade the death penalty. According to Swerling, the risk that the two officers might not actually impeach Jay, the fact that their testimony would reiterate the damaging testimony already heard once, and the danger of alienating a potentially favorable witness all caused trial counsel to follow the course of conduct ultimately employed in this case.

The decision not to call particular defense witnesses is normally a strategic decision demanding the assessment and balancing of perceived benefits against perceived risks, and one to which "'[Courts] must afford . . . enormous deference.'" *United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004) (quoting *United States v. Kozinski*, 16 F.3d 795, 813 (7th Cir. 1994)). In regard to a decision to call or not call a witness, "there is a presumption that 'counsel's conduct falls within the wide range of reasonable professional assistance.'" *Byram v. Ozmint*, 339 F.3d 203, 209 (4th Cir. 2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 669 (1984)).

Regardless of whether Basham told Jay "we killed her" or "we killed them," continued cross-examination and impeachment testimony would have highlighted the fact that Basham was a full participant in the killing of at least one woman, if not two. This would have undercut the defense theory that Fulks was the leader and Basham was just a passive follower throughout their seventeen-day crime spree. Moreover, the officers would have also confirmed Basham's statement to Jay that "we tied her to a tree." This would further reinforce the teamwork employed by Basham and Fulks. As the government points out in its responsive memorandum, sometimes, the hallmark of effective advocacy is to know when

139

to "leave well enough alone."  *United States v. Knox*, 287 F.3d 667, 671 (7th Cir. 2002).

In short, the failure to call the officers to testify clearly was not oversight; Swerling advised the court out of the jury's presence that as a strategic decision, the officers were not being called for impeachment purposes.  Such a strategy choice in the context of the hard fought trial in this case withstands constitutional scrutiny.

Finally, it should also be remembered that when the telephone conversation began, Clifford Jay was aware of the disappearance of Alice Donovan, the South Carolina woman whose death formed the basis of this death penalty case.  Even if Basham had told Jay "We killed her," Jay's testimony was a powerful weapon for the prosecution because it involved Basham's admission of the murder in question.

CLAIM 19:
TRIAL COUNSEL'S INVESTIGATION AND
PRESENTATION OF MITIGATION EVIDENCE

In Claim 19, Basham complains that his trial counsel were constitutionally ineffective for failing to investigate, develop, and present powerful mitigating evidence at the penalty phase of his trial.  Basham focuses on the areas of mental retardation and fetal alcohol spectrum disorder and alleges that trial counsel failed to investigate and develop mitigating evidence in those areas, and others, at the penalty phase.

"Although counsel should conduct a reasonable investigation into potential defenses, *Strickland* does not impose a constitutional requirement that counsel uncover every scrap of evidence that could conceivably help their client."  *Green v. French*, 143 F.3d 865, 892 (4th Cir. 1998), abrogated on other grounds by *Williams v. Taylor*, 529 U.S. 362 (2000).  "In the end, 'a particular decision not to investigate must be directly assessed for reasonableness in

140

all circumstances, applying a heavy measure of deference to counsel's judgments.'" *Tucker v. Ozmint*, 350 F.3d 433, 440 (4th Cir. 2003) (quoting *Wiggins v. Smith*, 539 U.S. 510 (2003)). "It is a cardinal tenet of the Supreme Court's ineffective assistance jurisprudence that 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Meyer v. Branker*, 506 F.3d 358, 371 (4th Cir. 2007) (quoting *Strickland*, 466 U.S. at 690). "Where it is apparent from the evidence concerning the crime itself, from conversation with the defendant, or from other readily available sources of information, that the defendant has some mental or other condition that would likely qualify as a mitigating factor, the failure to investigate will be ineffective assistance." *Hall v. Washington*, 106 F.3d 742, 749–50 (7th Cir. 1997) (citing *Stewart v. Gramley*, 74 F.3d 132, 135 (7th Cir. 1996)).

### *Mental Retardation*

Basham claims that at the time of trial he had a full scale IQ of 68 and that "[t]ypically, a Full Scale IQ of 70 or lower fulfills the 'significant deficits in intellectual functioning' prong of a diagnosis of mental retardation." Pet. at 83. He complains that if trial counsel had retained and consulted with an expert on mental retardation, the expert would have been able to explain why Basham should be diagnosed as being mentally retarded, thus rendering him constitutionally ineligible for a death sentence. The problem with this argument is that there was no real evidence to suggest that Basham is mentally retarded. "[T]he touchstone of effective representation must be sound, evidence-based judgment." *Meyer*, 506 F.3d at 371.

In *Green v. Johnson*, 515 F.3d 290 (4th Cir. 2008), the Fourth Circuit found that a state supreme court's determination that a petitioner had not established his claim of mental retardation, in spite of the fact that one of the four intelligence tests he had taken resulted in a score of 55, was not unreasonable. *Id*. at 300. The state supreme court had noted that three of the scores were higher than 70 and that a person can fake a lower score but not a higher score. *Id*. The Fourth Circuit concluded that the court had properly applied the factors set forth in *Atkins v. Virginia*, 536 U.S. 304 (2002). *Id*. In *Atkins*, the Supreme Court found that the clinical definitions of mental retardation require not only sub-average intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction, that became manifest before age 18. *Id*. at 318. It quoted the definition of mental retardation used by the American Association on Mental Retardation (AAMR):

> Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work. Mental retardation manifests before age 18.

*Atkins*, 536 U.S. at 308 n.3 (quoting MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed. 1992)). The Supreme Court also quoted a similar definition by the American Psychiatric Association:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety (Criterion B). The onset must occur before age 18 years

(Criterion C).

*Id.* (quoting DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4th ed. 2000)).   Thus, a showing of borderline or below-average intelligence alone does not constitute an adequate showing of mental retardation.  *United States v. Webster*, 421 F.3d 308, 313 (5th Cir. 2005).

Basham has failed to meet the requirements for showing mental retardation as set forth in *Atkins*: (1) significantly subaverage intellectual functioning (generally, a full scale IQ of less than 70); (2) limitations in adaptive functioning; (3) onset before age 18.  According to the IQ scores presented to this court, Basham did not suffer from "subaverage general intellectual functioning" prior to age 18.  For example, when Basham was "almost 18," his IQ was 89.  Tr. 10/26/04, ECF No. 965 at 66.  The only evidence offered by Basham to support his claim that he was mentally retarded at the time of trial is the result of one IQ test conducted shortly before trial, which indicated a full-scale IQ of 68.  *Id*. at 53.  The government points out that at that time, Basham had a strong motivation to make it appear that he had a low intelligence.

Basham asserts "on information and belief" that his trial counsel "ignored evidence that his earlier IQ testing had been skewed by seemingly well-meaning professionals to reflect a higher IQ so that Mr. Basham could be admitted to juvenile care facilities that set minimum IQs for patients."  Pet. at 84.  At the § 2255 evidentiary hearing, Harris admitted that in their investigation of Basham's background they learned that some of Basham's IQ scores may have been inflated.  Tr. 10/11/12, ECF No. 1555 at 307; *see also* Pet. Ex. 56.  Harris also testified that any tests that were provided to trial counsel were also provided to

143

defense psychologist Dr. Tora Brawley for her evaluation. *Id*. At some point, trial counsel decided not to pursue the mental retardation route because they "didn't have an opinion to support it." *Id*. at 306. In his petition, Basham further asserts, "[u]pon information and belief, [that trial] counsel also failed to obtain the raw data associated with the earlier IQ tests to determine the validity of the administration and scoring of those tests." Pet. at 84. However, in his testimony, Swerling noted that as part of their trial strategy, trial counsel "virtually subpoenaed every medical record, every jail record, every school record that we could find . . . ." Tr. 10/15/12, ECF No. 1556 at 634. Indeed, Basham's own standard of care expert, Larry Hammond, noted that an "impressive amount of first level data appears to have been gathered here." Tr. 10/16/12, ECF No. 1558 at 857.

Additionally, Basham has failed to show that he has significant limitations in adaptive skills such as communication, self-care, and self-direction, that became manifest before age 18. There has never been any suggestion that Basham could not take care of his daily needs. Further, observation of his behavior prior to and during the commission of his crimes and during his trial show that Basham possessed communication and self-direction skills. For example, the Fourth Circuit, in addressing Basham's claim on appeal regarding the admissibility at the penalty phase of video of the courtroom scuffle, observed: "Basham's actions and manipulation during the episode . . . , coupled with the fact that he remained calm during the remainder of the trial once he was permitted to have his chewing tobacco during breaks, point to a manipulative individual." *United States v. Basham*, 561 F.3d 302, 333 (4th Cir. 2009).

144

In their brief, the government lists the various "skills" that Basham exhibited on his and Fulks's seventeen-day crime spree. After Basham and Fulks escaped from prison, Basham was the one who went to James Hawkins's door at night and convinced Hawkins to give him a ride to a non-existent broken-down vehicle, thus demonstrating an impressive ability to communicate persuasively with another person. When Basham stole checks from Robert Talsma's box of checkbooks, he did not take the checkbook from the top. Tr. 9/14/04, ECF No. 936 at 99. Rather, he stole a checkbook from the middle of the box—another example of Basham's reasoning ability. Margaret Moore's testimony of Basham's attempt to convince her to take him to the store to get gas or to allow him into her house to use the telephone revealed Basham's planning and communication skills. Tr. 9/17/04, ECF No. 938 at 86–87.

According to the government, Basham's actions clearly show that he operated at a level exceeding the ceiling abilities for mental retardation. Basham argues that the government focuses too much on his skills when his limitations are important for a mental retardation analysis. However, Basham fails to offer the particular limitations that he believes satisfy that prong of the test for mental retardation.

Basham further alleges that trial counsel were ineffective for failing to obtain an expert in mental retardation. Basham's standard of care expert, Hammond, concluded that Harris and Swerling's conduct "fell well below the standard of care" with respect to Claim 19, in particular. Tr. 10/16/12, ECF No. 1558 at 858. Hammond took issue with trial counsel's decision to rely on the opinion of psychologist Dr. Brawley as to whether Basham was mentally retarded. Hammond opined that of all of the trial experts, Dr. Brawley was the

145

closest to a mental retardation expert.  However, in Hammond's view, "I believe she would say, and maybe did say, that she's not a sufficiently specialized psychologist to really evaluate the entire collection of *Atkins*-related issues."  Tr. 10/17/12, ECF No. 1560 at 935–36.  On the contrary, at trial, Dr. Brawley felt confident enough with her knowledge of mental retardation to confirm that mental retardation was "not an issue here."  Tr. 10/26/04, ECF No. 965 at 53.

Not only did Dr. Brawley receive copious amounts of subpoenaed medical information from trial counsel, but she also did her own investigation of Basham, both interviewing people who had known him for a long time and sitting down with Basham to conduct a battery of tests.  Based on her interviews and testing, Dr. Brawley diagnosed Basham as having "dementia due to multiple etiologies," including head injuries and drug abuse.  Tr. 10/26/04, ECF No. 965 at 81, 85–88.  She did not find that Basham was mentally retarded, nor did she ask for another expert to assess Basham for that specific purpose.  Defense counsel are not required to second-guess their experts' examinations or opinions.  *Goines v. Angelone*, 52 F. Supp. 2d 638, 664 (E.D. Va. 1999) (citing *Pruett v. Thompson*, 996 F.2d 1560, 1573– 74 (4th Cir. 1993); *Poyner v. Murray*, 964 F.2d 1404, 1418 (4th Cir. 1992) (holding that there was no right to effective assistance of expert witnesses distinct from the right to effective assistance of counsel and the deficiencies in the performance of experts are not automatically imputed to the performance of counsel)).

To further combat the notion that a claim of mental retardation should have been pursued in this case, the government points the court to the opinion of Dr. Bruce Capehart, a staff psychiatrist at the Federal Medical Facility, who conducted a court-requested

146

evaluation of Basham. Dr. Capehart administered the Wechsler Adult Intelligence Scale-III, which indicated a full-scale IQ of 75. Basham scored in the average range when tested for his ability to demonstrate reasoning and knowledge about practical and social problems. Importantly, he scored in the range of possible malingering on a test designed to measure effort and motivation. Dr. Capehart opined, "Given Mr. Basham's questionable motivation and his current legal circumstances, the current results are considered a minimum estimate of his cognitive functioning and potential." Dr. Capehart pointed out that Basham had exhibited a high degree of variability over time. He noted that Basham's most recent evaluation was conducted in July 1999 (prior to his arrest on the current charges) and resulted in a full scale IQ in the average range, with scores on nine of the twelve sub-tests being in the average range.

This court cannot find that Swerling and Harris were ineffective for failing to pursue a claim of mental retardation in Basham's case. It is evident that trial counsel were diligent in recovering as many of Basham's records as possible. The entire defense team also took great pains to interview an incredible number of people that Basham had encountered over the course of his life. Using all of this information, Basham's trial experts concluded that there was no issue of mental retardation. Trial counsel relied on their experts' opinions and did not pursue a claim of mental retardation, and this court concludes that they did not fall below the standard of care in doing so.

In his petition, Basham points out that if he can now show that he is mentally retarded, then he cannot be executed. However, Basham has failed to submit sufficient evidence on any of the three prongs of *Atkins* to show that he is mentally retarded, and specifically that

the onset was before he turned eighteen.

*Fetal Alcohol Spectrum Disorder*

Basham argues that his trial counsel were ineffective for failing to pursue evidence of his exposure to drugs and alcohol *in utero* and to seek expert advice on the effects of this exposure. According to Basham, "an adequate investigation into this issue would have revealed compelling mitigating evidence," Pet. at 85, but Basham fails to explain how evidence of Fetal Alcohol Spectrum Disorder (FASD) would have caused the jury to reach a different conclusion.

"'[T]he reasonableness of an investigation, or a decision by counsel that forecloses the need for an investigation, must be considered in light of the scarcity of counsel's time and resources in preparing for a sentencing hearing and the reality that counsel must concentrate his efforts on the strongest arguments in favor of mitigation.'" *Byram v. Ozmint*, 339 F.3d 203, 210 (4th Cir. 2003) (quoting *McWee v. Weldon*, 283 F.3d 179, 188 (4th Cir. 2002)).

Although Basham alleges a "complete failure to pursue evidence of Mr. Basham's exposure to drugs and alcohol *in utero*," Pet. at 85, trial counsel's testimony at the § 2255 evidentiary hearing shows that was not the case. The court heard the following exchange regarding FASD during the government's cross-examination of Harris:

A.    . . . I believe Chad Fulks's team had presented evidence of that to the jury, so we were aware of it. And our experts just said it did not exist in our case.

Q.    So it was looked at?

A.    Oh, yes.

Q.    And, again, you relied upon your experts?

148

A.     Yes.

Q.     To determine that he didn't have it.

A.     Another reason is there was a lot of family history with Brandon that suggested that that might have been something that—might have had a factor in what he did and why he did it and how he lived his life. It just unfortunately, once we did the testing, we didn't have it.

Tr. 10/11/12, ECF No. 1555 at 381. The court cannot find ineffective assistance of trial counsel for failing to investigate and present evidence of FASD because trial counsel did investigate that possibility with negative results.

### *Mitigation Investigation*

Basham reserved the right to assert additional types of mitigation evidence that he contents trial counsel should have investigated and presented to the court, but Basham never offered additional areas where he believes trial counsel's performance fell below the standard of care. In its brief, the government provided an extensive recitation of the mitigation evidence that trial counsel turned up and presented to the jury. Indeed, the mitigation evidence heard by the jury was exhaustive. Accordingly, the court concludes that trial counsel were not ineffective in their investigation and presentation of mitigation evidence during the penalty phase of Basham's trial.

### CLAIM 20:
### FAILURE TO ASSEMBLE AND SUPERVISE
### A COMPETENT CAPITAL DEFENSE TEAM

In general, Claim 20 alleges ineffective assistance of counsel based on Basham's trial counsel's failure to assemble a competent capital defense team and, in the alternative, their failure to adequately supervise the team that they assembled. Basham contends that the team

that his trial counsel did assemble "was one riddled with personal problems, conflicts of interest, and ineffective performance." Pet. at 87. Further, he alleges that his trial counsel failed to recognize these issues and failed to manage their team. *Id*. As discussed in detail below, the evidence does not support these allegations—trial counsel's performance was neither deficient nor prejudicial. *See Strickland*, 466 U.S. at 687.

Claim 20 is premised on the alleged shortcomings of two members of Basham's trial defense team. The first of these is Carlisle McNair, a former officer of the Lexington County Sheriff's Department (LCSD) hired as the lead investigator for Basham's defense. The second is Paige Tarr, a mitigation specialist. Regarding both McNair and Tarr, Basham avers that his Sixth Amendment rights were violated when his trial counsel failed to identify and/or remedy certain of their personal and professional problems.

Before turning to the specific allegations against each of these team members, it is important to note the following general testimony regarding the scope of Basham's trial defense team and their efforts in this case. Trial counsel assembled a large defense team, which included approximately twenty-four members, *see* Tr. 10/11/12, ECF No. 1555 at 340–48, and investigators in three states—Kentucky, South Carolina, and West Virginia, *see* Tr. 10/15/12, ECF No. 1556 at 627. Harris testified that he and Swerling worked on Basham's case unceasingly after their appointment and that they closely interacted with each member of the team. For example, Harris stated that "[e]very day without question something was done on this case, something was managed in this case, someone was interviewed, discussions were had between myself and Jack and the team." Tr. 10/11/12, ECF No. 1555 at 348; *see* Tr. 10/15/12, ECF No. 1556 at 633. Further, Harris noted that

Swerling was an "[e]xtremely hands on" manager and that they reviewed memoranda from team members daily. Tr. 10/11/12, ECF No. 1555 at 389–90; *see* Tr. 10/15/12, ECF No. 1556 at 632. Importantly, trial counsel felt that they were given every resource they needed or desired to defend Basham. *See* Tr. 10/11/12, ECF No. 1555 at 348. And as a result of their efforts, Harris stated that he was confident that "we did not miss one week of Brandon Basham's life" during the investigation. *Id*. at 385. Especially in light of this testimony, the court is, at the outset, mindful of the "strong presumption" that trial counsel provided effective assistance to Basham. *See Strickland*, 466 U.S. at 689 ("Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.")

*Carlisle McNair*

Basham identifies a litany of alleged deficiencies with investigator Carlisle McNair based on McNair's conduct both before and after he became a part of the defense team. First, Basham argues that McNair was an unqualified investigator. For example, McNair had not in fact "retired" from the LCSD, but rather had resigned after several instances of misconduct, including removing evidence and breaking the chain of custody, lying in an internal affairs investigation, violating the Fourth Amendment's search warrant requirement, and displaying obscene videos at work. Correspondingly, Basham contends that trial counsel's selection of McNair prejudiced him. Specifically, trial counsel allegedly could not call McNair as a witness because McNair could be impeached based on these instances of misconduct.

151

The court agrees with Basham that McNair's alleged workplace misconduct at the LCSD is both shocking and distasteful, but the court does not agree that Basham's trial counsel were ineffective for selecting McNair. Initially, the court notes that Swerling and Harris did not find out about this alleged misconduct until, at the earliest, right before trial. Tr. 10/10/12, ECF No. 1553 at 273; Tr. 10/15/12, ECF No. 1556 at 551–52. In any event, although the evidence of misconduct suggests that McNair broke a number of rules governing law enforcement officers, it does not necessarily mean that McNair was incapable of being an effective investigator on a death penalty defense team. Indeed, despite his alleged flaws as a law enforcement officer, it appears that McNair was quite good at finding difficult-to-locate witnesses. Tr. 10/10/12, ECF No. 1553 at 268; Tr. 10/11/12, ECF No. 1555 at 382–83. Also, Swerling testified that he hired McNair in other cases after Basham's trial. Tr. 10/15/12, ECF No. 1556 at 556.

Moreover, it does not appear that Basham was prejudiced by his trial counsel's selection of McNair. McNair did not testify at trial, and Basham nowhere identifies testimony that McNair would have been called as a witness to rebut. Indeed, Basham's trial counsel testified that there was never an instance at trial where they would have called McNair to rebut testimony from government witnesses but did not do so based on his background. Tr. 10/11/12, ECF No. 1555 at 409; Tr. 10/16/12, ECF No. 1558 at 761–62. Further, trial counsel did not believe that information regarding McNair's misconduct would have been admissible as impeachment evidence. Tr. 10/11/12, ECF No. 1555 at 409; Tr. 10/16/12, ECF No. 1558 at 762. Thus, the fear of McNair being impeached based on his background would not have prevented trial counsel from calling McNair as a witness had it

152

been necessary.

Next, Basham alleges that McNair was biased against him, both personally and professionally. According to Basham, McNair harbored a personal bias against him because McNair believed that Basham was a homosexual. In this regard, Basham states that McNair spent a "large part of his time" questioning witnesses about Basham's potential homosexual relationships. Basham also cites an email in which McNair, referring to a witness he intended to locate, states that he is planning to talk to "another homo friend of Branden's Can't wait [sic]." Basham bases his allegation of professional bias on McNair's "lengthy and recent law enforcement experience" prior to joining the defense team and an email to a potential law enforcement witness in which McNair stated, "I know I am working on the other side, but the 'FACTS DON'T CHANGE.' I am, and always will be, a 'cop' at heart." Reply at 129.

Although the court does not condone McNair's language regarding homosexuals, it does not appear to the court that McNair was personally biased against Basham. According to Swerling, in order to effectively represent Basham, he had to "find out as much as the prosecution kn[ew], and more." Tr. 10/11/12, ECF No. 1555 at 498; *see* Tr. 10/15/12, ECF No. 1556 at 554–55. Unless he pursued every line of inquiry and scrutinized "every aspect of Mr. Basham's background and his character," regardless of its apparent relevance at the time, Swerling explained that he would have been unable to make an informed decision regarding which issues were important for trial and which issues were not. Tr. 10/11/12, ECF No. 1555 at 499; Tr. 10/15/12, ECF No. 1556 at 555.

Swerling likely impressed this mind set upon McNair, his lead investigator and on whose investigative instincts Swerling had, at least to some extent, to rely. *See* Tr. 10/16/12, ECF No. 1558 at 758. Thus, although Basham's trial counsel did not specifically identify Basham's sexuality as an issue, *see* Tr. 10/10/12, ECF No. 1553 at 272; Tr. 10/15/12, ECF No. 1556 at 534, in light of their overall strategy to know everything about Basham's life, the court cannot at this point say that it was unreasonable for McNair to spend time investigating Basham's sexuality or that it suggests Mr. McNair was personally biased against Basham.

Indeed, Swerling testified that at least some aspect of Basham's sexuality may have been a subject of investigation because the defense team received information that Basham "would trade sexual favors for drugs," and if true, Swerling "would have wanted to know about it" in preparing a defense. Tr. 10/15/12, ECF No. 1556 at 534, 554.

Additionally, rather than being professionally biased against Basham, it appears to the court that McNair sought to leverage his past experience to gain information. In particular, trial counsel testified that McNair was particularly good at interviewing law enforcement officers, and he often used his background in law enforcement to build a rapport with these potential witnesses. *See* Tr. 10/10/12, ECF No. 1553 at 269–70. According to Swerling, by letting a potential witness know that he would always be a "cop at heart," McNair could get more information out of them than any other investigator. Tr. 10/15/12, ECF No. 1556 at 553. It is not unreasonable for a former law enforcement officer-turned investigator to use his former credentials to gain favor with a current member of law enforcement and thereby obtain more or better information. Moreover, it seems to the court that even "lengthy" prior

154

law enforcement experience should not preclude someone from being an investigator on a death penalty case. Therefore, the court gives very little weight to the allegations of bias against McNair.

Finally, Basham contends that McNair "directed an inordinate amount of time and resources towards irrelevant (and often prurient) matters at the expense of investigating issues that had direct and critical significance to the case against Mr. Basham." Reply at 127. More specifically, Basham first highlights McNair's apparent interest in Veronica Evans, Fulks's ex-wife. McNair spent a substantial amount of time interviewing Evans and her associates, and, according to Basham, McNair "seems to have been extremely focused on . . . the fact that she was a stripper . . . and the possibility that tapes existed that portrayed her performing sexual acts." *Id*. at 127–28. McNair apparently convinced an associate of Evans's to provide McNair a copy of one such videotape. *Id*. at 128. As a result of this focus on allegedly collateral and unimportant matters, Basham argues, McNair failed to properly interview several guards from the Federal Correctional Institution in Butner, North Carolina, where Basham was held pending trial.

Based on the testimony adduced at the evidentiary hearing on Basham's § 2255 petition, the court finds little merit in these allegations. First, in light of the stated strategy to learn everything about Basham's life—and therefore to determine the facts relevant to mitigation—the court cannot say that McNair should not have investigated Veronica Evans at all. Indeed, Swerling testified that this avenue of inquiry may have been an effort to gather information on Basham's co-defendant Fulks. *See* Tr. 10/16/12, ECF No. 1558 at 758. And even though McNair appears to have wasted some time and resources seeking a videotape

155

that was not important to the mitigation case against Basham, Tr. 10/10/12, ECF No. 1553 at 271–72, it does not appear that McNair spent an inordinate amount of time and resources doing so, or on any other irrelevant or prurient matters.  McNair submitted weekly reports describing his work, Tr. 10/16/12, ECF No. 1558 at 756–57, and he was not ever seen to have been wasting time or resources, Tr. 10/11/12, ECF No. 1555 at 382–83; Tr. 10/16/12, ECF No. 1558 at 758.  Thus, the time and/or resources he spent looking for the Evans video must have been a small amount of the approximately 4,400 hours he worked on Basham's case. *See* Tr. 10/16/12, ECF No. 1558 at 756.  Indeed, as noted above, after the investigation was concluded, trial counsel felt confident their investigators did not miss "one week" of Basham's life. *See* Tr. 10/11/12, ECF No. 1555 at 385.

With regard to prejudice based on McNair's allegedly dilatory investigation, the allegation is not that McNair failed to interview the proper witnesses; indeed, McNair conducted approximately 200 witness interviews.  Tr. 10/11/12, ECF No. 1555 at 383; Tr. 10/16/12, ECF No. 1558 at 755.  Rather, the allegation is that McNair failed to get the proper information out of the witnesses.  As an example, Basham emphasizes that his trial counsel were apparently taken by surprise when guards at the detention facility where Basham was detained testified that Basham had bragged he would not get the death penalty.  Reply at 129–30.  One of the guards, Eddie Ledford, testified that McNair only spent fifteen minutes interviewing him and that, had McNair asked whether Basham was boastful or bragging, Ledford would have told McNair so. *Id*. at 130.

Even assuming McNair had asked the right questions and uncovered this information earlier, however, it is not clear that trial counsel would have been able to stop Ledford from

156

testifying about Basham's bragging.  Notably, Basham's trial counsel did attempt to have the testimony excluded, but this court allowed Ledford to testify anyway.  Moreover, Basham has suggested nothing that McNair could have found that would have outweighed the overwhelming evidence of Basham's guilt in this case.  See discussion accompanying Claim 1, *supra*.

Based on the above, Basham has not shown that trial counsel were ineffective for selecting McNair as a member of the defense team.

### *Paige Tarr*

Basham's allegations that Paige Tarr was deficient are much fewer than his allegations against McNair.  In general, Basham contends that Tarr, the mitigation specialist, failed to perform the duties required of a qualified mitigation expert because she allegedly could not meet the substantial responsibility of her role. Reply at 131–32.  Basham notes, for example, that trial counsel had to bring in additional personnel to assist her.  *Id*. at 131.  Correspondingly, Basham argues that trial counsel failed to supervise Tarr and "failed to take prompt remedial steps when her deficiencies came to their attention." *Id.*

Initially, the court notes that it is somewhat contradictory to argue ineffective assistance of counsel based on counsel's selection of a team member who counsel had to bring in additional personnel to support, while also arguing ineffective assistance based on counsel's failure to supervise and remedy the alleged deficiencies of the exact same team member.  In other words, Swerling and Harris must have been supervising Tarr if they noticed she needed additional help.  Notably, between the two of them, Harris and Swerling spent 126 hours talking with Tarr in over 100 conversations.  *See* Tr. 10/16/12, ECF No.

157

1558 at 770–71. And they certainly attempted to remedy this alleged deficiency in Tarr's productivity by bringing in Lisa Kimbrough to help. *See id*. at 764.

Nonetheless, trial counsel was not ineffective for selecting Tarr as a mitigation specialist. For example, Tarr had worked death penalty cases before, *id*. at 759, and she developed a special rapport with Basham's family, Tr. 10/10/12, ECF No. 1553 at 267–68. Additionally, Tarr conducted approximately 70 interviews while spending approximately 1,800 hours working on the case. Tr. 10/16/12, ECF No. 1558 at 763. Thus, it appears that Tarr was a valuable member of Basham's defense team.

Correspondingly, trial counsel's inclusion of Tarr on the defense team did not prejudice Basham. Although Tarr may have had trouble at one point completing her work in a timely fashion, she was not the only mitigation specialist. In fact, trial counsel testified that everyone, not just Tarr and McNair, was a member of Brandon's mitigation team. *See* Tr. 10/11/12, ECF No. 1555 at 382. Notably, trial counsel conducted approximately sixty to seventy interviews themselves. *See id.*; Tr. 10/16/12ECF, No. 1558 at 765. Moreover, any issue with Tarr allegedly not being able to keep up with her duties did not affect the way that trial counsel prepared for or defended the case against Basham. Tr. 10/11/12, ECF No. 1555 at 384; Tr. 10/16/12, ECF No. 1558 at 764–65. According to Harris, they received Tarr's memoranda in time to adequately prepare for trial. Tr. 10/11/12, ECF No. 1555 at 384.

Consequently, Basham has also failed to show that his trial counsel were ineffective for selecting Tarr as a member of his defense team.

CLAIM 21:
TRIFURCATION OF THE TRIAL

In Claim 21, Basham contends that his trial counsel were constitutionally ineffective for failing to request that the trial be trifurcated. The Federal Death Penalty Act (FDPA), by its express terms, calls for bifurcation, providing for a guilt phase, followed by "a" separate sentencing hearing. 18 U.S.C. § 3593(b). Basham contends that notwithstanding the statute, constitutional considerations require that the sentencing phase be split into two separate components: (1) an "eligibility" phase in which the jury would hear the government's evidence regarding the threshold intent factors and the statutory aggravating factors in determining whether Basham was eligible for the death penalty; and (2) a "penalty" or "selection" phase in which the jury would consider nonstatutory aggravating factors and all mitigating factors, and in which the jury would weigh the aggravating and mitigating factors in deciding whether to impose the death penalty.

This argument is grounded upon the assertion that a trifurcated trial was necessary to ensure that the jury was not swayed by evidence of nonstatutory aggravating factors (such as victim impact evidence) in deciding whether the government had first proven Basham's eligibility for the death penalty beyond a reasonable doubt. In other words, Basham argues that a bifurcated trial violates a capital defendant's rights because it allows an improper spillover between proof of statutory and nonstatutory aggravating factors.

Federal appellate courts that have considered the issue have held that although the FDPA contemplates a single sentencing hearing, it does not prohibit a district court from bifurcating a sentencing hearing (and thus trifurcating the trial) to avoid confusion of the

159

issues before the jury. *United States v. Bolden*, 545 F.3d 609, 618 (4th Cir. 2008); *United States v. Fell*, 531 F.3d 197, 240, n.28 (2d Cir. 2008). The appellate courts, however, have not held that trifurcation is mandatory and have left the matter to the discretion of the district courts. *See Bolden*, 545 F.3d at 618–19.[53]

Basham points out that four district courts have employed trifurcation in the manner suggested in Claim 21. *See, e.g., United States v. Natson*, 444 F. Supp. 2d 1296, 1309 (M.D. Ga. 2006); *United States v. Johnson*, 362 F. Supp. 2d 1043, 1110–11 (N.D. Iowa 2005); *United States v. Mayhew*, 380 F. Supp. 2d 936, 955–57 (S.D. Ohio 2005); *cf. United States v. Jordan*, 357 F. Supp. 2d 889, 903–04 (E.D. Va. 2005). All of these decisions involved cases that went to trial subsequent to Basham's criminal trial in 2004. Basham points the court to no authority, and this court's independent research has found none, directly holding that trifurcation is mandatory in federal death penalty cases.[54]

This court's jury instructions and accompanying verdict form—which required the jury to engage in a sequential evaluation of the penalty phase—eliminated any potential confusion or prejudice regarding the sentencing process. The court's jury instructions began

---

[53] The Fourth Circuit Court of Appeals has held, in a habeas corpus review of a state death sentence, that a state capital defendant was not denied due process when the trial judge refused to bifurcate his sentencing hearing. *Booth-El v. Nuth*, 288 F.3d 571 (4th Cir. 2002). In *Booth-El,* the state court sentencing regime provided for a jury determination as to whether the defendant was a first degree principal before any evidence regarding aggravating and mitigating factors were presented.

[54] Basham cites *Ring v. Arizona*, 536 U.S. 584 (2002), and suggests that the principle announced in *Ring* should compel trifurcation as a matter of Constitutional law in federal death penalty cases. In *Ring*, the Supreme Court addressed an Arizona state sentencing regime in which, following a jury adjudication of a defendant's guilt of first-degree murder, the trial judge, sitting alone, determined the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty. The Court held that such an arrangement violated the Sixth Amendment right to trial by jury in capital prosecutions. *Ring* can thus be seen as having no application to the case at bar. Here, in accordance with the federal statutory mandate, the jury, not the court, determined whether life imprisonment or death was the appropriate punishment.

by outlining "the deliberative steps [the jury] should follow in considering both the offenses for which the death penalty is a possible punishment." Tr. 11/1/04, ECF No. 971 at 199. The court told the jury:

> First, you must consider whether the Government has proven, beyond a reasonable doubt and to your unanimous agreement, that the Defendant was at least 18 years of age at the time of his offense.
>
> Second, you must consider whether the Government has proven beyond a reasonable doubt and to your unanimous agreement, one of four threshold intent factors.
>
> Third, you must consider whether the Government has proven, beyond a reasonable doubt and to your unanimous agreement, the statutory aggravating factor alleged.
>
> Fourth, if you find these first three steps have been proved to your unanimous agreement, then you must consider whether the Government has proven, beyond a reasonable doubt and to your unanimous agreement, any nonstatutory aggravating factors identified by the Government.
>
> Fifth, you must consider whether any one or more of you individually find that the Defendant has proven any mitigating factor or factors by a preponderance of the evidence. You may find any mitigating factor by considering everything that you have learned during either phase of the trial, regardless of whether or not Mr. Basham's attorneys have asserted that factor.
>
> Sixth, all of you then must weigh the aggravating factors you have unanimously found to exist against any mitigating factor or factors any one of you individually found to exist, to determine the appropriate sentence.

*Id*. at 199–200. In this way, the district court indicated that the steps were sequential and that the jury had to first find Basham eligible for the death penalty (based on his age, the threshold intent factor, and the statutory aggravating factor) before they could even consider other aggravating factors and mitigating factors.

161

Moreover, this court further emphasized the sequential process in the jury charge. The court stated "[b]efore you may consider the imposition of the death penalty, you must first unanimously agree, beyond a reasonable doubt, that the defendant was eighteen years of age or older . . . [and] you must also find beyond a reasonable doubt that the defendant acted with one of the four potential mental states, called threshold intent factors . . . ." *Id*. at 203. The court then emphasized, "You must find one of these threshold intent factors . . . before you may continue your deliberations." *Id*. at 206. The court continued, "if and only if you unanimously find beyond a reasonable doubt that the defendant acted with one of the threshold intent factors . . . you must proceed to determine whether the government has proved beyond a reasonable doubt the existence of a statutory aggravating factor . . . ." *Id*. at 207. "If you do not unanimously find that the government has proven the statutory aggravating factor," the court instructed, "you should so indicate . . . and no further deliberations will be necessary." *Id*. at 208. This court thus made it plain that the jury could only proceed to the penalty or selection deliberations once the government had proven all of the eligibility requirements (age, threshold intent factor, and statutory aggravating factor). "Jurors are presumed to follow their instructions" and there is no indication in the record of this case that they did not do so here. *Bolden*, 545 F.3d at 619 (citing *Shannon v. United States*, 512 U.S. 573, 584–85 (1994)).

Finally, as the government points out in its opposition brief, the bifurcated trial proceeding had the potential to work in Basham's favor. Just as there could have been spillover between the nonstatutory aggravating factors, such as victim impact statements, the jury might have also considered information regarding mitigating factors in deciding whether

162

Basham was death eligible.  Basham's trial attorneys submitted six statutory mitigating factors and thirty-one nonstatutory mitigating factors for the jury to consider.  Many of these proposed mitigating factors related to Basham's mental or emotional health in general or to his mental state at the time of the offenses.  The court instructed the jury that these factors were not relevant to whether Basham was *eligible* for the death penalty, and the jury was not to consider them until after they had made their eligibility determination.  But, to the extent the jury might have intentionally or unintentionally considered these factors in deciding eligibility, this process could have worked in Basham's favor.  Had Basham's attorneys successfully argued for trifurcation, the government might well be defending against a § 2255 claim that it was error to trifurcate the trial, suggesting that a bifurcated trial would have worked in Basham's favor because of the fact that mitigating factors would have been before the jury at the time they made their eligibility determination.  It can thus readily be seen that the decision of trial counsel not to request a trifurcated death penalty trial did not fall below the standard of care in this case.  As such, Claim 21 is denied.

CLAIM 22:
*BRADY* ISSUES

In Claim 22, Basham contends that the government violated his constitutional rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose material, exculpatory, or impeachment evidence to Basham that was necessary to his ability to prepare and present a defense.  In his § 2255 petition, Basham contends that the non-disclosed *Brady* evidence includes: (1) information concerning federal, state, and local investigations of Sheriff Ronald Hewett; (2) information concerning the government's post-verdict investigation of juror

misconduct in Basham's case; and (3) any agreements made by the government or a governmental agency with witnesses who testified.  In responding to these allegations, the government suggests that they all lack factual support.  Basham's reply brief merely recites that the investigation into the *Brady* claim is "on-going" and suggests that at that time the petitioner had nothing to add to his original claim.

This claim merits little discussion.  To begin with, the investigation of Sheriff Hewett did not begin until December 2006, two full years after the conclusion of Basham's trial.  As to the juror misconduct, this court conducted a total of nine hearings which were in the nature of discovery depositions, thus allowing full access to all information about the alleged juror misconduct.  There is no showing that the government's own investigation, if there was one, revealed any exculpatory or impeachment information that should have been turned over to defense counsel.  Finally, with regard to plea agreements and the like with government witnesses, the government made it plain throughout the duration of the case that no plea agreements or deals were made with any of the witnesses who testified.  Claim 22 is, therefore, without merit.

CLAIM 23:
THE GOVERNMENT'S ALLEGED INCONSISTENT
POSITIONS AT THE TWO TRIALS

In Claim 23, Basham argues that the government violated his right to due process by presenting a theory at his trial that was inconsistent with the theory it presented at co-defendant Fulks's trial. Basham claims that his trial counsel were constitutionally ineffective for failing to object to the government's use of inconsistent theories. Finally, Basham contends that he was denied effective assistance of appellate counsel when they failed to

164

raise this issue on appeal. The court finds these arguments unpersuasive.

In his § 2255 petition, Basham contends that the government "took diametrically opposed positions" at the two trials, "manipulated the evidence," and "relied upon factually inconsistent and irreconcilable evidence at the two trials." Pet. at 98–101.

Claim 23 is somewhat duplicative of Claims 11 and 16, both of which this court has already rejected. Specifically, the court has determined that with regard to Sheriff Hewett's strap testimony, the government did not use false testimony at Basham's trial in violation of *Napue v. Illinois*. In Claim 16, the court has determined that the government did not make inconsistent factual assertions at the two trials. Claim 16 contains a lengthy recitation of the closing arguments made by the government in both trials, and those portions of the transcript need not be repeated here. Suffice it to say that this court has combed the record in both Fulks and Basham's cases and finds no basis for a due process violation or ineffective assistance of counsel claim. Indeed, in Fulks's § 2255 appeal, the Fourth Circuit Court of Appeals focused upon some of the same language this court has quoted herein, and the court determined that the government did not take inconsistent positions in the two trials. *Fulks*, 683F.3d at 524; *see* discussion of Claim 16, *supra*. For these reasons, the court finds no merit to Claim 23.

## CLAIM 24:
### THE PROSECUTION'S "CAUSE AND EFFECT" ARGUMENT

In Claim 24, Basham contends that the prosecution violated his Eighth Amendment rights when it argued to the jury that a "causal nexus" was required between a mitigating factor and Alice Donovan's death. Basham further argues that by failing to object to the

165

government's misconduct, trial counsel rendered ineffective assistance of counsel and that his appellate attorneys were similarly ineffective for failing to raise the issue on appeal.

At the outset, it should be noted that the identical argument was made to, and rejected by, this court in Fulks's § 2255 petition. After the court rejected the claim in the Fulks case, appellate counsel in the § 2255 proceeding did not include it among the issues raised on appeal.

Notwithstanding this fact, the court has considered this issue anew and finds no basis for disturbing its earlier decision that no error occurred by trial or appellate counsel.

During summation, the government argued as follows:

But generally what did their experts say? What is the most important thing they said? Brandon Basham knows right from wrong and there is no cause-and-effect between whatever issues Brandon Basham is dealing with in the kidnapping and carjacking randomly of two innocent women. There is no cause and effect. It is not like you were born into an alcoholic family, you run the risk of being an alcoholic. There is no cause-and-effect of Brandon Basham's upbringing or any problems Brandon Basham has with the effect of him randomly targeting, and kidnapping, and killing two innocent women. Every single defense expert took that witness stand and acknowledged that because they had to. Because that is a fact. No cause and effects. There are thousands and thousands of kids and adults walking around this country . . . that grew up impoverished, much poorer than Brandon Basham, with physical disabilities he did not have. With significant, significant mental issues that don't kill, that don't carjack . . . [a]nd that is absolutely critical.

Tr. 11/1/04, ECF No. 971 at 85.

Later during the argument, the government stated:

What does Brandon Basham having a memory problem have to do with targeting Alice Donovan in the Wal-Mart parking lot, and kidnapping and carjacking her? What does a memory problem have anything to do with the facts and circumstances of this case as to what happened to Samantha Burns and what happened to Alice Donovan? What does a memory problem have to do with that, if you so find that he has a memory problem?

166

*Id*. at 86.

> Still later during the argument, the government argued as follows:

> [T]he Government's psychiatrist diagnosed [Mr. Basham] with something that explained his behavior against Samantha Burns and Alice Donovan. And the defense expert opines two problems in which she acknowledges does not explain his behavior. Who got it right? That is for you to decide. You know, deciding on who got it right on that issue clearly only goes to show what mitigation, what weight you will consider to give that when you are deliberating as to what the appropriate punishment will be . . . the facts speak for themselves . . . and one of the tougher points you can't forget, there is absolutely no question Mr. Basham knew right from wrong. No question whatever his issues are, there is no cause-and effect.

*Id*. at 89.

In addition to the above arguments, the government at trial cross-examined several mitigation witnesses about whether there was a "cause and effect" connection between Basham's history and deficits and the crimes of which he had been convicted. For example, social worker Jan Vogelsang was asked "So, because there is a volitional component [to an act of murder], you cannot take these factors and say that they caused Brandon Basham to carjack and kidnap Alice Donovan, you can't say that, can you?" Tr. 10/20/04, ECF No. 960 at 205–06. Pushing the issue further, counsel for the government later asked, "The other family members . . . who you indicated may have issues similar to Mr. Basham's did not go out and carjack and kidnap strangers?" *Id*. at 210.

Just as the court did in the Fulks case, the court concludes that there was no error because the government did not suggest, either during cross-examination or summation, that the jury was *required* to find a causal nexus between the mitigating evidence and the crime for the evidence to be considered by the jury in its sentencing decision. Moreover, this

167

court's instructions made sure the jury was aware that it could consider all mitigating evidence without regard to any nexus.

As the government points out in its responsive brief, habeas counsel has selectively edited one of the quotations from the trial in an effort to portray the government's nexus argument in an inaccurate light.  Counsel quotes the AUSA as saying during summation:

> You know, deciding on who got it right on that issue clearly only goes to show what mitigation [the jury can consider].

Pet. at 110.

The full quotation of the AUSA's statement, however, was as follows:

> You know, deciding on who got it right on that issue clearly goes to show what mitigation, what weight you will consider to give that when you are deliberating as to what the appropriate punishment will be.

Tr. 11/1/04, ECF No. 971 at 89.

The replacement of the phrase "what weight you will consider" with an incorrect bracketed paraphrase of "the jury can consider" is a mischaracterization of the argument.  Moreover, this court's review of the entire record in this case leads to the conclusion that the government did in fact argue strenuously that no witness testified directly to a causal connection between mitigating factors and the murder.  This is not the same thing as saying that the government argued that a causal nexus was required for a death sentence.

For example, at one point, the AUSA was explaining to the jury that they were the ones who would decide which expert witness to believe.  The following then transpired:

> Defense experts opine that he has a self or induced, inhalant-induced psychosis. And that he has got dementia, memory loss. Dr. [Schwartz-]Watts, on the witness stand in response to Mr. Schools, acknowledged that those two problems don't explain his behavior.  So, the Government's psychiatrist

168

diagnosed him with something that explained his behavior against Samantha Burns and Alice Donovan.   And the defense expert opines two problems in which she acknowledges does not explain his behavior. Who got it right? *That is for you to decide*.  You know, deciding on who got it right on that issue clearly only goes to show what mitigating, what weight you will consider to give that when you are deliberating as to what the appropriate punishment will be.  Regardless of all of the yelling, raising voices, and attacking someone for what school they went to, the facts speak for themselves, ladies and gentlemen.

And one of the tougher points you can't forget, there is absolutely no question Mr. Basham knew right from wrong.  No question, that whatever his issues are, there is no cause-and-effect.

*Id*. (emphasis added).

Basham relies primarily upon the Supreme Court case of *Tennard v. Dretke*, 542 U.S. 274 (2004), a case decided approximately four months before Basham's trial began.

Unlike the jury in *Tennard*, Basham's jury was not limited in their consideration of mitigating evidence. In addition to the statutory mitigating factors set forth in the FDPA, Basham's attorneys submitted thirty-one nonstatutory mitigating factors for the jury's consideration.  Tr. 11/1/04, ECF No. 971 at 223.  Basham's jury was required to consider each mitigating factor and to indicate the number of jurors, if any, who found each mitigating factor.  *Id*. at 221.

So unlike the Texas statutory scheme in *Tennard* that focused the jury's determination on just two issues, the jury here was specifically required to make findings on each of the thirty nonstatutory mitigating factors submitted on the verdict form. And unlike the prosecutor in *Tennard* who argued that the defendant's IQ was irrelevant to the special issues, the prosecutor in Basham's case never argued that Basham's mitigating evidence was irrelevant. To the contrary, the AUSA here explicitly noted to the jury that Basham's

169

psychiatric evidence was relevant because it "goes to show what mitigating, what weight you will consider to give that when you are deliberating as to what the appropriate punishment will be." *Id*. at 89.

Additionally, as noted in the Fulks case, this court's instructions clearly informed the jury that they could consider any mitigating evidence regardless of any nexus to the crime.

The court never suggested that there had to be some nexus between mitigating evidence and the charged crimes before the jury could consider the mitigating evidence. To the contrary, the court explained that "[a] mitigating factor is not offered to justify or excuse a defendant's conduct." *Id*. at 219. The court instructed jurors they could consider any factor to be mitigating if the factor tended to suggest life in prison without parole and not death should be the appropriate sentence. *Id*. at 220. Moreover, the court instructed the jury that "there is essentially no limit on the number of factors or things that the jury may consider in mitigation as to each of the factors submitted by the defendant and on which I am about to list." *Id*. After listing the mitigating factors, the court emphasized to the jury: "The law does not limit your consideration of mitigating factors to those that are listed for you; therefore, if there are any mitigating factors not listed in these instructions, but which any juror finds to be established by a preponderance of the evidence, that juror is free to consider them in his or her sentencing decision." *Id*. at 227.

Moreover, the jury verdict revealed that the jury did, in fact, consider the mitigating evidence advanced by Basham. Of the statutory mitigating factors, six jurors found that Basham suffered from an impaired capacity (Statutory Factor No. 1) and one juror found that Basham committed the offense under severe mental or emotional disturbance (Statutory

170

Factor No. 5).  Tr. 11/2/04, ECF No. 972 at 8.  Of the nonstatutory mitigating factors, all twelve jurors found that Basham had a family history of mental illness (Nonstatutory Factor No. 2), that Basham grew up in a home filled with domestic violence (Nonstatutory Factor No. 7), that Basham's mother encouraged him to steal to support their drug habit (Nonstatutory Factor No. 13), and that Basham began using drugs at an early age (Nonstatutory Factor No. 14).  *Id*. at 8–9. One or more jurors found ten other nonstatutory mitigating factors (Nonstatutory Factors 3, 4, 5, 6, 12, 15, 16, 19, 25, 26). *Id*.  In order for the jurors not to have considered the numerous mitigating factors they found, they would have had to blatantly ignore the Court's verbal instructions and the written instructions.

Finally, it should be noted that the objection to the government's "causal nexus" argument is substantially similar to the defendant's objection to this court's "two-step" mitigation instruction.  Like the nexus argument, the two-step jury instruction was also litigated in Fulks, but unlike the nexus argument, the two-step instruction was appealed.  On appeal, the Fourth Circuit Court of Appeals found no error in this court's instruction regarding a two-step procedure and evaluating mitigating evidence.  Although textually different, these two objections are similar in nature.  The essence of each argument is that the jury was diverted from considering mitigating evidence advanced by the defendant.  The Fourth Circuit's rejection of Fulks's challenge to the court's instructions on mitigation lends support to this court's decision in Basham's case that no error occurred with regard to the causal nexus argument.

CLAIM 25:
COURT'S INSTRUCTION ON MITIGATION

In Claim 25, Basham contends that this court's instructions to the jury regarding the statutory and nonstatutory mitigating factors were flawed.

The offending portion of the jury instruction read as follows:

As to the mitigating factors asserted by the defendant, Mr. Basham in this case, the law provides that there is essentially no limit on the number of factors or things that the jury may consider in mitigation as to each of the factors submitted by the defendant and on which I am about to list. You must essentially engage in a two-step process in determining whether any one or more of the mitigating factors have been proven.

Specifically, you must first determine if the evidence that you heard establishes the existence of the factor by a preponderance of the evidence. Secondly, if you determine the factor has been proven, you must determine whether the factor is mitigating, as I have defined that term for you. That is, it tends to suggest that life in prison, without the possibility of release, and not death is the appropriate punishment.

Tr. 11/1/04, ECF No. 971 at 220. A similar two-step instruction was given on the verdict form. ECF No. 805 at 5.

This precise argument was also raised by Fulks, Basham's co-defendant. This court denied relief in Fulks's § 2255 petition, and in a published decision, the United States Court of Appeals for the Fourth Circuit held that the jury charge assailed in Basham's Claim 25 was a proper statement of the law. *United States v. Fulks*, 683 F.3d 512 (4th Cir. 2012). Because the Fourth Circuit Court of Appeals has already rejected an identical challenge to the precise language challenged in Basham's § 2255 petition, the court must deny relief on this Claim 25.

172

CLAIM 26:
COURT'S FAILURE TO GIVE REASONABLE DOUBT
INSTRUCTION REGARDING WEIGHING OF
AGGRAVATING AND MITIGATING FACTORS

In Claim 26, Basham contends that his death sentence is unconstitutional based on the court's failure to instruct the jury that it may only impose a death sentence if it finds that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. Additionally, Basham argues that to the extent the federal death penalty scheme allows a death sentence without such an instruction, it is unconstitutional. Further, Basham argues that he received ineffective assistance of trial and appellate counsel for their respective failures to request such an instruction at trial and on appeal.

More particularly, in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court stated that "[o]ther than the fact of a prior conviction, any *fact* that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490 (emphasis added). Then, in *Ring v. Arizona*, 536 U.S. 584 (2002), the Court held that "[c]apital defendants, no less than noncapital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id.* at 589. Thus, a jury must find any "aggravating circumstance" necessary for imposition of the death penalty beyond a reasonable doubt. *Id.* at 602.

The FDPA sets forth the relevant burdens of proof regarding the aggravating and mitigating factors which may be proved in a federal death penalty case. In particular, the FDPA states that:

173

The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established *beyond a reasonable doubt*. The burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless the existence of such a factor is established by a preponderance of the information.

18 U.S.C. § 3593(c) (emphasis added). Additionally, the FDPA states that in weighing aggravating factors against mitigating factors to determine whether death is an appropriate sentence:

The jury . . . shall consider whether all the aggravating factor or factors found to exist *sufficiently outweigh* all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone *are sufficient* to justify a sentence of death.

*Id.* § 3593(e) (emphasis added). The court's jury instructions in this case in no way deviated from these statutory requirements, and Basham does not contend otherwise.

Instead, Basham argues that the court's jury instructions deviated from the Constitution's requirements. In particular, according to Basham, the jury's weighing of aggravating factors against mitigating factors is a factual finding subject to the rules announced in *Apprendi* and *Ring* because it is an essential prerequisite to the death penalty. Basham cites scant authority in favor of this proposition, relying principally upon a panel opinion of the Sixth Circuit in *United States v. Gabrion*, 648 F.3d 307 (6th Cir. 2010), which held that "a jury's finding that the aggravating factors outweigh the mitigating factors is an element of the death penalty and must be found beyond a reasonable doubt."[55]

---

[55] Notably, however, the Sixth Circuit vacated this opinion and granted the government's petition for a rehearing *en banc* on November 17, 2011. Basham also cites the majority opinions of two state court cases and the dissenting opinions of two other state court cases. *See Evans v. State*, 886 A.2d 562, 578, 582–84 (Md. 2005) (Raker, Green, JJ. & Bell, C.J., dissenting); *Duest v. State*, 855 So. 2d 33, 53 & n.18 (Fla. 2003) (Anstead, C.J., dissenting); *State v. Whitfield*, 107 S.W.3d 253, 256–59 (Mo. 2003); *Woldt v. People*,

As an initial matter, the court notes that, regardless of its instructions to the jury in this case, the special verdict forms as to both Count 1 and Count 2 indicate that the jurors in fact applied the reasonable doubt standard to their weighing process. Specifically, both special verdict forms stated, "We, the jury, as to Brandon Leon Basham, *unanimously find beyond a reasonable doubt that the aggravating factor(s) proved in this case outweigh(s) the mitigating factor(s)* so as to justify a sentence of death . . . . We, therefore, unanimously conclude that Brandon Leon Basham shall be sentenced to death." ECF No. 805 at 11; ECF No. 806 at 11 (emphasis added). Below this paragraph are the signatures of all twelve jurors.

For at least this reason, then, and even assuming Basham could show that his trial and appellate counsel's respective performance fell below the standard of reasonableness, Basham cannot satisfy the prejudice prong of *Strickland,* and Claim 26 must fail. Likewise, even if the Constitution requires such an instruction, Basham's sentence is not unconstitutional because the jurors in his case actually deliberated in accordance with the standard he now proposes. As explained below, however, the Constitution does not require this instruction and Basham's trial and appellate counsel provided him effective assistance.

Turning to the merits, virtually all federal courts of appeals to consider the issue disagree with Basham's argument. Specifically, at least the First, Fifth, Ninth, and Tenth Circuits have held that the weighing process is not a fact which the jury must find beyond a reasonable doubt. *See United States v. Fields*, 516 F.3d 923, 950 (10th Cir. 2008) (citing *United States v. Barrett*, 496 F.3d 1079, 1107–08 (10th Cir. 2007)); *United States v. Mitchell*, 502 F.3d 931, 993–94 (9th Cir. 2007); *United States v. Sampson*, 486 F.3d 13, 31–32 (1st

---

64 P.3d 256, 264–67 (Colo. 2003).

Cir. 2007); *United States v. Fields*, 483 F.3d 313, 345–46 (5th Cir. 2007). As the Fifth Circuit explained, for example, when the jury considers whether the aggravating factors "sufficiently outweigh" the mitigating factors to "justify a sentence of death," it makes a "'highly subjective,' 'largely moral judgment.'" *Fields*, 483 F.3d at 346 (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 340 n.7 (1985)). Similarly, the First Circuit noted that the outcome of such a "process" is not "an objective truth susceptible to (further) proof by either party." *Sampson*, 486 F.3d at 32. Rather, the weighing process is "the lens through which the jury must focus the facts that it has found." *United States v. Purkey*, 428 F.3d 738, 750 (8th Cir. 2005).

Basham provides a number of arguments distinguishing these cases, as at the time his brief was filed the Fourth Circuit had not specifically addressed this issue. Importantly, however, the Fourth Circuit recently did so in *United States v. Runyon*, 2013 WL 657784 (4th Cir. Feb. 25, 2013). In *Runyon*, the court explained that the Supreme Court has never extended *Ring*'s requirement to the weighing process. *Id.* at \*33. The Fourth Circuit discussed the cases cited in the above paragraph and stated that it found their reasoning "persuasive." *Id.* It thus decided to "join the broad consensus of authority." *Id.* Accordingly, as it is in the First, Fifth, Ninth, and Tenth Circuits, the law in this circuit is now clear that the reasonable doubt standard does not apply to the weighing of aggravating factors. *Id.* In light of the *Runyon* holding, Basham's Claim 26 is without merit, and the court need not address his contrary arguments.

For the above reasons, the court's failure to provide an instruction that the jury must find, beyond a reasonable doubt, that the aggravating factors outweigh the mitigating factors

did not render Basham's death sentence unconstitutional. Likewise, the fact that the FDPA only requires jurors to find that the aggravating factor or factors found "sufficiently outweigh" the mitigating factor or factors found does not render the FDPA unconstitutional. Further, because the Constitution does not require weighing beyond a reasonable doubt, Basham's trial counsel did not fall below an objective standard of reasonableness under *Strickland* by failing to request such an instruction. Finally, Basham's appellate counsel appropriately did not pursue this issue on appeal because the issue lacked merit and similarly, counsel did not render ineffective assistance to Basham.

## CLAIM 27:
### JUROR WILSON'S JUROR QUESTIONNAIRE

During the last week of trial, the court instructed the jury to elect its foreperson. They selected Cynthia Wilson, a nurse from Spartanburg, South Carolina to serve as foreperson. The week after the death penalty verdict was announced and the jury was discharged, a Spartanburg television station called the United States Attorneys' Office to report a contact by someone purporting to be on the Basham jury inquiring as to why the Spartanburg area television station was not covering the trial. The United States Attorneys' Office promptly notified the court and defense counsel. Upon receipt of this information, the court cancelled an out-of-state vacation that had been planned for several months and began the first of what were to be nine separate evidentiary hearings on the question of juror misconduct by Wilson.

That misconduct is set out at length in this court's earlier orders and in the decision of the Fourth Circuit Court of Appeals in Basham's direct appeal. Suffice it to say that despite this court's forty-one warnings during the trial admonishing the jury not to discuss the case with anyone, it learned that Cynthia Wilson had contacted three Spartanburg-area

177

television stations to inquire as to why they had not covered the trial. Eventually, after gaining court approval to access all of Wilson's telephone records, defense counsel learned that Wilson had also contacted two newspapers in upstate South Carolina.

The court found Wilson to be in contempt of court, fined her nearly $3,000, and required her to perform 120 hours of community service. The court struggled with the question of whether the verdict should be disturbed because of Wilson's misconduct. Ultimately, for reasons set out in detail in the court's order of March 14, 2005, ECF No. 890, the court determined that a presumption of prejudice arose from Wilson's conduct but that the government had successfully rebutted the presumption and that the jury verdict should stand. The court's decision to deny Basham's motion for a new trial based upon Wilson's misconduct was affirmed by the Fourth Circuit Court of Appeals on the direct appeal, and the Supreme Court denied Basham's petition for a writ of certiorari.

Although the court ultimately denied the motion for a new trial by Basham's trial counsel, the court made it plain that Wilson's conduct was reprehensible and that she had perjured herself at the evidentiary hearings.[56]

In Claim 27, Basham contends based on a careful review of Wilson's sworn juror questionnaire submitted prior to her selection on the case, that she misrepresented two facts that trial counsel should have uncovered. Basham argues that this information was "readily available" to trial counsel at the time of the post-verdict proceedings and that counsel's

---

[56] In arguing Claim 27, Basham suggests that in many respects, the court accepted Wilson's testimony. Pet. at 127 ("The court accepted Wilson's excuse."); 129 ("The court's decision relied heavily upon its acceptance of Wilson's testimony.") To the contrary, the court rejected testimony by Wilson at almost every turn, indicating on several occasions during the colloquy that it had resolved the credibility question by accepting the television reporter's statement of what transpired.

failure to independently investigate this information constituted deficient performance that prejudiced Basham.

At issue in Claim 27 is juror questionnaire question 41, which read "Have you ever sued someone or been sued?" Wilson answered this question "No." In his § 2255 petition, Basham contends that this statement was false because she has been "sued" by the South Carolina Department of Revenue on two occasions, one resulting in a judgment against her of $615.18, entered in 1995, and the other judgment against her of $1,761.59, entered in 2000. With commendable candor, Basham's counsel conceded at the § 2255 evidentiary hearing that they have now learned that these state tax liens were filed administratively and that no lawsuit, as that term is commonly understood by laymen, ever occurred.

The other alleged misrepresentation by Wilson occurred during voir dire wherein she indicated that she had been a nurse for four years. Basham's habeas counsel have learned that Wilson did not receive her Registered Nurse's license until February 2002, so she had not, in fact, been working as a nurse for four years when she was selected to serve on the case in 2004.

The court is unpersuaded that these two relatively minor misstatements afford Basham any relief as to this claim. First, now that it has been clarified that the tax liens were filed administratively, the court finds that Wilson did not perjure herself in response to question 41 on the juror questionnaire. With regard to her statement that she had been a nurse for four years, as the government points out, it is quite possible that she worked in some type of nursing capacity before obtaining her Registered Nurse license, thereby rendering her statement that she had been a nurse for four years entirely true. Even if it was not accurate,

179

it is a misstatement as to a relatively inconsequential issue and would not have affected this court's decision at any time during the nine evidentiary hearings conducted on the matter. As indicated above, this court rejected Wilson's testimony in many respects, resolving the dispute between Wilson's testimony vis-a-vis that of the news reporter who called the government adversely to Wilson at every turn.

Basham argues that evidence of Wilson's additional untruthfulness would have done much to convince the court that Wilson was "not impartial and not competent to serve." Pet. at 132. To the contrary, the court finds that, even construed in the light most favorable to Basham, Wilson's failure to mention the administrative tax liens, coupled with a seeming misstatement of nursing experience, would have been of but minimal value to the court in deciding the very difficult issue before it regarding Wilson's misconduct in contacting the news media.

The juror questionnaire in this case was in two parts, encompassing a total of sixty-two questions, many with extensive sub-parts. The process of selecting the jury required nearly two weeks. Permitting a post hoc examination of the minutia of juror responses in an effort to uncover some misstatement, however slight, would make it virtually impossible to achieve finality in criminal litigation.

The court finds no merit to Claim 27.

## CLAIM 28:
## JUROR WILSON'S CONTINUED MISCONDUCT

In Claim 28, Basham alleges that newly discovered evidence further undermines the credibility of Juror Cynthia Wilson during her testimony at the hearing on Basham's motion for a new trial related primarily to the issue of whether the jury engaged in premature

180

deliberations. Thus, Basham requests that this court vacate its previous order denying him a new trial.

As an initial matter, the government argues that Claim 28 fails on procedural grounds because it is, in essence, an untimely motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure. Under Rule 33, "[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." Although the jury found Basham guilty and sentenced him to death in 2004, the government notes that Basham did not file the instant motion until 2011, more than six years after the verdict.

Under § 2255, the grounds upon which a prisoner may move the court to vacate, set aside, or correct his sentence are "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). Although the § 2255 remedy is comprehensive, "it does not encompass all claimed errors in conviction and sentencing." *United States v. Addonizio*, 442 U.S. 178, 185 (1979). Generally, "unless the claim alleges a lack of jurisdiction or a constitutional error, the scope of collateral attack has remained far more limited." *Id.* Indeed, the "Court has held that an error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *Id.* (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).

Notably, the Supreme Court has held that a claim of newly-discovered evidence alone is not cognizable in a petition seeking a writ of habeas corpus as relief from a state court judgment. *Herrera v. Collins*, 506 U.S. 390, 404 (1993).[57]   Rather, there must be "an independent constitutional violation occurring in the underlying state criminal proceeding" because "federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." *Id.* at 400.  A mere "claim that new evidence casts doubt, even grave doubt, on the correctness of a conviction is not a ground for relief on collateral attack." *Conley v. United States*, 323 F.3d 7, 14 (1st Cir. 2003) (en banc).

In this claim, Basham does not allege that this court was without jurisdiction to impose his sentence or that his sentence exceeded the maximum authorized by law.  Instead, Basham states that his § 2255 petition is based on alleged violations of the Constitution and laws of the United States, and because the § 2255 petition itself was filed within one year of the Supreme Court's denial of certiorari in his direct appeal, the petition—including Claim 28—is timely.  *See* Reply at 180.

The court agrees that Claim 28, by itself, is not cognizable under § 2255.  Rather, it is an evidence-based claim that does not allege an independent constitutional violation. *See, e.g.*, *United States v. Berry*, 624 F.3d 1031 (9th Cir. 2010) (finding prisoner's claim for a

---

[57]  Though the Supreme Court decided *Herrera* in the context of 28 U.S.C. § 2254, its holding should apply equally to a petition under § 2255. *See Davis v. United States*, 417 U.S. 333, 344 (1974) ("[Section] 2255 was intended to mirror § 2254 in operative effect."); *Hill v. United States*, 368 U.S. 424, 427 (1962) (stating that "it conclusively appears from the historic context in which § 2255 was enacted that the legislation was intended simply to provide in the sentencing court a remedy exactly commensurate with that which had previously been available by habeas corpus in the court of the district court where the prisoner was confined").

new trial based on FBI agent's perjury conviction subsequent to prisoner's trial at which FBI agent testified not cognizable under § 2255 because it did not allege an independent constitutional violation); *see also Conley*, 323 F.3d at 13–16 (distinguishing, in a motion under § 2255 based on new evidence, between new evidence claims which simply cast doubt on the correctness of the conviction (not cognizable) and claims alleging an independent constitutional violation under *Brady v. Maryland*, 373 U.S. 83 (1963) (cognizable)).

In particular, the primary allegations of Claim 28 are that it has now been discovered that Wilson did not maintain her close friendships with the other jurors after the case was concluded and that Wilson continued to lie to authorities, failing to reveal to State Board of Nursing licensing authorities the discipline meted out by this court as a result of Wilson's contempt at trial. Pet. at 145–46. According to Basham, if the court had this information at its disposal while Basham's motion for a new trial was pending, the court may have found that premature deliberations occurred and ordered a new trial. Thus, Claim 28 relates to the effect that new evidence would have had on his trial, and it "therefore falls into the realm occupied by new trial motions under Rule 33." *Berry*, 624 F.3d at 1042.

Next, despite Basham's apparent argument to the contrary, Claim 28 does not become cognizable because it was filed along with other, independently cognizable claims in a timely § 2255 petition. In *Berry*, for example, the Ninth Circuit considered a prisoner's due process claims in his § 2255 motion on their merits. However, because the remainder of his § 2255 petition argued that new evidence "undermines confidence in his guilty verdict," the court of appeals found that portion to be a Rule 33 motion for a new trial. *Id.* at 1039, 1042. The court of appeals would have ordinarily found these "new-trial claims well out-of-time,

because he filed his § 2255 motion almost seven years after a Rule 33 motion was due," but in *Berry* the government waived its objection to the untimely claims. *Id.*

In this case, the government has not waived its objection to the timeliness of Claim 28, and thus this claim is procedurally defaulted and incognizable under this § 2255 petition.

Nevertheless, even if Claim 28 were properly before the court, it is unavailing. As noted previously, when evidence came to light that juror Cynthia Wilson had contacted a Spartanburg, South Carolina television station to inquire as to why the television was not covering the trial, the court began a series of nine post-verdict hearings during which Wilson testified on three occasions and all of the remaining jurors testified at least once. The court authorized Basham's defense counsel to subpoena Wilson's phone records in preparation for these hearings. The phone records revealed additional calls to other news media outlets, which prompted a motion for a new trial, which this court denied. The Fourth Circuit Court of Appeals affirmed the denial in Basham's direct appeal. *United States v. Basham*, 561 F.3d 302, 320 (4th Cir. 2009).

The phone records also revealed an extensive number of calls between Wilson and other jurors. During the various hearings the court conducted, Wilson suggested that these calls were of a personal nature, with the jurors conversing about matters of mutual interest. Wilson and all the other jurors steadfastly denied any premature deliberations. Claim 28, however, alleges new evidence that Wilson did not remain close with the other jurors following the trial. Also, this claim alleges that Wilson continued to lie after the trial by providing false statements on nursing license applications on several occasions.

184

Thus, Claim 28 is primarily an assertion that the jurors engaged in premature deliberations, as evidenced by the numerous phone calls, and that Wilson should not have been believed when she denied premature deliberations in her three post-verdict appearances on the witness stand. This newly discovered evidence, it is argued, further undermines Wilson's credibility and should yield a conclusion that the jury did, in fact, engage in premature deliberations.

There is another procedural obstacle to Claim 28 that must be addressed. Evidence Rule 606(b) declares a juror incompetent to testify "as to any matter or statement occurring during the course of the jury's deliberations . . . ." Several circuits have held that Rule 606(b) bars a juror from testifying about premature deliberations. *E.g., United States v. Logan*, 250 F.3d 350, 380–81 (6th Cir. 2001) (Rule prohibits post-verdict interrogation about internal jury influences, including premature deliberations); *United States v. Caldwell*, 83 F.3d 954, 956 (8th Cir. 1996) (Rule "generally precludes the testimony of any juror regarding intrajury communications," including alleged intrajury communications made during trial that they had "heard enough" and that "this is just a bunch of crap"); *United States v. Siegelman*, 561 F.3d 1215, 1240–42 (11th Cir. 2009) (district court did not abuse its discretion in concluding that the Rule barred it from questioning jurors about e-mails exchanged during trial).

Other circuits have held that, while a court may inquire about premature deliberations in some circumstances, jurors may not testify about any effect the premature deliberations had on their verdict. *E.g., United States v. Richards*, 241 F.3d 335, 343–44 (3rd Cir. 2001) (noting that although the district court could have inquired about premature deliberations

185

during trial, a post-verdict inquiry would violate the Rule because it would necessarily delve into the effect of premature deliberations on the verdict); *United States v. Morales*, 655 F.3d 608, 631 (7th Cir. 2011) ("Any inquiry as to bias arising from the alleged premature deliberations would run afoul of the Rule's clear proscription . . . .").

At least one circuit has taken a more open view, opining that the Rule 606(b) allows courts to delve into the content of premature deliberations. *United States v. Jadlowe*, 628 F.3d 1, 20 (1st Cir. 2010).

Faced with this split of authority, the court will err on the side of caution and assume that Rule 606(b) allows the court to receive testimony about premature deliberations but that it does not allow juror testimony concerning any effect the premature deliberations had on the verdict. Giving Basham the benefit of the doubt on this question, however, Claim 28 still lacks merit.

All of the new information referred to in Claim 28 relates only to the credibility of Wilson—the jury foreperson whose credibility is already questionable and whose testimony has already been rejected by this court. The other eleven jurors who participated in the return of the verdict all affirmed to the court that no premature deliberations occurred. Distilled to its essence then, Claim 28 is merely an assertion that new evidence has arisen suggesting that one of twelve jurors, whose credibility has already been undermined and whose testimony has already been rejected, in part, by this court, should not be believed when she testified that premature deliberations did not occur.

Wilson's ex-husband testified that Wilson did not remain friends with the jury after the verdict was returned and that it would be unlikely that his wife would have contacted

186

another juror about purchasing sod for her residence because he, in fact, did all of the yard work while the couple was living together. His testimony is somewhat speculative and a weak attempt at impeachment. It is certainly possible that Wilson did not continue to contact jurors after the trial because she may have been embarrassed by this court's sanctions against her.

The fact that Wilson, on several occasions after she was disciplined by this court, failed to reveal the sanctions to authorities when she was renewing her nursing license, is certainly damaging to her credibility, but it is also cumulative to the other damaging testimony regarding her credibility developed during the post-verdict juror misconduct evidentiary hearings.

For the foregoing reasons, the court finds no merit to Claim 28.

## CLAIM 29:
### NEWLY DISCOVERED EVIDENCE REGARDING
### THE CREDIBILITY OF SHERIFF RONALD HEWETT

In Claim 29, Basham argues that he is entitled to a new trial based on newly-discovered evidence which undermines the credibility of Sheriff Ronald Hewett, who testified on behalf of the government. As in Claim 28, the government initially argues that Claim 29 is an untimely motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure. For the reasons discussed above with respect to Claim 28, the court agrees with the government.

Like Claim 28, Claim 29 is not cognizable under § 2255 by itself because it is an evidence-based claim that does not allege an independent constitutional violation. In particular, Basham's core allegation in Claim 29 is that evidence that Sheriff Hewett pled

187

guilty to corruption and obstruction of justice makes it "highly possible that Hewett fabricated his testimony when he claimed that Mr. Basham had demonstrated how he (Basham) had strangled Alice Donovan with the purse strap." Pet. at 149. Then, "[w]ithout Hewett's testimony, there is legitimate doubt as to whether the results of Basham's trial, especially the penalty phase, would have been different." *Id.* In other words, Basham is calling into doubt the overall weight of the evidence against him, and the "proper device for such a claim is Federal Rule of Criminal Procedure 33." *Berry*, 624 F.3d at 1038. Additionally, as explained above, Claim 29 does not become cognizable because it was filed along with other, independently cognizable claims in a timely petition under § 2255. For at least these reasons, then, Claim 29 must fail.

Notwithstanding the above, even if this claim were timely, the newly discovered impeachment evidence relating to Sheriff Hewett[58] is unrelated to Basham's case and does not serve as the basis for a new trial. As the government points out in its brief, the Fourth Circuit has recently expressed its reluctance to order retrials because of subsequently developed impeachment evidence. *See United States v. Robinson*, 627 F.3d 941, 948–49 (4th Cir. 2010) (finding that newly discovered impeachment evidence that police officers who investigated defendant and testified against him were engaged in unrelated misconduct did not warrant retrial on prosecution for drug trafficking and firearm offenses because

---

[58] Sheriff Hewett was sentenced to prison, followed by a term of supervised release and fine. As part of its prosecution of Hewett, the government obtained affidavits setting out allegations that Hewett was repeatedly intoxicated at crime scenes and sexually harassed female workers. The indictment charged that he used his office for his personal benefit, including obstruction of an investigation against a relative and misuse of public funds by forcing deputy sheriffs to perform manual labor at his house and to work on his political campaigns. There was also evidence that Sheriff Hewett engaged in threats and retaliation against those who testified against him and that he encouraged employees to be uncooperative with the investigation.

government's case did not rest entirely on uncorroborated testimony of the officers, and the officers' misconduct, while serious, did not relate to counts for which the defendant was convicted or to the truth-finding function of the proceedings).  In another case, the Fourth Circuit noted that newly discovered impeachment evidence would result in a new trial only in the narrowest of circumstances:

> If the government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly untrustworthy of being believed because he had lied consistently in a string of previous cases, the district judge would have the power to grant a new trial.

*United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir. 1993) (quoting *United States v. Taglia*, 922 F.2d 413, 415 (7th Cir. 1991)).  Here, the government's case clearly did not rest entirely on the uncorroborated testimony of Sheriff Hewett.  He was but one of eighty-nine witnesses who testified in Basham's guilt phase trial.  Moreover, as noted previously in this opinion, Basham is incorrect to assert that Hewett's testimony clearly and unequivocally told the jury that Basham admitted to Hewett that he was the one who strangled Alice Donovan.  Rather, Sheriff Hewett testified that Basham showed him how Donovan "was" strangled and how he (Basham) threw the strap into the woods.  This evidence cannot be said to be the lynchpin of the government's case against Basham.  Indeed, the Fourth Circuit Court of Appeals noted on three occasions in its opinion in the direct appeal of this case that the evidence against Basham was "overwhelming."  *Basham*, 561 F.3d at 328, 329, 330 ("The government presented an overwhelming case against Basham during the guilt phase"); ("overwhelming evidence against Basham"); ("overwhelming evidence against Basham").

189

Because the government's case against Basham did not rest exclusively on the uncorroborated testimony of Sheriff Hewett; because Sheriff Hewett's testimony was not the critical piece of evidence that showed to the jury that Basham "struck the fatal blow" that killed Donovan; and because the evidence against Basham at the guilt phase was overwhelming, as found by the Fourth Circuit Court of Appeals, Basham's claim of newly discovered evidence regarding Sheriff Hewett's conviction does not present a basis for relief in this case.

CLAIM 30:
FAILURE TO SURRENDER AND PROVIDE
REASONABLE ACCESS TO BASHAM'S TRIAL FILES

In Claim 30, Basham argues that his trial counsel, in particular Jack Swerling, rendered ineffective assistance when he failed to provide Basham's appellate counsel "all files produced in the course of representing Mr. Basham." Pet. at 140. Correspondingly, Basham argues that this failure "necessarily resulted in Mr. Basham being denied effective assistance of counsel on appeal." *Id*. More particularly, Basham alleges that Swerling repeatedly refused to "surrender or allow appellate counsel reasonable access to the thousands of trial-related documents known to be in his possession." *Id*. at 141. For example, Swerling allegedly forced appellate counsel to travel from Washington, D.C. to Columbia, South Carolina shortly before the opening brief was due in order to obtain necessary documents. *Id*. at 142. "Even after this trip, however, appellate counsel lacked most of the trial file in Mr. Basham's case." *Id*. Because of this, appellate counsel "may have erroneously omitted a viable claim," and therefore Basham contends that Mr. Swerling "compromised the underlying appeal to an unknowable extent." *Id*. at 141.

At the outset, the court notes that quite a few attorneys represented Basham during the process of his direct appeal to the Fourth Circuit, which lasted more than three years. The bulk of his allegations in Claim 30, however, appear to relate only to Timothy J. Sullivan and Melissa A. Meister, the final two attorneys the Fourth Circuit appointed Basham. To provide some context for this claim, it is important to consider the history of Basham's representation during the process of his direct appeal. After Basham filed his direct appeal on February 24, 2005, the Fourth Circuit initially appointed both of his trial attorneys (i.e., Swerling and Harris) as his appellate attorneys. The Fourth Circuit later relieved Swerling as appellate counsel and appointed Sullivan in his place. Harris, however, who undoubtedly had access to Basham's entire trial file, continued to represent Basham on appeal for more than two years until September 1, 2007. After relieving Harris, the Fourth Circuit appointed Meister on November 16, 2007. Notably, three partners and five associates at Meister's firm, Jenner & Block, assisted Meister in her efforts. *See* Tr. 10/09/12, ECF No. 1561 at 84–89. The team of Sullivan, Meister, and her colleagues at Jenner & Block prepared and ultimately filed the opening brief on May 13, 2008 and a reply brief on September 22, 2008. Meister then argued Basham's case before the Fourth Circuit on October 31, 2008.

With this history in mind, it is important to recognize that at least one of Basham's appellate attorneys had ready access to Basham's physical file for more than two years. Moreover, the final, ten-member team which prepared his appeal briefs had extensive resources and was probably as good as any that could be assembled. For these reasons, the court is again reminded of the strong presumption that Basham's trial and appellate attorneys rendered effective assistance of counsel. *See Strickland*, 466 U.S. at 689.

191

Turning to the merits of Basham's Claim 30, Basham repeatedly emphasizes that Swerling refused to surrender the physical trial file to appellate counsel. This is true. However, this does not mean that Swerling did not provide reasonable access to Basham's file to appellate counsel. It appears that appellate counsel obtained access to Basham's file shortly after each time they requested it. For example, Sullivan wrote to Swerling on January 14, 2008 requesting to meet with Swerling and requesting access to Basham's trial file. Tr. 10/16/12, ECF No. 1558 at 787. On January 29, 2008, Swerling met with Sullivan and indicated that Sullivan would have complete access to the file for inspection and copying. *See id.*; Tr. 10/09/12, ECF No. 1561 at 106. Also, Meister's first contact with Swerling was on March 26, 2008 when she spoke to him by phone and then followed up with an email requesting specific items from Basham's trial file. *See* Tr. 10/09/12, ECF No. 1561 at 99–104. Swerling was out of town, which apparently resulted in Meister making a number of subsequent communications to Swerling. *Id*. at 100–01; *see* Tr. 10/16/12, ECF No. 1558 at 789–90.

In any event, by April 1, 2008, Swerling told Meister that she could come down to his office and copy anything from the file that she wished; Meister did so on April 3, 2008. Tr. 10/09/12, ECF No. 1561 at 104. Thus, in both cases when appellate counsel wanted access, they were given it, and Swerling did not deny them access to any document requested. *See id.* at 105. Moreover, it appears that Swerling assisted appellate counsel through the month of May 2008 in preparing and filing the opening appeal brief. *See* Tr. 10/16/12, ECF No. 1558 at 797–98.

192

Therefore, although Swerling did not surrender the physical file to Sullivan and Meister, the court finds that Swerling's performance was not deficient because he provided both with reasonable access thereto. Likewise, because they had reasonable access to Basham's trial file, the court finds that Basham's appellate counsel also did not render deficient performance.

Undoubtedly appellate counsel's task would have been easier had they had the entire file in their possession. But just because they might not have had to work as hard with the file at hand does not mean that Basham's constitutional rights were violated in this case. As explained above, appellate counsel could obtain many documents from the court's docket, had access to the entire physical file, and were allowed to copy what they wished therefrom. Notably, Basham does not specifically identify any claim his appellate counsel failed to raise because of Swerling's failure to surrender Basham's file though Basham does suggest that some of the claims of ineffective assistance of appellate counsel in the instant motion identify claims which Basham's appellate counsel might have raised in his direct appeal. Pet. at 143–44. However, the court has found that appellate counsel were not ineffective in failing to raise the issues Basham identifies, and thus even if it were the case that appellate counsel did not raise these issues because they did not possess Basham's entire trial file, Basham cannot have been prejudiced thereby. *See* discussion of Claims 3, 7, 12, 15, and 23–26, *supra*.

More important, however, and leaving the speculation aside, Meister testified that the access she received was sufficient for Basham's direct appeal, even if dealing with Swerling made things more difficult. Tr. 10/09/12, ECF No. 1561 at 105. Likewise, Meister testified

that there were no claims appellate counsel could not have raised because of Swerling's behavior. *Id*. Therefore, even if Swerling's performance was deficient because he did not surrender the entire physical file to appellate counsel, the court finds that this failure did not prejudice Basham.

Based on the above, the court finds no merit to Claim 30. Neither Swerling, in failing to surrender Basham's trial file to appellate counsel, nor Basham's appellate counsel, in preparing and filing Basham's appeal, rendered ineffective assistance to Basham.

CLAIM 31:
THE SUFFICIENCY OF THE INDICTMENT

Claim 31 was withdrawn by Basham prior to the evidentiary hearing.

CLAIM 32:
CONSTITUTIONAL, STATUTORY, AND SUPERVISORY ISSUES
REGARDING THE DEATH PENALTY INSOFAR AS IT IS INVOKED
ON THE BASIS OF RACE AND GEOGRAPHY

Succinctly stated, Claim 32 asserts that the death penalty in the United States is not enforced equally in terms of race and geography. This court is asked to grant relief on this ground under the Constitution, federal statutes, and the court's supervisory authority. Basham points out that the federal death row currently consists of nineteen men, four of whom are white, thirteen black, one Hispanic, and one "other." It is argued that twelve of the nineteen defendants on federal death row have been sentenced in the South. Virginia and Texas have each contributed four defendants each. South Carolina has contributed two: Fulks and Basham.

As the court pointed out at the conclusion of phase I of the evidentiary hearing, it is abundantly clear that race played no part whatsoever in the decision to prosecute or the

handling of this case: both Basham and Fulks are Caucasian; both of the women who were raped and murdered were Caucasian; and all of the other victims or potential victims (James Hawkins, Robert Talsma, Sam Jordan, Deanna Frances and her fifteen-year-old daughter, Officer Matt Davis, and the Ohio State Trooper who were almost run over during Fulks's 130 mph high-speed chase) were all Caucasian as well.  The government indicated as this action was commenced that this was the first federal case in which the United States Attorney sought the death penalty in South Carolina since the enactment of the death penalty statute in 1994.  Accordingly, there is no basis for an assertion that race or geography played any part in the resolution of this case.  The court concedes, of course, that Claim 32 has been properly raised, and if and when there is a change in the law by the Courts of Appeal, this claim is properly preserved for review.

CLAIM 33:
CONSISTENCY OR PREDICTABILITY IN THE MANNER
IN WHICH THE FEDERAL COURTS HAVE IMPOSED
THE FEDERAL DEATH PENALTY

In Claim 33, Basham contends that there is no principled basis for distinguishing cases in which federal defendants received the death penalty from those in which the defendants did not receive the death penalty.  According to Basham, this lack of a principled basis renders the death penalty in the federal courts unconstitutional as arbitrary and capricious.

Reasserting the suggestion made in Claim 32, Basham argues that the only basis for distinction between death and non-death verdicts are race and region of the country.  Citing *Furman v. Georgia*, 408 U.S. 238 (1972) and *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), Basham argues that the FDPA is unconstitutional because it is not fairly and

consistently imposed.  Basham contends that the government must meet its burden of showing a legitimate distinction between cases where the death penalty is imposed and cases where it is not imposed.

In response, the government correctly points out that it is Basham, not the government, who must shoulder the burden of proof as to this issue.  Basham must show that his sentence violates the United States Constitution.  *See United States v. Taylor*, 635 F. Supp.2d 1243, 1246 (D.N.M. 2009).  In order to meet this burden, Basham must establish that "'no set of circumstances exists under which the Act would be valid.'"  *Id*. (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

The court concludes that Basham has not met his burden of proof of showing that the FDPA is unconstitutional because of its application.  The court notes, however, that Basham has properly raised this issue, and it is preserved for appeal in the event that there is a change in intervening law on the appellate level.

## CLAIM 34:
## CUMULATIVE EFFECT OF ALLEGED ERRORS

In Claim 34, Basham argues that the cumulative effect of the errors involved in the guilt and penalty phases of his trial justifies a vacating of the conviction and sentence in this case.  He also suggests that if none of the claims presented in the petition individually justifies reversal, when considered cumulatively, these errors deny Basham his constitutional rights.  He argues that these constitutional errors "so infected the integrity of the proceedings that the errors cannot be deemed harmless."  Pet. at 164.

The cases Basham relies upon for this proposition involve disputes where courts determined actual constitutional error to have occurred. In those cases, each error, standing alone, was not grounds for relief, but cumulatively, the errors complained of compelled the court to order a new trial.

As the Fourth Circuit said in Basham's direct appeal:

> Generally, . . . if a court determines that none of a defendant's claims warrant reversal individually, it will decline to employ the unusual remedy of reversing for cumulative error. To satisfy this requirement, such errors must so fatally infect the trial that they violated the trial's fundamental fairness. When none of the individual rulings work any cognizable harm it necessarily follows that the cumulative error doctrine finds no foothold.

*Basham*, 561 F.3d at 330 (internal punctuation and citations omitted).

In this court's view, this case is not one where there were a number of constitutional errors or numerous instances of ineffective assistance of counsel. Accordingly, the cumulative error doctrine does not afford any relief to Basham.

## CONCLUSION

Brandon Leon Basham received first-class representation from a team of highly skilled, motivated lawyers (one of whom had significant death penalty experience), together with innumerable investigators and experts who contributed to mounting a vigorous defense marshaling all the evidence available in the best light to the defendant.

Not counting several weeks of pretrial proceedings and an eight-day evidentiary hearing on his § 2255 petition, Basham's trial consumed nine weeks. During the entire course of these proceedings, Basham has had the benefit of legal involvement by at least twenty-six attorneys, together with five medical experts, and an investigator, mitigation

specialist, and other court-provided resources.  The documentation in this case reveals an exhaustive effort to interview potential witnesses, to locate and interview experts, to evaluate their potential testimony, and to use those that would assist the defense team in its efforts to spare Mr. Basham's life.  The petition is therefore denied.

*Certificate of Appealability*

On December 1, 2009, the rules governing §§ 2254 and 2255 cases in the United States District Courts were amended to require that the district court issue or deny a certificate of appealability when a final ruling on a post-conviction petition is issued.  *See* Rule 11(a) of the Rules governing  28 U.S.C. § 2254 and § 2255.  The court has reviewed its order and pursuant to Rule 11(a) of the Rules Governing § 2254 and § 2255 cases, issues a certificate of appealability as to all of the claims asserted in this case except for Claims 33 and 34.[59]

As to Claims 33 and 34, Basham has not made a substantial showing of a denial of a constitutional right, and therefore, a certificate of appealability is denied as to these claims only.  *See* 28 U.S.C. § 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 336–38 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

IT IS SO ORDERED.

June 5, 2013                                    Joseph F. Anderson, Jr.
Columbia, South Carolina                United States District Judge

---

[59]  As noted previously, Claims 8 and 31 were withdrawn.

198