IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

UNITED STATES OF AMERICA,        )          Cr. No. 4:02-992
                                 )
                                 )
                                 )
VERSUS                           )          Columbia, S.C.
                                 )          February 14, 2005
BRANDEN L. BASHAM,               )
                                 )
                                 )
        Defendant.               )
-------------------------------)

TRANSCRIPT OF SENTENCING HEARING

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Appearances:

For the Government:        SCOTT SCHOOLS, ESQ.
                           JONATHAN S. GASSER, ESQ.
                           JOHN DUANE, ESQ.
                           Assistant U.S. Attorneys
                           1441 Main Street, Suite 500
                           Columbia, S.C.  29201

For the Defendant:         JACK B. SWERLING, ESQ.
                           1720 Main Street
                           Columbia, S.C.  29201

                           GREGORY P. HARRIS, ESQ.
                           1720 Main Street
                           Columbia, S.C.  29201

Court Reporter:            Gary N. Smith, CM
                           901 Richland Street
                           Columbia, S.C.  29201
                           (803) 256-7743

            STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

THE COURT:  All right, we are here in the case of United States of America versus Branden Leon Basham, Criminal Docket Number 4:02-992.  Before the court is the defendant's motion for a new trial, he having been convicted by a jury in this court on all eight counts of the indictment against him, counts 1 and 2 carrying the death penalty.

The motion for a new trial was filed some time ago after an episode of juror misconduct had come to light.  We heard brief argument on the motion, and then determined the appropriate course of action was to defer on the motion and conduct more of an inquiry or more of an evidentiary hearing than had been conducted up to that point.

And suffice it to say, that we have had -- I believe, today will be the ninth hearing we have had on the juror misconduct issue.

In that inquiry, we summoned in all of the jurors, including the alternates, to give sworn testimony about extrajudicial contact and premature deliberations.  The jurors were unaware of the reason they were being brought back to court so that their testimony would be more fresh and more candid.

The juror in question, Ms. Cynthia Wilson, has testified under oath I believe three times, her husband has testified under oath.  I signed subpoenas for an extensive list of telephone calls by and between the jurors.  And suffice it

to say, I think the matter is ready for a resolution today.

I think I announced at the last hearing, the last time we got into the substance of the motion, that I would announce at the outset that because of the extrajudicial contact I would presume prejudice, and therefore shift the burden to the government to rebut that presumption under the Remmer decision.

I understand an argument can be made that Remmer may no longer be good law in light of the revision to Rule 606 of the evidence rules regarding competency of jurors to testify. But unless and until the Fourth Circuit changes the law, I am bound to apply Remmer.

So with that, I guess, Mr. Harris, this is still your motion, even though the government bears the burden of proof, I think you ought to go first.

MR. HARRIS:  Judge, we have been through this, as you said, a number of times in court.  And just to try to put a cap on everything we have presented to the court, we are left with the inescapable conclusion that there is a possibility, there is a probability that this jury verdict was influenced by extrajudicial information.

What extrajudicial information am I referring to? The juror came in and said that she didn't discuss the case with her husband.  Had she discussed it with her husband, that would have been extrajudicial information.

The juror said that she didn't follow the case on the internet, although her husband said that he did.  Had she followed it, that would have been extrajudicial information.

The juror said she didn't watch it on TV, that would have been extrajudicial.  She said that she didn't read the papers, that would have been extrajudicial.  She said she didn't discuss the case with people outside.  Initially she said that she didn't discuss the case with people outside of the jury box before she was instructed to.  Had she done that, that would have been extrajudicial.

Later she *sought from that position.  And when asked that question, said, "I don't recall whether I did."  All of those would be extrajudicial information that would result most certainly in an influenced jury verdict.  Because as we know, Mr. Basham, more so in a death penalty than any other case, but in all cases, is entitled to 12 jurors, not 11.

Now, can we accept what she has told us in all of those particulars?  In each of those instances that I just outlined for the court, can we accept anything that she has said in those regards, whether or not she was influenced?

We think clearly the record reflects that this woman was not candid or --

THE COURT:  What would have influenced her?  What communication to her from news media representatives would have influenced her?  What information did she gain that would bear

on the verdict?

MR. HARRIS:  Well, you know, first of all, I think that she has to be influenced, but also I want to make sure that our position is clear, the Cheek case.  Cheek focused not on the substance of the conversation, but the conversation itself, and found there to be influence.

So, we were talking about what could have been said. I think it's clear that the Fourth Circuit has held it's not only what is said, but what is not said by implication.

And what was said, however, was that this is a never ending trial.  Clearly she could have thought from that that there were matters that maybe she hadn't heard about.  Maybe there are other murders, maybe there are other crimes, maybe this is the reporter's opinion that it's going to get overturned because of something that you haven't heard. There's any number of things that could have influenced her by that statement.

There was another statement that was made about --

THE COURT:  Well, the Cheek case was a little bit more exaggerated than here, because some unknown third party picked up the juror and took them to bail bondsman's office, and the juror surmised that a bribe was getting ready to be offered, when he got cold feet and left, really.

MR. HARRIS:  And I understand.  There are differences in the case, Your Honor.  The finding, if you look at the

language in the Cheek case, what they did in fact focus on was not -- again, not the substance of the conversation, but the communication, the fact there was a communication.  And that's the only reason I bring it up at this point --

THE COURT:  Well, let's stop before that just a minute.  You know, I think back to the new judges' school I went to a long time ago when we had a breakout section on evidence.

And I remember -- I don't know why it sticks in my mind -- the speaker who was some professor talked about the sanctity of verdicts and how Rule 606 does not permit you to go behind a verdict and question the jurors about whether they understood the jury charge or whether they were -- somebody was drunk at the time of deliberations, it's just a no man's land.

And the professor said, "The only real exception to that is when some outside influence has been brought to bear on the jury, someone outside of the jury has communicated information to the jury in some way."

And the prototypical example used is, in that training session, at least, the janitor is cleaning up after court one day and finds a newspaper on the table in the jury room.  And in that newspaper front and center is a huge news story about the suppression of the confession made by the defendant.

And so there you have an outside source, that is the

newspaper, getting into the jury room and tainting the whole trial.  All right, and that's the prototypical case.

But, but, what if you change the facts just a little bit so that the janitor found a newspaper about the beginning of the case, the United States versus Branden Basham, and the article basically said, "Jury selection began today in the trial of Branden Basham who was accused of murdering Alice Donovan of Gallivant's Ferry last year.  Jury selection is expected to take two weeks, and the trial is expected to take six weeks.

"Representing the government are Scott Schools and Johnny Gasser and Strom Thurmond, Jr., and Mr. Duane.  And representing the defendant are Jack Swerling and Greg Harris."  End of story, that's it.

And so the jury was exposed to something outside of the trial, but it did no more than give them information that was clearly known to the jury.

And I'm just wondering if what we have here is not something similar to that.  An improper contact, certainly, and a disobeying of the court's repeated instructions, certainly, but no information imparted to the juror.  What about that?

MR. HARRIS:  One of the problems we have -- one of the problems -- and I agree with a lot of what the court just said -- but one of the problems we have is that unlike the

GARY N. SMITH, CM
COLUMBIA, SC

hypothetical you pose, we don't have the credibility problems of the one person that was influenced in this case.  We have got a witness here that repeatedly came in and was less than candid with the court.

So, when this court is judging -- you don't have the newspaper on the desk, what you have is a lot of smoke, and you are looking through the smoke to try to get to the fire.  And you can't get to it because the one person who knows what the truth is, has thrown up stumbling blocks every opportunity she has to throw up a stumbling block, and has evaded questions by the court.  And at the last hearing evaded questions by defense counsel regarding extrajudicial contacts outside of the courtroom, outside of the jury room.

Whether or not she called other mediums, "I don't recall," I believe was her answer to many of those questions. So, you don't have a problem -- or you don't have the hypothetical of the newspaper, the smoking gun so to speak, sitting in the jury room.

But what you do have is her husband admitting that he was following it on the internet.  What you do have is her admitting that -- rather, what you do have is the witness from WSPA, Ms. Shannon Mays, say, and another witness from another medium say, that when this juror called she said, "Why aren't you covering it?"  You do have that.

Which brings to question whether or not she is

watching it.  "Why aren't you covering it?"  There is only one way you are going to know if somebody is not covering it, either you are watching it or you are discussing it with someone who is watching it.

Now, that's what you do have.  So, based on her credibility, and applying what you can believe about what she says and what she doesn't say to those facts that you have, just as you asked the jury to apply the facts that they have and come to a reasonable conclusion, there is only the conclusion that she was following it in the media, following it most likely on the internet with her husband, and discussing it with her husband.

Now, you know, at the last hearing you questioned -- at the last hearing, "Did you discuss it with anybody outside of the jury room?

"I don't recall."

You have that also, Judge.  And those -- the answers to all of those questions are crystal clear.  I mean, there's only one answer if she didn't, and that's no.  She had already given that answer.

And every time she would give the answer no, we doubled back behind her, or the court doubled back behind her on most occasions and found out that the answer was not no, it was, "Oh, yeah, it was no, but there was also newspaper mediums."

"Oh, no, we didn't have those conversations but, yeah, we did discuss the eye Nystagmus test."

"No, we didn't talk about the death penalty but, yeah, I did discuss with her the fact that, you know, she was going to have to answer to her church."

She gave no to all those questions, and that's the reason we had -- kept having to come back with these hearings. So, clearly what we have here is the only person that knows the answer to the questions is evasive, I believe has perjured herself, and at best is less than candid with the court on issues that directly relate to whether or not there is a reasonable possibility -- not probability, but just the possibility -- that this jury's verdict was influenced, and that her verdict was influenced.

THE COURT:  Well, let me say, obviously we have had a lot of time to prepare for this hearing, and my law clerk has scoured the legal landscape.  And we found only one case that even mentions a contact with the news media, and in that case it wasn't much help because it's not clear whether the contact was before or after the verdict, and there was no actual holding.

So, what we have here is a situation that really -- not to unduly emphasize it -- but it is totally unprecedented in the history of legal jurisprudence, where a forelady of the jury contacts the news media repeatedly to try to ginger up

some coverage for the trial.

And I struggled with it, I really have.  It seems to me what you have is a situation that doesn't fit in the traditional extrajudicial contact cases that are all decided.

In other words, you have situations where there was an attempted threat to a juror or an attempted bribe of a juror.  Clearly we don't have that.

And then the other case, as I said, the newspaper hypothetical, where the jury is exposed to something they weren't supposed to hear about: a suppressed confession, a suppressed murder weapon, a prior conviction, something like that.

This case doesn't fall into any of those typical patterns.  What we have here is a case of egregious misbehavior by a member of the jury, certainly.  But no showing that she learned anything or had any pressure brought to bear on her on what verdict to return.  That's what I'm struggling with.

MR. HARRIS:  The one thing that they do have in common, however, Your Honor, is the fact that in all those cases there was influence.  Whether it be communicated to that juror or not communicated to that juror, that juror was influenced.  And that's what all the cases --

THE COURT:  Where is the influence here?

MR. HARRIS:  I think the influence is -- I think this court can presume the influence, as it did the presumption,

that she was influenced because she did in fact talk to her husband about the facts of the case.  And the way we know that is, we know that he came in and he was following it on the internet.

And to believe this woman with the records that you have -- we have put into the record, with all her telephone calls to him, all her telephone calls to other jurors, there is no way in the world that we can just close our eyes to the record to indicate that she is in constant contact with him, that she is in constant contact with everyone, that she's talking to jurors during the trial.

There is no question that this woman was talking about the trial with someone, and I think the court could make a finding, based on the record that it has before it, based on the evidence that it has before it, that she was influenced by her husband.

I think this court can make a finding, based on the record, and based on the record before it, as well as based on the records that we have provided to it, that she was following it in the media.

I think the record exists that you could make that finding based on the answers that she has given, the answers that she has not given, the record that we have given to you, that she was in fact violating not just the court order, but her oath as a juror to not be influenced.

GARY N. SMITH, CM
COLUMBIA, SC

Because as I have discussed at the beginning of this discussion, it only takes one of those instances, whether or not she was influenced by the media, following it in the media. She could have heard anything.  She could have heard that both -- this is the second trial, the first one resulted in the death penalty.

She could have heard that -- she could have heard any number of things, I don't know.  There was a lot of information in the media that she could have picked up on.  It wasn't covered heavily in this area, but it was in fact covered.  And it was covered heavily Sun Times, and obviously her husband has already admitted picking it up on the internet, so she could have followed any of that.

She could have picked up during the guilt phase portion evidence that Mr. Basham was acting out, for instance, evidence that came in in the latter part of the trial.  That could have influenced her verdict.  There are any number of influences that could have been exerted on her if she violated the court order.

I mean, that's why you told them not to watch TV, that's why you told them not to read the newspapers, so that they wouldn't be influenced during either phase of the trial by information that may come in during the guilt phase.  It may come in during the penalty phase, or it may not come in at all.

I think that based on the record, you can make a

GARY N. SMITH, CM
COLUMBIA, SC

finding that she not only violated the court order -- which you have already made, you made that on January the 20th at her hearing.  But I think you can make a further finding that she was influenced, and that it is just absolutely crystal clear to this court that she not only violated your court order, but her violations resulted in her becoming influenced.

Because again, the one thing that this case does have in common with the cases where a fry cook says, "Fry the son-of-a-bitch."  Or a case where a juror is taken out at nighttime and taken to the location.

The one thing that we do have are the influences, the attempted influence.  Even if you attempt to influence yourself and you have the violation of the court order, either from a juror to another third party, or from a third party to the jurors.  All of those things exist in this case that existed in all the cases that the court has already referred to earlier today.

And we believe that you can clearly, easily find that her violations resulted in a scenario so reprehensible to our justice -- our system of justice, that it requires a new trial.

THE COURT:  Well, let me ask you, my law clerk pulled up one case -- actually several -- trying to find something close to what we have here.  And most of what she found were old cases, really.  There's one, a 1984 case, United States versus Diaz, D-i-a-z -- y'all might have cited that to me,

actually.

But anyway, in the Diaz case, it was a drug related case, and during the trial the prosecutor told the juror -- the prosecutor told the judge about some alleged juror misconduct in that over the weekend break he learned that one juror had a conversation with senior investigator Lawrence McDonald, a New York state trooper, who also was assigned to the DEA task force, was not assigned to the case on trial.

In this conversation, which had taken place in a neighborhood bar, the juror told McDonald that he had been assigned to a case in the Eastern District of New York in which Agent Columbo and Detective O'Sullivan were witnesses.

McDonald was asked if he knew these men.  Reportedly replied that they worked in the same office.  And then that was reported to the judge, and the judge didn't even conduct a hearing.  Didn't each bring in the officer, didn't bring in the juror, just said, "No big deal."

So, you had a situation where in a bar a juror struck up a conversation with law enforcement who happened to have some relation to some of the witnesses, and obviously told him about the case the juror was sitting on.  And the judge there didn't -- and the Second Circuit affirmed the judge who didn't even conduct an inquiry.

Now, if that had been me, if that had been reported to me, I would have stopped the trial, brought in Officer

McDonald, put him under oath, found out what all happened in the conversation. I would have probably kicked the juror off the jury without even asking what happened. I might get it on the record what happened for the record, but, I mean, I have done a lot more than what was done in that case. And then --

MR. HARRIS: And that juror would have received the remedy that we were entitled to. That's the remedy --

THE COURT: But that didn't happen here -- that was not required here, though. I'm saying that's what I would have done. But it was held not to be reversible error to not even conduct a hearing.

And then we have the Fourth Circuit case that we talked about in one of the previous hearings, the recent Fourth Circuit case, where it was reported to the judge that there was a possibility of premature deliberations. And all the judge did was call in the jury as a group and say, "Have any of you violated any of my instructions?" And he got silence. And that was his answer, and he went forward.

And, of course, most people know that's not a way calculated to get to the truth, but the Fourth Circuit sanctioned what was done there.

So, I have gone way beyond what some appellate courts have required in terms of the searching factual inquiry necessary when you have allegations of juror misconduct. But I don't know where that leaves us.

There was one other case where -- it's a civil case actually -- O'Neal versus Cowles, C-o-w-l-e-s, Magazine, decided in 1955, where a juror told someone what the verdict was going to be during the trial.

MR. HARRIS:  What circuit was that in?

THE COURT:  It was a District of Columbia Circuit. And just reading from it, "Appellant further complains of the actions of the court in denying a motion for a new trial.  It appears that after the verdict, the plaintiff appellant filed affidavits to the effect that one of the jurors on the evening before the submission of the case to the jury had told a friend that the verdict would be unfavorable to the plaintiff.

"The court conducted a careful inquiry.  The juror in question took the stand and denied having made the statements alleged.

"There is no showing that the juror has been influenced by the defendants, or that the statement in any way prejudiced the plaintiff or prevented the trial from being a fair one."

So, it looks like it may have been up in the air whether the statement was even made, if it was denied.  But in any event, I think they held, even if it had been made, no problem with a fair trial.

It seems to me, Mr. Harris, that your best argument is, that even though you cannot fit this case within any of

these precedents, in a death penalty case if you have a juror who just flagrantly violates the court's instructions in a way that was done here, it just smells so bad that there is a due process violation.

MR. HARRIS:  And, Judge, I think that's -- at the end of the day at the last hearing, after we had talked about Remmer and every case that both sides have argued, and Mr. Swerling stood up and touched on that issue.  At the end of the day at the last hearing, he was arguing due process violation.

Is that this system of justice that has worked in our country for so many years, and it works in DUI cases, all the way through death penalty cases, it just didn't work in this case.

And it failed miserably.  And it failed miserably because one juror took it upon herself to violate the instructions -- the repeated instructions of this court.  I think you said that the jury was instructed over 55 times.

THE COURT:  We actually went back and counted 41 times.

MR. HARRIS:  41 times not to do what she did on numerous occasions.

And compound that -- you are talking about whether or not she was a valid juror, whether she was even -- ever took her oath appropriately.  To compound -- to answer that question -- simply look at the way she answered her questions.

GARY N. SMITH, CM
COLUMBIA, SC

Just simply look at the way, when she sat five feet from you, when she was on the witness stand, look at how she looked into your eyes, put her hand on the Bible, and answered your questions.

This is a juror that -- I can't imagine, I can't imagine compounding what she did any worse than she continued to do repeatedly through the hearings.

She was not truthful from the very onset, even after having been given a lawyer.  We keep overlooking -- and it was somewhat overlooked at the hearing on the 20th.  I wanted to stand up and say something but I really didn't have a dog in that fight.

But we just completely overlooked the discrepancies in her testimony and Shannon Mays' testimony.  We have just completely overlooked the series of questions that go to the heart of whether or not this juror was doing her job appropriately.

"Why aren't you covering this trial?  It would be good TV.  He's acting out in the courtroom.  We are going to have a hard time getting a verdict."

And it's just not Shannon Mays that says that, those are the same questions that this juror put to another TV reporter.  "Why aren't you covering it?  It would be good TV."

So, you know, we have just completely overlooked the fact that she came in that very first day, after having been

given a lawyer, after having been explained to her what the problem was, what your concerns were, and she looked at you when you said, "Did you say that this would be good TV?

"No, sir, I didn't."

How do you forget that?  There has got to be one moment in this woman's -- one fiber in her being that makes her think, "Oh, yeah, I did say that."  You don't remember that? She said that.

How do you forget, "He's acting out in the courtroom. It would be good TV"?  How do you forget having the discussion with her about she used to live in Evansville.  She didn't -- that she lived in Evansville.  She did not forget that.  She chose to lie.

And we've just completely gotten two months away from that lie, and we've just -- it's like it's been buried.  But those lies go to the heart of the due process that my client did not receive.  It goes to the heart of whether or not she was a good juror, a valid juror, whether or not she was influenced at any point, whether or not anything she has said is truthful.

And this -- it smells so bad.  Not because of anything that Branden Basham did, not because of anything the government has done, not because of anything the court has done or hasn't done, it smells bad because of what she did, and because of what she continued to do.

And there is a taint that will follow this case all the way to the court of appeals if this court doesn't give us a new trial.  And it's a taint no worse, however, than the taint that was on the trial beginning in November when she was selected as a juror.

THE COURT:  Let me ask this.  In looking at whether she was influenced, are we looking at an objective test or a subjective test?  I have struggled with that too.  I mean, should we look at --

MR. HARRIS:  I think it should be subjective, Your Honor.  I just don't know how, based on the record that we have, that you -- it is what it is.  She is an untruthful -- she is untruthful about the heart of the questioning put to her by this court.

You could be a juror in her case.  And if you were the juror in her case, the sole juror in her case -- it was a bench trial, and you were deciding whether or not she was truthful.  Let's say she had been indicted for perjury, let's say she had been indicted for obstruction of justice, let's just create a hypothetical, and you were the sole determiner of whether or not she was going to be convicted.

Is there any question in your mind what the verdict would be?  She would have been convicted in five minutes, maybe less, because she's guilty of those offenses.  She absolutely is guilty.

And to accept her rationale that she was doing it totally for altruistic motives, that is insulting.  That is something that she came up with after the fact, and it was the only thing that she could possibly say that would salve the wounds that she had created.  The only thing she could have said.

So, we believe that you can look at this, Your Honor, and you can make a determination, just as if it were a bench trial.

THE COURT:  Let me ask this, I tried to give your side plenty of resources to do research, did y'all find any case where this has ever happened before?

MR. HARRIS:  No, sir.

THE COURT:  Mr. Schools, did your side ever find any case?

MR. SCHOOLS:  No, sir.

THE COURT:  Well, we have got, what, 220 years of common law in this country, and about 600 years under England before that, and I guess there were newspapers back then, 600 years into the past in England, and this is the first time this has ever happened.

MR. HARRIS:  Not just -- the fact of the matter, Judge, I couldn't find anything where a judge brought a juror in and the juror lied to the judge.  We couldn't even find that.  Where there was a discussion about juror misconduct

after the fact and they lied to the judge, and what happened if that were the result, we couldn't even find that.

So, to that extent, this is a huge issue.  And what you do today will impact a lot of -- a lot of cases, but most importantly it will impact Mr. Basham's case.

THE COURT:  All right, thank you, sir.

MR. HARRIS:  Mr. Swerling I believe had --

THE COURT:  All right, Mr. Swerling.

MR. SWERLING:  I just wanted to add one thing.  Mr. Harris argued it fully, but the situation you were talking about where the incident happened during the trial with the detective.

This is a situation that I think you can say is a little bit analogous, and obviously Your Honor would have gone a lot further than that court did.  But had you known, had you become aware, had you become aware of what this juror did during or prior to the actual verdict in this case, there is no question, I believe, that this court would have excused her and held her in contempt, and whatever sanctions the court wanted to impose.

It did not happen that way, it happened subsequent to that.  We found out about it subsequent to that.  But what in actuality happened, is a situation where the court would have excused that juror without even a motion by either side, I'm sure.

We now find out about it, and there is no remedy for us.  And I think -- we ask the court to take a look at it from that perspective, that at that time you would have excused her, we would have had the right to have her excused and taken off that panel.  And we still have that right, to go ahead and have that situation considered by the court, and the only way the court can consider that is to grant a new trial.

And since this is a death penalty case, if there is any question in the court's mind, because of the ultimate penalty that is involved in this case, we ask the court to err, if you are going to err, on the side of Mr. Basham, or any doubt that you may have, err in his favor.

Because since there is no precedent, we think the only way the court can address that issue, that would have happened had that -- we found out about it during the course of the trial, would be to grant a new trial.

THE COURT:  Thank you, Mr. Swerling.

Mr. Schools.

MR. SCHOOLS:  May it please the court.  I would like to, Your Honor, start with sort of the big picture question that you raised first, and I think that Mr. Harris and Mr. Swerling addressed sort of toward the end of their argument. And that is, essentially if this error on its face, does it just smell so bad that we really don't conduct a prejudice analysis.  We are just going to assume that it happened.

There is a case in the Fourth Circuit called Sherman versus Smith that deals with a juror who conducted a crime scene investigation on his own.  He went out to a crime scene during the course of the trial, and it was discovered later that the juror had done that.

And the Fourth Circuit conducted an analysis to determine whether that type of error or that type of juror conduct is structural in nature, such that it has the impact that Your Honor suggested that this might.  And that it smelled so bad that we are not going to look at it to determine whether there's really any need to assess whether there was harm that actually flowed from that contact or not.

And the Fourth Circuit rejects the analysis that even that type of misconduct, where clearly a juror had not only violated the court's instruction, had gone and obtained information about the case that was not presented at trial, he conducted investigation on his own, clearly something that violated the court's instructions, whether that is the kind of misconduct that automatically in essence warrants a new trial, because it's structural in nature and we don't conduct harmless error analysis.

In deciding that that's not the type of case, the Fourth Circuit set forth a number of cases in which they talked about juror misconduct and whether or not it was structural or whether it was subject to harmless error analysis.

Those cases included a case where the juror -- a juror had previously served in the trial of a co-defendant.  A case where a juror had experimented in which one juror bit another to observe the resulting bruises.

A case where a juror commented about a defendant's reputation for violence was subject to harmless error analysis. The jury foreman's actions of reading a book, showing the book to other jurors, and organizing deliberations based on the book was subject to harmless error analysis.

A juror's out of court experiment in which she attempted to fire a weapon while holding it in a position consistent with the defendant's version of the shooting was subject to harmless error analysis.

So, while we can't necessarily find a case where this occurred, I think what the cases demonstrate is that there may be all kinds of instances in which jurors do things that they are not supposed to do.

And in all of those cases, the argument that Mr. Swerling just made would apply.  If the judge found out about the error during the course of the trial, the judge would have excused the juror, and that juror would not have sat on the case.

But when we look back at it, the Fourth Circuit says, all of those types of contacts, even those types of improper juror conduct, are subject to harmless error analysis.

So, in the beginning when Your Honor was talking about Remmer and you suggested that -- and it's not the government's argument that Remmer doesn't -- that it's not good law any more, it's our argument that it doesn't apply in this case because it clearly applies to efforts of third parties reaching out to influence jurors, and this isn't what we have here.

Now, Mr. Harris has kind of morphed this argument into one where it's sort of the contact with the media has become 404 (b) type evidence for a lot of other things that he is alleging may have happened for which there is no support in the record.

But on the structural -- do we look at whether there was harm that flows from this particular contact, I think Sherman versus Smith says that we do have to.  And I think Remmer says the same thing.  Even applying the Remmer presumption, Remmer itself says that it becomes the government's burden to establish that the conduct was harmless.

While we don't concede that the Remmer presumption applies, we do think that the inquiry that the court has conducted with respect to all of these jurors does establish that her reaching out to the media was in fact harmless.

Mr. Harris argues this entire case almost as if Ms. Wilson was the only witness except for Ms. Mays.  The fact is that Your Honor spoke to her husband.  When he first came in

here, he was instructed -- you instructed Ms. Wilson, you instructed Mr. Strom not to let Mr. Wilson know what was the subject matter of this hearing.

And he was asked whether his wife discussed the case with him.  And he said that not only had she bearly discussed it after it was over, but that what she had done was to tell him precisely what you told the juror to tell their spouses at the beginning of the trial.  And that was, "You have to be my filter.  You have to make sure that I don't see any news coverage of this thing.  If you get a newspaper and there's an article in there, you have to take it out."  So, that's the testimony from her husband.

And somehow Mr. Harris wants to make a leap about the fact that not only did -- the fact that she complied with that instruction and tell him, "I don't want to see any news coverage," that somehow we are going to make this huge inferential leap that she did in fact consult with him about the case, about the internet information he was receiving.

So, it's almost as if we went to trial on a drug case, we presented in evidence in a 404 (b) fashion that the defendant dealt drugs on January 3rd of 1999, and we are trying to prove that he dealt them on January 20th of 1999, and that's the only evidence we have of the January 3rd transaction.

Because everything else in that is just a huge leap in logic, not supported by any of the other evidence in this

case.  It's not supported by the other testimony of the other jurors, it's not supported by the testimony of Ms. Wilson's husband.

You would think that if all of the horrible things that Mr. Harris was suggesting may have happened had happened, that somebody would have told us about it.  And it just didn't happen.

And I think there were jurors who testified on the stand -- there was even one juror who came back after leaving because she was concerned about something she had left out.  I think each one of those jurors, there is nothing to suggest that any of their credibility is suspect.  And all of them testified that the process was not corrupted.

So, I think where we are is, we are in a position where we have done exactly what we are supposed to do.  We find out information about an extrajudicial contact, we conduct the inquiry that the Fourth Circuit requires and Remmer requires, to say was it harmless or not.

And what we have determined is that this impact, this contact, this 21 minutes in time when Cynthia Wilson reached out to news media just prior to the last witness testifying in that case, was in fact harmless.

And here is where the other -- I think the other real breakdown in the defendant's arguments come, and that is, not only -- his inferential leap that Ms. Wilson in fact talked

GARY N. SMITH, CM
COLUMBIA, SC

with her husband about the facts of the case or saw news media coverage or whatever, there is a part missing.

Even if you were to believe that, the next -- the point that Your Honor raised with the example of the newspaper in the jury room, we don't have that answer to that question either.  There is no indication that anything that she may have learned was not information that she already knew.

THE COURT:  Well, along that line, the two news representatives who recalled the conversation admitted to a brief discussion of the case.  But they did not -- well, first of all, the WSPA representative had worked in Indiana, and the WYFF representative had worked in Conway.  Now, what are the odds of that happening?

But for that reason, it kind of jarred their memory, and they both allowed that there may have been a discussion of the fact that the news representative was familiar with the case.  But neither one testified that they imparted any information back to the juror, did they?

MR. SCHOOLS:  They did not.  I think Ms. Mays may have made some comment about it being the never ending case, because she was familiar with it when she was in Indiana.

THE COURT:  And there was certainly no expression of an opinion about -- along the lines of, "Well, anybody who rapes and kills two women deserves the death penalty if anybody does."

MR. SCHOOLS:  There was no --

THE COURT:  I mean, no suggestion as to what the verdict should be.

MR. SCHOOLS:  That's exactly right.  And all of the cases on which the defendant relies have that type of suggestion in it.  Even in Stockton, which is where the restaurant owner tells the entire jury sitting at the restaurant that they should "fry the son-of-a-bitch."  In that case the Remmer presumption applied.

There is a case out of the D.C. Circuit in which the juror's husband told her that she should nail the defendant.  And the D.C. Circuit did not apply the presumption in that case.

In Cheek, the facts of Cheek are radically different than this case.  I mean, there's really virtually nothing about Cheek which informs the decision in this case.

Because obviously a juror who is picked up by a third party after being told by the third party, "You are needed at the courthouse," taken to various different locations, one of which is a bail bondsman's office where the juror then sees the co-defendant, that's an entirely different set of facts than we have here.  And one on which the juror's feeling that he was -- there was an attempt being made to pressure his verdict is patent.

In this case, that just isn't there.  There is none

of that "attempt to influence the juror" evidence.  There is none.  So, in order to get to that point where the defendant needs, you have to take what he claims is an open and shut case of perjury on the part of Ms. Wilson, and then extrapolate it to assume she did all these other terrible things.

Your Honor had a hearing during which Ms. Wilson responded to the notion that she had intentionally -- or had not been forthcoming with the court.  And I believe your conclusion was that you gave her the benefit of the doubt.

And I think what we keep forgetting about all of this is, that there had been the passage of time since Ms. Wilson testified, that she disclosed more phone calls to news media outlets than we knew about when she testified, that the testimony of Shannon Mays, who has obviously no motive to dissemble, but was inaccurate, at least with respect to when the phone call occurred.

Ms. Wilson's testimony about how that media contact and why it was made -- I noticed in the defendant's pleading, they made the point that when we argued the fact that she didn't call the media afterwards, it refutes the notion that she was seeking 15 minutes of fame.  They say, "Well, that same thing refutes the notion that she thought that the public should be aware of the case."

Well, the reality is, that the verdict was covered.  So, the news media did cover the fact that the verdict was

returned, and then there were articles all throughout the state with respect to the verdict in this case.  So, if --

THE COURT:  So you argue that quenched her desire to see it covered after the verdict?

MR. SCHOOLS:  It accomplished her objective.  And there were jurors who were quoted in the newspaper, who spoke to the news media about this case, and she wasn't one of them.

So, you know, I certainly -- when we first received the phone call regarding this contact, I think we all imagined that it might lead to bad places.  But I think based on the record now at this point, it's clear that it really was just an isolated moment in time during which this juror did something she wasn't supposed to do.

But there is nothing on which the court could hang a ruling that this juror was influenced by outside information or there was an attempt to influence this juror.  In fact, it would be the government's position that because of the complete lack of evidence on that point, if the court were to reach that factual conclusion, that it would be clearly erroneous, because it's essentially fashioned out of thin air.

The argument essentially is one that Your Honor talked about, which is, is this so bad that it's structural? And I think if you look at Sherman versus Smith and the type of contact in there, the types of juror misconduct that occurred in there, that the Fourth Circuit held was not structural, this

is clearly less egregious than a lot of those types of misconduct.

And I think therefore it is incumbent upon the court to find some harm somewhere, and I think there is just nowhere to find it.  And that's why we think the motion is without merit and the verdict is solid.

THE COURT:  Thank you, sir.  Anything in reply?

MR. GASSER:  Your Honor, please?

THE COURT:  All right, I'm sorry.  Mr. Gasser.

MR. GASSER:  Very, very briefly.  I also would note that just so the record is complete, that in support of Mr. School's argument that he just made, I think the court can also look to the verdict itself to show as to whether or not this juror was capable of performing her duties as a juror and listening to the -- applying the law and the facts and deliberating in an open-minded fashion with her fellow jurors.

What I mean by that is, if you recall, Your Honor, in the verdict -- you know, I argued for the government in closing argument.  And particularly with this case, because of the direct evidence, the statements Mr. Basham made to his former school counselor and to Sheriff Hewett, I specifically argued and stressed to that jury to come back that Branden Basham intentionally killed Alice Donovan.

All 12 of those jurors, including Ms. Wilson, rejected that.  She rejected that, as well as all 11 of them

rejected that.  They came back with the fourth intent factor of -- what we refer to as the reckless disregard intent factor.

We put up -- how many witnesses did the government put up indicating that Mr. Basham would represent future dangerousness to all of the men and women he would come into contact with?

And if you -- under the law that you charged them and under the law as it exists in the Fourth Circuit, when it comes to the aggravating and mitigating factors -- when it comes to mitigating factors it could be eight-four, it could be seven-five, it could be two-10.

When it comes to aggravating factors, it needed to be unanimous.  And Ms. Wilson, along with 11 other jurors, rejected that future dangerousness.  They did not find that he would be a future danger.

When it comes to the mitigating factors, on many of the mitigating evidence and testimony that the defense has presented, on many of those factors the jury came back 12-zero, finding those mitigating factors.  So, Ms. Wilson, along with 11 other jurors, found the presence and the existence of mitigating factors.

So, I just wanted to put that in the record to make -- because one of the things I think you should look at, and someone -- later on, the people in Richmond will be looking at, is whether or not is there any evidence in the record that

she was incapable of performing her duties as a juror.

And I would submit, based on the verdict itself and the verdict form process and what went on back in the jury room, that she was fully capable of giving the benefit of the doubt on many occasions, as I just cited, to Mr. Basham.

And again, I would stress the fact that -- you know, we are looking at this after the fact.  11 other jurors sentenced Mr. Basham to death.  So, the fact that she was one of those 12 jurors that signed her name that she could give the death sentence should in no way be any type of inference that she was somehow incapable of being a fair juror, because 11 other jurors also sentenced him to death.

THE COURT:  All right, thank you, sir.

Anything further, Mr. Harris?

MR. HARRIS:  The only thing I would respond to is, Mr. Gasser, discussing some of the factors -- some of the discussions that they were -- the votes they may have taken, I think we all know, there is no way to look at eight-four, nine-three, and to try to figure out how they got there.  I think 606 does not allow that.  So, I don't think this court should be making that consideration.

I think I kind of know how they got to some of these places, they got on these votes, and I don't think it's appropriate for the record.  And I don't know that it's consistent with, you know, just coming in and saying it was a

12-0 vote, therefore they considered the defense's case.

I would just suggest that that is not a consideration that you should make in determining whether or not she was a thoughtful -- a thoughtful juror on this case.

THE COURT:  All right.  I think we have heard enough debate and I'm prepared to rule.  It's been obviously an issue that has weighed on my mind and weighed on my conscience for quite a while.  And obviously whatever I do is going to be taken up on appeal, so I'm going to do a written order.

But suffice it to say for this morning, I'm going to deny the motion for a new trial based on juror misconduct and proceed with sentencing.  And I will set forth my reasons in a written order that I hope to get out fairly soon.

So, pursuant to the notice that was sent, I think we can proceed to the sentencing hearing this morning, if both sides are prepared.  Mr. Schools?

MR. SCHOOLS:  We are prepared, Your Honor.

THE COURT:  All right.  And you have seen the presentence report on counts 3 through 8?

MR. SCHOOLS:  Yes, sir.

THE COURT:  And there are no objections by the government?

MR. SCHOOLS:  No, sir.

THE COURT:  All right.  Mr. Harris, have you had enough time to read over the presentence report on counts 3

through 8, and discuss it carefully with your client?

MR. HARRIS:  We have.

THE COURT:  And there are a number of fact-based objections in which your client -- the probation officer said your client denies certain factual events.  And I think in all cases, the presentence report was amended to reflect that denial.

And so is that sufficient for the record, or do you suggest that I need to make a fact finding on each of those issues?

MR. HARRIS:  Well, initially, Your Honor, to make the record clear, that we have resolved some of these with probation and with the government, and I think need to put that on the record.

THE COURT:  All right.

MR. HARRIS:  We have resolved and withdraw paragraph 19, paragraph 25, a portion of paragraph 37 having to do with the firearm not cocked and ready to fire.  We have resolved paragraph 56.  Again, that's the paragraph dealing with the firearm recovered from the train.

We have resolved paragraph 57 -- part of 57 rather.  And we have resolved paragraph 112, which has to do with his criminal history.

THE COURT:  All right.  And so the report as presently drafted meets your satisfaction on those

paragraphs --

MR. HARRIS:  Yes, sir.

THE COURT:  -- or is there further amendment that needs to be made?

MR. HARRIS:  Well, we would like to be amended in -- specifically -- exactly as how we have objected.  So, we do have --

THE COURT:  I'm just trying to find out if the probation officer has to rewrite these paragraphs y'all have agreed to?

MR. HARRIS:  No, sir.  She has rewritten the paragraphs -- that they suit us --

THE COURT:  All right.  So then, by agreement of the parties, the objections to the following paragraphs have been resolved: paragraphs 19, 25, part of 37 related to weapon not being cocked, 56, 57, and 112.

All right.  Now, what about the remaining objections to the other paragraphs?

MR. HARRIS:  Judge, we are not satisfied with the alterations made by probation.

THE COURT:  All right.  But in many respects the paragraphs just recite testimony that was heard.  And, of course, your client didn't testify, but his denial of those facts had been put in the report by the probation officer.  So, I guess the question is, am I required to make a factual

finding or --

Mr. Schools, what is the government's position?

MR. SCHOOLS:  It's our position that you not -- you don't need to make factual findings with respect to any objection that does not impact the guideline calculation.

THE COURT:  Right.  Well, there is -- of course, there is the acceptance of responsibility objection that sort of stands alone.  We will get to that in a minute.  But before that, the fact-based objections?

MR. SCHOOLS:  Well, it doesn't impact the guidelines, but Mr. Gasser and I talked about this and I spoke with Ms. Makhuli about it as well, the extent that the report references Mr. Basham having raped Alice Donovan, we -- while Mr. Fulks has told us that, there is really no other evidence to corroborate that.

THE COURT:  That was my concern, and that appears in many of these paragraphs.

MR. SCHOOLS:  And we don't have any objection to that reference being removed.

THE COURT:  All right.  Well, then, without objection, I will ask the probation officer to remove all references to the fact that Ms. Donovan was raped at all by either of the two defendants?

MR. SCHOOLS:  Oh, she was raped by Mr. Fulks, and he admitted that, and there is physical evidence of that.  I don't

know --

THE COURT:  All right.  Remove all reference to the fact -- or any allegation of the fact that Mr. Basham raped Ms. Donovan.

MR. SCHOOLS:  Right.

THE COURT:  All right.

MR. SCHOOLS:  And the only other objection that it appears to us really arguably impacts the guideline calculation is Mr. Basham's objection to an obstruction of justice enhancement for his having shot at Officer Matt Davis.  Those enhancements in fact take the guideline calculation above the top 43.  And so the enhancement is in fact irrelevant, but it is in the report to calculate a guideline enhancement.

THE COURT:  So, the enhancement takes him off the top of the chart on the sentencing table?

MR. SCHOOLS:  It applies to counts that otherwise would have a base offense level of 43, which is the top end, and so he goes above 43.  Now, if you were giving --

THE COURT:  It's sort of academic anyway?

MR. SCHOOLS:  Unless you were to give him acceptance. But yes, sir, it's just really academic.

Well, I also think the evidence is clear, Officer Davis testified, and so we are confident the record fully supports the fact that Mr. Basham shot at Officer Davis.

Not only did he testify -- Officer Davis testify

that's what he observed, but also there was physical evidence that would corroborate a shot from the gun that Mr. Basham was holding in the direction of Matt Davis, and it missed him and hit a truck in the parking lot that was directly behind Officer Davis.

So, we think there is physical and testimonial evidence that supports that finding, and we would ask the court to so find. But that's the only objection that we can find that actually --

THE COURT: Let me speak to the defendant and be sure he -- Mr. Basham, let me speak to you. Have you read over the presentence report that has been prepared in your case?

THE DEFENDANT: Yes, sir.

THE COURT: Have you discussed it with your attorneys?

THE DEFENDANT: Yes, sir.

THE COURT: Now, they have made a number of objections to certain factual statements in this report. In some respects the government has agreed to make the changes your lawyers have requested.

THE DEFENDANT: Uh-huh.

THE COURT: And you heard us say paragraphs 19, 25, 37, 56, 57, and 112 have been modified satisfactorily to your attorneys. And then the government has agreed to delete all references to any suggestion that you might have raped Ms. Donovan.

THE DEFENDANT:  Right.

THE COURT:  So, the presentence report has been edited and cleaned up in your favor in those respects.  We still have to take up the question of whether you should be given credit for acceptance of responsibility, that is one objection still open.

And then we have an objection still open about whether you obstructed justice when you allegedly fired at the police officer during the chase, right before you were captured.  We have got to take up those two objections.

Mr. Schools tells me that those are the only two objections that remain alive that bear on the guidelines in any way.

Mr. Harris, do you agree with that?

MR. HARRIS:  Yes, sir.

THE COURT:  All right.  Mr. Basham, I'm going to take up these two objections about whether you obstructed justice by firing at an officer, and whether you should be given credit for acceptance of responsibility, which would lower your offense score for the counts 3 through 8.  I'm going to take those two things up in just a minute.

THE DEFENDANT:  Yes, sir.

THE COURT:  We have resolved those paragraphs in your favor that I described earlier.  Are you aware of anything else in this presentence report that is wrong that needs to be

corrected?

THE DEFENDANT:  No, sir.  Other than what they --

THE COURT:  Other than what your attorneys have raised?

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.  Well, then the corrections stated on the record have been made or will be made by the probation officer.  As to the other fact-based objections that simply recite what testimony was produced at trial and include a reference to the fact that Mr. Basham denies those facts, the report can stand as written.

And then we will proceed then to the two remaining objections that do have some impact on the guidelines, which is obstruction and acceptance.  All right.

Mr. Schools, the obstruction is an enhancement that you bear the burden of proof on.

MR. SCHOOLS:  Yes, sir.

THE COURT:  And you say you rely on the sworn testimony at trial about the shots being fired and the physical evidence?

MR. SCHOOLS:  Yes, sir.  Yes, sir, that -- Officer Matt Davis testified that on November 17th of 2002, he was at the intersection -- or he was very near the WalMart in Ashland, Kentucky.  He got a call regarding the defendant's alleged attempt to carjack or kidnap Andrea and Deanna Francis.  That

he responded to that call and saw Mr. Basham walking across the street away from the mall at that time.

He pursued him on foot.  His testimony was that Mr. Basham fired one shot in the air, and then he turned around and fired a shot in his direction.  It was clearly -- that was clearly Officer Davis' impression at the time, because Officer Davis returned fire, not hitting Mr. Basham.

After that incident occurred, the Ashland police department conducted an investigation of the vicinity of the area, or the area where Mr. -- Officer Davis had been in foot pursuit with Mr. Basham.

They located a pickup truck which had what appeared to be fresh damage from -- that was consistent with a bullet from a small caliber handgun having been fired at it.  The evidence included a dent in the truck itself, and also paint chips that were recovered from the area below where the dent had occurred.

Subsequent to that, four days after that shooting incident, the gun was recovered, and the bullets were located in the chamber consistent with having two of the bullets having been fired.  Actually the shell casings were still there, the bullets had been fired from two of the shell casings from the revolver.  So, it was clear that the weapon -- or it appeared that the weapon had been fired.

And we think all of that evidence really conclusively

establishes that Mr. Basham fired a shot at Officer Davis. It's also worth noting that in Mr. Basham's -- one of Mr. Basham's interviews with the FBI, he initially said that he fired the shots in the air to try to scare the officer, that was in one 302.  And in a subsequent 302, he actually acknowledged that he had fired one shot at Officer Davis.

So, we think the evidence clearly supports that finding.  There is nothing to suggest that Officer Davis was incapable of observing what was appearing in front of him.  He specifically remembered the discharge, the flame of the discharge when the gun was pointed in the air, and then specifically saw a different type of discharge in his direction when the gun was turned and pointed at him.  It would have been dark, but the flash of those guns -- of that gun would have been visible to Officer Davis, and he saw it.

So, we think the testimony is overwhelming that much -- I think our burden at this stage is by a preponderance, but we think the evidence is overwhelming, really beyond a reasonable doubt, that Mr. Basham indeed fired a shot at Officer Davis, and that the obstruction enhancement is appropriate.

THE COURT:  All right, Mr. Harris.

MR. HARRIS:  The way we recall that evidence is that, first of all it was night, and I think what Officer Davis testified was that the first shot Mr. Basham fired was a

GARY N. SMITH, CM
COLUMBIA, SC

warning shot.

THE COURT:  Right.

MR. HARRIS:  Both of them were running, I think the distance was over 50 feet between the two.  And the second shot he said he turned around and Mr. Basham pointed in his direction.  And I think Mr. Basham's statement said that he did not shoot at Officer Davis, he shot somewhere in his direction in a effort to scare him, and then he left.

I think the most compelling argument, however, the clearest evidence that Mr. Basham was not shooting at Officer Davis is in the weapon itself.  Mr. Swerling argued to the jury that -- and I think it is a good argument -- that because the bullet having been chambered, there is an equally sound inference that Mr. Basham could have pointed the gun at Officer Davis and had chosen not to fire at him.

We ask and we submit that based on our recollection of the record, and if you accept those are the facts, I think an equally compelling argument could be made that he didn't shoot at Officer Davis, and that he should not be given two points for obstruction of justice.

THE COURT:  All right.  Do you want to offer any testimony from your client or anyone else?

MR. HARRIS:  No.  We would rely on the statement he gave to law enforcement, which is that he did not intend to shoot at Officer Davis, he was just merely attempting to scare

him.

THE COURT:  All right.  Well, having heard the testimony of Officer Davis about the chase and so forth, it's my determination that the first shot was fired in the air, the second shot was fired at Officer Davis.

I base that finding on the testimony and the physical evidence at the scene.  I reject the defendant's denial of that event.  So, the objections to paragraphs 67, 75, 81, and 87, all of which relate to that issue, those objections are overruled.

Now, we come to acceptance of responsibility.  This is a mitigating factor for which the defendant bears the burden of proof.  So, Mr. Harris, I will be glad to hear from you.

MR. HARRIS:  We have conceded from -- actually from jury selection, all the way through today, most of the counts in this indictment.  Most of the facts in this indictment.

I believe the court will remember that during voir dire, defense made concessions regarding our ability, as to some of the jurors -- that we thought we would be in a second phase.  The only way to get there is to concede on counts 3, 4, 5, 7, and 8.

We have never contested stolen weapons, we have never contested the stolen gun, the stolen vehicles, the interstate commerce, many of the facts in this case we have never contested.  We have absolutely admitted through their

witnesses.

The only thing that we ever contested in this trial, and I think it's clear all the way through the trial, was Mr. Basham's intent to kill Alice Donovan or harm Alice Donovan. That is the only -- really, that's the only thing we ever fought, that, as it relates to the carjacking and kidnapping. Everything else we have admitted.

Also Mr. Basham has reminded us that he assisted the government in the location and apprehension of Chad Fulks. That he gave a statement to them immediately upon his arrest that assisted them in the apprehension of Mr. Fulks in Indiana. And we believe that it would be appropriate to allow him acceptance of responsibility for that assistance also.

THE COURT:  Mr. Schools?

MR. SCHOOLS:  Your Honor, with respect to that last assertion, Mr. Basham's first statement to law enforcement was that Mr. Fulks had Alice Donovan with him alive, and was going to Arizona to a motorcycle rally.  So, I don't know exactly what Mr. Harris is referring to with respect to alleged assistance in locating Chad Fulks.  I haven't seen that myself.

In addition, there are other factors besides what the defendant admits that the court should look to to determine whether he has, as the rule says, clearly demonstrated acceptance of responsibility for his offense.  And I think all of those factors indicate that he has not.

GARY N. SMITH, CM
COLUMBIA, SC

Among them are voluntary termination or withdrawal from criminal conduct or association.  Your Honor will recall that Mr. Basham did not -- not only did he not voluntarily withdraw, he shot at a pursuing officer in an attempt not to withdraw from his criminal conduct and associations.

As we said in our opening statement, and Mr. Gasser reiterated in close, Mr. Basham didn't stop committing crimes, he was stopped.

Voluntary surrender to authorities promptly after commission of the offense:  He did not do that.  Voluntary assistance to authorities and the recovery of the fruits and instrumentality of the offense:  He did not do that.

He lied to the officers in Ashland about where his firearm was.  Only a diligent search by the -- of the railroad cars located in the vicinity where Mr. Basham was arrested proved that his version of the facts, which was that the firearm had been dumped in the river, was false.

He obviously then led law enforcement on a wild goose chase in the Savannah Bluff area claiming that Alice Donovan's remains would be located in that area.

And Your Honor heard testimony about the extent of the law enforcement effort that was generated as a result of that lie.  The 75 to 100 law enforcement officers that searched the Savannah Bluff area resulted in Mr. Basham's dissembling after he was arrested.

Post offense rehabilitative efforts:  To the contrary, I would say if there is any evidence of what has happened to Mr. Basham post defense is that he has become perhaps even a more hardened criminal than he was when he was arrested.

The testimony is clear that he takes advantage of the jail personnel who are there to make sure he is secure.  He masturbated in front of female nurses, he assaults guards, and that conduct continues, has continued since his conviction in this case.

In fact, on the day of his conviction, he attempted to get out of his handcuffs.  So, there is just no evidence that Mr. Basham has made any effort toward any sort of rehabilitation.

And then the final factor, the timeliness of the defendant's conduct manifesting acceptance.  And really this defendant, in front of this court, Your Honor, has never manifested acceptance of responsibility.

In fact, you have had a chance to observe him throughout these entire proceedings.  And I think if there is anything that you can glean from his conduct in the courtroom is that he is entirely indifferent to the damage that he caused to these families.

So, I think to award him acceptance of responsibility would be entirely contrary to what that enhancement, that

reward is intended to accomplish.  And that is to give the benefit to someone who clearly, having committed an offense, comes forward and says, "I did the wrong thing and I'm remorseful, and I need to do better in the future."  But Mr. Basham has done none of that, and we think the enhancement is not appropriate.

THE COURT:  All right.  I'm going to overrule the objection and determine that Mr. Basham is not entitled to a reduction for acceptance of responsibility for the reasons that Mr. Schools just noted on the record.

He did acknowledge his guilt in many respects to many of the charges, but he has failed to completely acknowledge all the relevant conduct and all the other matters that Mr. Schools just discussed, in terms of not ceasing his conduct, not turning himself in.  All those go to acceptance, and the objection is respectfully overruled.

So, with that then, the presentence report may be adopted by the court with the modifications either agreed to or ordered here this morning.  I will instruct the probation officer to make the necessary edits and changes to clean up the report to get it in final form.

As modified here this morning, I adopt the presentence report as the court's findings for purposes of calculating the guideline sentencing range for counts 3 through 8, which are the noncapital counts in this case.  I would

GARY N. SMITH, CM
COLUMBIA, SC

request the clerk to file the presentence report under seal.

If there is an appeal, the report may be made available to

counsel for purposes of the appeal only.

Having adopted the report, it is my belief that the following statutory and guideline provisions are applicable to these counts:  First, as to the statutory provisions, the maximum sentence for count 3 is 10 years, count 4 is five years, count 5, 20 years, count 6, a seven year minimum consecutive sentence, count 7 is 10 years, and count 8 is 10 years.

The defendant is not eligible for probation under the statute.  Supervised release under the statute is as follows: Count 3, three years; 4, three years; 5, three years; 6, five years; 7, three years; and 8, three years.

The fine is $1,500,000, or $250,000 maximum on each count.  The special assessment, which is mandatory, is $600. Those are all the statutory provisions.

Then the guideline provisions are as follows:  The total offense level is 43, the criminal history category is 6, the defendant is not eligible for probation, the term of imprisonment is 660 months, plus 84 months, to run consecutive, for count 6, which must run consecutive.  Supervised release is three to five years.  The fine was not calculated because of inability to pay.  And the special assessment is $600.

Now, understanding that the guidelines are now

advisory and not mandatory with regard to counts 3 through 8, have I correctly stated the statutory and guideline provisions, Mr. Schools?

MR. SCHOOLS:  Yes, sir.

THE COURT:  Mr. Harris?

MR. HARRIS:  Yes, sir.

THE COURT:  All right.  Now, Mr. Schools, do you have any victim impact testimony to put up?

MR. SCHOOLS:  Yes, Your Honor, Mr. Donovan would like to address the court.

THE COURT:  All right.

MR. DONOVAN:  This is a statement to the defendant, Branden Leon Basham.  This is the second time I have stood to address this court in Alice's case.  The first was in the sentencing of your co-defendant, Chad Fulks.

I feel that the justice system has now brought us full circle.  In the weeks during your trial, we have been subjected to your outbursts, stories of your outbursts, and stories of your aggravation and tormenting of correctional officers, both male and female.  We also heard about the stories of your childhood abuse and history of your institutionalization.

Alice also had an abusive childhood and 16 years of an abusive marriage.  She overcame that, and chose to better herself in spite of it.  And did it with grace and style that

endeared her to all that knew her.

I consider your actions to be those of pure evil.  In my observations, there has been no sign of remorse in any of your actions or statements, and no one I have spoken to has observed any sign of remorse.  In many ways your anger, hatred, and actions are more reprehensible than those of Chad Fulks.

As I said to Chad Fulks, this trial was not about revenge, but accountability.  Now you are being held accountable for your actions.

In life and in death, Alice's goodness, kindness, and courage had a profound effect on the life of everyone she met. And now her death will have a profound affect on your life. Alice and Samantha both had so much to live for, and that was stolen from them.

I don't believe that death by lethal injection is true punishment for you nor true justice for them.  I hope that during this trial you have listened as friends and family described their personalities and lives.  Perhaps you will have an appreciation for how much they are still loved and how much they are missed.

Thank you.

THE COURT:  Thank you, Mr. Donovan.

Anything further from the government?

MR. SCHOOLS:  No, sir.

THE COURT:  All right, Mr. Swerling, Mr. Harris, I

will be glad to hear from you.  If there's anything you would like to say.

MR. SWERLING:  Excuse me a moment.

THE COURT:  All right.

MR. SWERLING:  Judge, of course, we recognize the fact that under Title 18, United States Code 3594, that since the jury recommended death, that Your Honor has no discretion, has to go ahead and sentence Mr. Basham to death.

We don't think that that same thing applies as to the guideline calculations.  We think the court can go below the maximum sentence, and in fact in this case should.

While the jury did not find that the mitigating factors we presented were sufficient to overcome their recommendation of death, we do feel that there are compelling reasons in Mr. Basham's background that would warrant a sentence of less than life in prison.

THE COURT:  Thank you, sir.

Mr. Basham, under our rules of procedure, I'm required to address you personally and advise you that if there is anything you would like to say to me before I decide upon the sentence in your case, I will be glad to review it.  I will be glad to hear anything you want to say or review anything you present for me to look at.  This is your chance to speak, I will be glad to hear from you.

THE DEFENDANT:  I just like -- I would just like the

court to -- to the families and everybody, that this is -- this has been a real bad situation. It's a tragedy that -- I have no words to present of what's gone on and -- and for me to say what's been taken away from the victims. And to the judge, and to the jury, to everybody that has dealt with these things and had to try to understand, I guess, my personality and the way that I am.

And that I just hope and pray that -- that the victims' families can find it in their heart to -- I know they can never forget, I just pray they forgive. And for the judge and for you, that for all your -- all your working with me throughout the trial and trying to help me in getting all the people to help me, I appreciate that. And I just want to thank you for that.

THE COURT: Thank you, sir.

All right, anything further before sentencing?

MR. SWERLING: No, sir.

THE COURT: All right, as to the noncapital counts, that is to say, counts 3 through 8, the sentence of the court is as follows:

Pursuant to the Sentencing Reform Act of 1984, it is the sentence and judgment of the court as to counts 3, 4, 5, 7, and 8, that the defendant, Branden Leon Basham, is hereby committed to the custody of the Bureau of Prisons for a term of 660 months. This term consists of 10 years on count 3, five

years on count 4, 20 years on count 5, 10 years on count 7, and 10 years on count 8, all to run consecutively, pursuant to sentencing guideline 5 G 1.2 D.

As to count 6, which is a statutorily required consecutive sentence, the defendant is sentenced to a term of 84 months consecutive to all the other sentences imposed this morning, and previously imposed by any other court.  Therefore, the total term of imprisonment for counts 3 through 8 is 744 months.  I find the defendant does not have the ability to pay a fine in this case, therefore the fine is waived.

It is further ordered that the defendant shall pay to the United States a special assessment fee of $600, which shall be due immediately.

If the defendant is ever released from prison, then upon release he shall be placed on supervised release for a term of five years.  This term consists of three years on counts 3, 4, 5, 7, and 8, and five years on count 6, to be served concurrently.

Within 72 hours of release from custody, the defendant shall report in person to the probation office in the district to which he is released.  While on supervised release, the defendant shall comply with the mandatory and standard conditions of supervision outlined in Title 18 of the United States Code, Section 3503 (d), and also the following special condition:

GARY N. SMITH, CM
COLUMBIA, SC

The defendant shall participate in a mental health treatment program as directed and approved by the U.S. Probation Office.  That is my sentence as to counts 3 through 8.

I am required by statute to state my reasons for imposing this sentence.  I have adopted the presentence report as modified, either by consent or by court ruling on disputed matters this morning.  The sentence that was imposed is a guideline sentence.

I am mindful of the fact that the guidelines are no longer mandatory, they are advisory only.  However, it is my determination after carefully reviewing the facts of this case, that a guideline sentence is a reasonable sentence in this case.

I have certainly considered the statutory factors contained in Title 18 of the United States Code, Section 3553 (a).  I have considered and given careful reflection on all those statutory factors, and have determined that the sentence announced is the reasonable sentence for Mr. Basham on the counts that do not carry a death sentence.

As to counts 1 and 2, for which the jury returned a death verdict, the sentence of the court is as follows:

On September 30th, 2004, the defendant, Branden Leon Basham, was found guilty of, among other things, counts 1 and 2 of the superseding indictment.

GARY N. SMITH, CM
COLUMBIA, SC

Pursuant to the jury's verdict, the defendant is adjudged guilty of carjacking resulting in the death of Alice Donovan on or about November 14th, 2002, a violation of Title 18 of the United States Code, Section 2119.  That's contained in count 1.  And kidnapping resulting in the death of Alice Donovan on or about November 14th, 2002, a violation of Title 18 of the United States Code, Section 1201.  That is the charge of count 2.

Pursuant to the Federal Death Penalty Act of 1994, appearing at Title 18, Section 3591 through 94, and the special findings of the jury returned on November 2nd, 2004, and the jury's unanimous vote recommending that the defendant shall be sentenced to death, it is the judgment of the court that the defendant, Branden Leon Basham, is sentenced to death on counts 1 and 2 of the superseding indictment.

It is ordered that the defendant pay to the United States a special assessment in the amount of $100 on count 1 and $100 on count 2, which shall be paid immediately.  The court declines to impose a fine due to the defendant's inability to pay.

It is further ordered that the defendant's sentence shall be executed by a United States Marshal, designated by the director of the United States Marshal's Service.  The defendant's sentence shall be executed by intravenous injection of a lethal substance or substances in a quantity sufficient to

cause death.

Defendant's sentence shall be executed on a date and at a place designated by the Director of the Federal Bureau of Prisons, which date shall be no sooner than 60 days from the entry of this judgment of death.

The sentence shall be executed at a federal penal or correctional institution designated by the Director of the Federal Bureau of Prisons by a United States Marshal, designated by the director of the United States Marshal's service, assisted by additional personnel selected by the marshal and the warden of the designated institution, and acting at the direction of the marshal, and by intravenous injection of a lethal substance or substances, to be determined by the Director of the Federal Bureau of Prisons, and to be administered by qualified personnel selected by the warden and acting at the direction of the marshal.

If the date for execution passes by reason of a stay of execution, then a new date shall be designated promptly by the Director of the Federal Bureau of Prisons when the stay is lifted.  Unless the President of the United States intervenes, the United States Marshal shall not stay execution of the sentence on the basis that the defendant has filed a petition for executive clemency.

Except to the extent a court orders otherwise, the warden of the designated institution shall notify the defendant

of the date designated for execution at least 20 days in advance, except when the date follows a postponement of fewer than 20 day of a previously scheduled and noticed date of execution, in which case the warden shall notify the defendant as soon as possible.

Beginning seven days before the designated date of execution, the defendant shall have access only to his spiritual advisors, not to exceed two, his defense attorneys, under supervision, members of his family, and the officers and employees of the institution.

Upon approval of the Director of the Federal Bureau of Prisons, the warden may grant access to such other persons as defendant may request.

In addition to the marshal and the warden, the following persons shall be present at the defendant's execution:  One, necessary personnel selected by the marshal and warden; two, those attorneys of the Department of Justice who the deputy attorney general determines are necessary; three, not more than the following number of persons selected by the defendant, one spiritual advisor, two defense attorneys, and three adult friends or relatives; and four, not more than the following number of persons selected by the warden: first, eight citizens; and second, 10 representatives of the news media.

No other persons shall be present at defendant's

execution, unless leave for such person's presence is granted by the Director of the Federal Bureau of Prisons or by this court.  No person younger than 18 years of age shall witness the execution.

The warden should notify those individuals described in paragraph C above of this section as soon as practicable before the designated time of execution.

No photographic or other visual or audio recording of the execution shall be permitted.  After the execution has been carried out, qualified personnel selected by the warden shall conduct an examination of the defendant's body to determine that death has occurred, and shall inform the marshal and warden of his determination.

Upon notification of defendant's death, the marshal shall complete and sign the return attached to the order that I will enter and/or any similar document, and shall file such document with the court.

The defendant's remains shall be disposed of according to procedures established by the Director of the Bureau of Prisons.

No officer or employee of the Department of Justice shall be required to be in attendance or to participate in the execution if such attendance or participation is contrary to moral or religious convictions of the officer or employee, or if the employee is a medical professional who considers such

participation or attendance contrary to medical ethics.

For purposes of this paragraph, the term "participation" means or includes personnel -- personal participation of the condemned individual, and the apparatus used for execution and supervision of the activities of the other personnel in carrying out such activities.

Pursuant to the provisions of Title 18, Section 3596, it is ordered that the defendant is committed to the custody of the Attorney General of the United States, or his authorized representative, for appropriate detention until exhaustion of the procedures for appeal of the judgment of conviction and for a review of the sentence.

When the sentence is to be implemented by the attorney -- excuse me, when the sentence is to be implemented, the attorney general shall release the defendant to the custody of the United States Marshal who shall supervise the implementation of the sentence in the manner prescribed by law.

The defendant is remanded to the custody of the United States Marshal to await placement in or at the appropriate facility.

Does the government have any objection to the technical form of the sentence?  Mr. Schools?

MR. SCHOOLS:  No, Your Honor.

THE COURT:  Any objection by the defendant to the technical form of the sentence?

GARY N. SMITH, CM
COLUMBIA, SC

MR. HARRIS:  The only question I have, Your Honor, is at the beginning it sounds like you said the verdict -- the death verdict was in September, and I believe the death verdict was November the 2nd.  Maybe I'm --

THE COURT:  Well, I said on September the 30th he was found guilty, that was the guilt phase verdict, I think.  And then on November 2nd the vote on the death sentence came in.

MR. HARRIS:  Okay.

THE COURT:  All right.  Mr. Basham, you have 10 days from today to appeal your conviction by the jury.  You also have 10 days from today to appeal the sentence the court has imposed on counts 1 and 2, which are the capital counts, and counts 3 through 8, which are the noncapital counts.

If you wish to appeal and cannot afford an attorney, the court would appoint one for you for purposes of appeal.

THE DEFENDANT:  Yes, sir.

THE COURT:  I think that will do it.  Thank you very much.  We will be in recess.

MR. SCHOOLS:  Thank you, Judge.

MR. HARRIS:  Two matters before we do recess.  I have handed to the court and provided to the government an affidavit from the Spartanburg Herald that we would ask you make part of the record.

THE COURT:  Right.

MR. HARRIS:  The last hearing we referred to it.

GARY N. SMITH, CM
COLUMBIA, SC

THE COURT:  This eliminated the need to have that evidentiary hearing?

MR. HARRIS:  Right.

THE COURT:  Right.  I was wondering if that had been put in the record.  We will put that in the record for completeness.

MR. HARRIS:  Secondly, Your Honor, we would ask that the marshals transport Mr. Basham immediately to Terre Haute, Indiana where he will be housed at that death facility.  And we would also ask that when he is so moved, that all medical records and treatment plans that he is currently under be sent with him forthwith.

THE COURT:  All right.  Well, I don't know if I should order immediately.  I think I should say, "As soon as reasonably possible he should be transferred to Terre Haute." And obviously his medical records need to go along with him so that he can receive proper medications.

Thank you, we will be in recess.

(Thereupon, the proceedings were adjourned.)

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

_____        _____
s/ Gary N. Smith, CM


GARY N. SMITH, CM
COLUMBIA, SC